Volume 9

Pages 1769 – 1983

United States District Court

Northern District Of California

Before The Honorable Charles R. Breyer

United States of America,      )
                               )
          Plaintiff,           )
                               )
   vs.                         )          NO. CR10-642 CRB
                               )
Michael Arnold and             )
Jeffrey Herholz,               )          **Jury Trial**
                               )
          Defendants.          )
_____)

San Francisco, California
Thursday, February 16, 2012

**Reporter's Transcript of Proceedings**

**Appearances:**

For Plaintiff:          Melinda Haag
                        United States Attorney
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California  94102
                   By:  **Kirstin Ault, Esquire**
                        **Thomas Stevens, Esquire**
                        **Assistant United States Attorneys**


For Defendant:
Michael Arnold:         Swanson & McNamara
                        300 Montgomery Street, #1100
                        San Francisco, California  94104
                   By:  **Ed Swanson, Esquire**

(Appearances continued on next page.)

**Reported By:     Sahar Bartlett, RPR, CSR 12963**
                   **Official Reporter, U.S. District Court**
                   **For the Northern District of California**

(Computerized Transcription by Eclipse)

**<u>Appearances, (continued)</u>**

For Defendant
Michael Arnold:          Ellsworth Law Firm, P.A.
                         1501 Collins Avenue, Suite 208
                         Ocean Steps Plaza
                         Miami Beach, Florida  33139
                    **By:  Sean M. Ellsworth, Esquire**


For Defendant
Jeffrey Herholz:         Law Offices of Seth P. Chazin
                         1164 Solano Avenue
                         Albany, California  94706
                    **By:  Seth P. Chazin, Esquire**

                         Law Offices of Sang S. Nguyen
                         742 45th Avenue
                         San Francisco, California  94121
                    **By:  Sang S. Nguyen, Esquire**

Also Present:            Samantha Potts
                         Paralegal Support/
                         Swanson & McNamara

                         Denise Oki
                         Paralegal Support/Government

                         Jason Chin
                         Government's DEA Special Agent



                         ---o0o---

# I  N  D  E  X

                                                         Page

**Plaintiff's Witnesses:**

**Catizone, Carmine**
**(Sworn)**

Direct Examination by Ms. Ault                           1773
Cross-Examination by Mr. Ellsworth                       1817
Cross-Examination by Mr. Chazin                          1823
Redirect Examination by Mr. Stevens                      1833
Recross-Examination by Mr. Ellsworth                     1836
Further Redirect Examination by Mr. Stevens              1839

**Chin, Jason Wayne**
**(Sworn)**

Direct Examination by Mr. Stevens                        1841
Cross-Examination by Mr. Swanson                         1905
Cross-Examination by Mr. Chazin                          1926
Redirect Examination by Mr. Stevens                      1931
Recross-Examination by Mr. Swanson                       1937

**Bridgers, Brandon**
**(Re-sworn)**
(Previously testified as an expert/
now testifying as a fact witness.)

Direct Examination by Ms. Ault                           1939

---o0o---

**E X H I B I T S**

| Plaintiff's Exhibits: | W/Drawn | Iden. | Evid. |
|---|---|---|---|
| 554 and 555 | | | 1796 |
| 42 | | | 1847 |
| 40G | | | 1850 |
| 336 | | | 1853 |
| 355 | | | 1871 |
| 390 | | | 1874 |
| 385A | | | 1877 |
| 379 | | | 1879 |
| 40E.1 | | | 1890 |
| 43 | | | 1896 |
| 40 | | | 1899 |
| 156 | | | 1905 |
| 586 | | | 1936 |
| 25A and 25B | | | 1941 |
| 39 | | | 1947 |
| 124C | | | 1951 |
| 133C | | | 1953 |
| 144 | | | 1956 |
| 569A | | | 1967 |
| 572A | | | 1969 |
| 573A | | | 1983 |

| Defendant's Exhibits: | W/Drawn | Iden. | Evid. |
|---|---|---|---|
| 802 | | | 1911 |
| 801 | | | 1915 |
| 803 | | | 1917 |

---o0o---

Proceedings

```
 1    Thursday, February 16, 2012                    9:30 a.m.

 2                      P R O C E E D I N G S

 3                 (The following proceedings were held

 4                 outside the presence of the jury with

 5                 both defendants present at 9:30 a.m.)

 6         THE COURT:  Good morning, everyone.

 7         MR. SWANSON:  Good morning.

 8         MR. STEVENS:  Good morning, Your Honor.

 9         THE COURT:  So we're waiting for some jurors.

10    Then we'll start.

11                 (Jury in at 9:31 a.m.)

12         THE COURT:  Okay.  Let the record reflect that

13    all jurors are present.

14         Please be seated.

15         Good morning, ladies and gentlemen.

16         The Government may call its next witness.

17         MR. STEVENS:  Thank you, Your Honor.

18         The United States calls Carmine Catizone.

19                      CARMINE CATIZONE,

20    called as a witness for the Government, having been duly

21    sworn, was examined and testified as follows:

22         THE CLERK:  Please state your full name, spell

23    your last name for the record.

24         THE WITNESS:  Carmine Catizone, C-a-t-i-z-o-n-e.

25    ///
```

Proceedings

1                        DIRECT EXAMINATION

2   *BY MR. STEVENS:*

3     *Q.*   Good morning, sir.

4     *A.*   Good morning.

5     *Q.*   What is your profession?

6     *A.*   I am a pharmacist.

7     *Q.*   What is your educational background?

8     *A.*   I have Bachelor of Science in pharmacy, and a Master's

9   of Science in pharmacy administration.

10    *Q.*   From which university did you receive those degrees?

11    *A.*   From the University of Illinois in Chicago.

12    *Q.*   What was your profession after you received your

13  master's degree?

14    *A.*   I practiced as a pharmacist in the state of Illinois,

15  where I was registered and licensed.  Practiced in a

16  community retail setting as well as in a hospital pharmacy

17  setting.

18    *Q.*   For how long did you practice as a pharmacist in those

19  settings?

20    *A.*   For 14 years.

21    *Q.*   And after practicing as a pharmacist, what did you do

22  next in your career?

23    *A.*   I started employment with the National Association of

24  Boards of Pharmacy as the test and measurement director in

25  1985 and became executive director in 1988.

**Proceedings**

1    *Q.*   When was the National Association of Boards of

2    Pharmacy founded?

3    *A.*   1904.

4    *Q.*   And what is the National Association of Boards of

5    Pharmacy?

6    *A.*   We are the association for state jurisdictions that

7    regulate the practice of pharmacy.

8    *Q.*   And does your organization go by an acronym?

9    *A.*   Generally by the acronym NABP.

10   *Q.*   What types of things does the NABP do?

11   *A.*   Our primary mission is to help the states protect the

12   public health, so we prepare and administrate for all the

13   states the pharmacy competence examination, the national

14   license exam that all pharmacists must take in order to be

15   licensed.

16          We also prepare the state law exam for all -- for

17    48 of the 50 states, which tests the pharmacist's

18    knowledge of law, and we also provide an accreditation

19    service for the states where we accredit pharmacies,

20    wholesale distributors and Internet pharmacies.  Last

21    year we accredited over 30,000 pharmacies, 700 wholesale

22    distributors and 30 Internet pharmacies.

23          We also maintain a licensure clearinghouse and

24    disciplinary clearinghouse for the states so that any

25    pharmacist that wants to transfer their license from one

**Proceedings**

1     state to the other applies through NABP, and we conduct

2     all the background checks and disciplinary checks to make

3     sure that pharmacist is qualified to practice in another

4     state.

5     *Q.*  And as executive director, what are your specific

6     duties?

7     *A.*  I'm responsible to implement all the policies that the

8     state boards pass and direct us to implement, I oversee

9     all the day-to-day operations, and I'm responsible for

10    assisting the states with their legislative questions,

11    issues and competence matters.

12    *Q.*  Have you published in the fields of pharmacy practice?

13    *A.*  Yes.

14    *Q.*  And can you give an example of the kinds of things

15    you've published and approximate number of how many

16    publications?

17    *A.*  The approximate number of publications is somewhere in

18    the hundreds.  Those publications have included

19    information about pharmacy practice, about the competence

20    of a pharmacist, and most recently and most specifically,

21    Internet pharmacy practice, what that practice is, what

22    pharmacists need to know about in their practice, and how

23    consumers can utilize Internet pharmacists to their

24    advantage and for the best use of their medications.

25    *Q.*  Have you -- I'm sorry.

**Proceedings**

1    **A.**  Those publications have appeared in professional

2    journals as well as state and national media, the *New York*

3    *Times*, the *Wall Street Journal*, *USA Today*, and a number of

4    local newspapers throughout the country.

5    **Q.**  Have you made appearances in the media discussing the

6    fields of pharmacy practice?

7    **A.**  Yes.

8    **Q.**  And briefly could you describe the nature of those?

9    **A.**  Sure.

10          Very similar to the print, same type of articles

11    and information, we have appeared on CNN, on the "Today

12    Show," and on a number of local news and

13    consumer-oriented shows throughout the country.

14   **Q.**  Have you testified before any legislative bodies in

15    the field of pharmacy practice?

16   **A.**  Yes, I had the opportunity to testify for all state

17    legislatures with the exception of Alaska.

18   **Q.**  And have you testified in court in administrative

19    hearings in that field?

20   **A.**  Yes, testified in federal court, in criminal

21    proceedings, as well as in revocation hearings for boards

22    of pharmacy and the DEA, as well as been asked by the U.S.

23    Senate and Congress to appear before their committees to

24    testify about Internet pharmacies and other pharmacy

25    practice matters.

**Proceedings**

1    *Q.*  You have mentioned Internet pharmacies a couple of

2    times so far.

3           Do you have -- you and your organization have any

4     familiarity with Internet pharmacies that you can

5     describe on a high level basis?

6    *A.*  Sure.  Yes, we do.  We began looking at Internet

7    pharmacies in 1995, when we saw that people were trying to

8    sell prescription drugs via the Internet as if they were

9    CDs or books.  We instituted an accreditation program in

10   1997 for Internet pharmacies, and then we began a consumer

11   empowerment education program in 1999, to educate patients

12   and consumers about Internet pharmacies.

13           To date, we have looked at 8,000 websites on the

14    Internet, and we've visited and surveyed more than 500

15    Internet pharmacy operations.

16           *MR. STEVENS:*  Your Honor, the United States

17   offers Mr. Catizone under Federal Rule of Evidence 702 in

18   the fields of standards of pharmacy practice.

19           *THE COURT:*  You may proceed.

20   *BY MR. STEVENS:*

21   *Q.*  Mr. Catizone, has the Government in this case asked

22   you to offer an opinion?

23   *A.*  Yes.

24   *Q.*  And have you formed an opinion?

25   *A.*  Yes.

**Proceedings**

1    *Q.*  And what materials have you considered in forming an

2    opinion that the Government has requested you to provide?

3    *A.*  I have reviewed the indictment, some investigative

4    reports, and affidavits provided to me by the U.S.

5    Government.

6    *Q.*  And did the materials include an -- what appear to be

7    an online website Internet pharmacy purchase as well?

8    *A.*  Yes.  I also viewed two videos of online purchases.

9    *Q.*  And is the United States -- who's covering your travel

10   expenses to make this appearance?

11   *A.*  The U.S. Attorney's Office.

12   *Q.*  First of all, where is the NABP based?

13   *A.*  We are located in Mount Prospect, Illinois, just

14   outside of Chicago.

15   *Q.*  And outside of your travel expenses, how much are you

16   charging for your testimony and work in this case?

17   *A.*  There is no charge, no professional fees.  I do this

18   as a service to the states that my organization covers and

19   that I do on my own time as well.

20   *Q.*  Are pharmacies regulated?

21   *A.*  Yes, sir.

22   *Q.*  Who regulates pharmacies?

23   *A.*  Specifically, the states license or permit pharmacies,

24   and pharmacies themselves are responsible to follow the

25   laws of the Food and Drug Administration and the Drug

**Proceedings**

1    Enforcement Agency as well.

2    *Q.*   What is a State Board of Pharmacy?

3    *A.*   A State Board of Pharmacy is an agency of the state

4    that is constituted by the legislature that oversees

5    pharmacies and pharmacists.  They are responsible to make

6    sure that that pharmacy operates appropriately and that

7    the pharmacist providing care to patients is competent to

8    do so.

9    *Q.*   Now, are pharmacists themselves regulated in some way?

10   *A.*   Yes, they are.

11   *Q.*   And what are the -- the agency or governmental body

12   that regulates pharmacists?

13   *A.*   Pharmacists are also required to be licensed with the

14   State Board of Pharmacy or similar agency, and they, too,

15   are responsible for any federal laws or state laws as part

16   of their licensure.

17   *Q.*   Are you familiar with the term "controlled substance"?

18   *A.*   Yes, sir.

19   *Q.*   And can you briefly describe what that is.

20   *A.*   Sure.  There are two general classes of drugs,

21   prescription drugs and over-the-counter drugs.  And

22   prescription drugs require a prescription from a doctor, a

23   valid prescription, and that prescription needs to be

24   dispensed by a pharmacist.

25              Over-the-counter drugs can be sold without a

**Proceedings**

1    prescription because they are safe for people to use

2    without the doctor and pharmacist helping with that

3    process.

4         Within prescription drugs there is a class of

5    drugs called "controlled substances," and these are

6    substances that have high abuse and addictive properties,

7    and they have to be closely monitored and closely

8    controlled, even more so than prescription drugs.

9    *Q.*  And without going into too much detail, can you

10   elaborate on the topic of the schedules of controlled

11   substances?

12   *A.*  The controlled substances are divided into five

13   schedules.  The most dangerous of those schedules is

14   Schedule I, and those are controlled substances that have

15   no medical value.  And those include heroin and cocaine.

16        Schedules II to V have lessening potential for

17   abuse, and these include medications for pain or anxiety

18   or medications to help you sleep.  They work on the

19   central nervous system, and if people don't take them

20   appropriately or take them for too long, they could

21   develop physical and psychological addictions to these

22   medications.

23   *Q.*  And Schedules III and IV?

24   *A.*  Schedules III and IV would be, again, controlled

25   substances with the potential for abuse and addiction.

**Proceedings**

 1    *Q.*   Have you heard of a drug called phendimetrazine?

 2    *A.*   Yes, sir.

 3    *Q.*   Also known as Bontril?

 4    *A.*   Yes, sir.

 5    *Q.*   And what type of a drug is that?

 6    *A.*   That's a stimulate.  It's something that stimulates

 7    the brain and nervous system, and is often prescribed for

 8    people that want to lose weight.  It's a Schedule III

 9    prescription, and it's one of the prescriptions that is

10    also closely controlled and monitored.

11    *Q.*   And have you heard of a drug known as phentermine,

12    also known as Apidex?

13    *A.*   Yes.  That is a Schedule IV, so its abuse and

14    addictive potential is less than a Schedule III.  That

15    medication is also used to stimulate the brain and nervous

16    system for people that may be seeking a weight loss

17    treatment.

18    *Q.*   Do drugs in the Schedule III and Schedule IV

19    categories have any potential addictive quality to them?

20    *A.*   Yes.  That's why they are a controlled substance and

21    that is why they are within that class of drugs, just for

22    that reason alone.

23    *Q.*   According to the professional practice of pharmacy,

24    what does a pharmacist need to do prior to filling a

25    prescription?

**Proceedings**

 1    *A.*   The pharmacist really has two primary responsibilities

 2    when a prescription is presented to them.  One, they have

 3    to make sure that medication is appropriate for that

 4    patient.  They also have to -- the second part of that is

 5    make sure there is no fraud or diversion occurring with

 6    that prescription.

 7    *Q.*  And within the -- taking them one at a time then, in

 8    the concept of appropriate medication for the patient,

 9    what are -- explain what you mean by that, what are the

10    factors there?

11    *A.*   There are some factors that overlap both components,

12    but then at critical junctures those components split.

13    The first is that there is a valid prescription, that the

14    prescription that the doctor has issued is actually based

15    upon a bona fide or true relationship between the doctor

16    and patient.  And the way that relationship is

17    established, based upon professional standards, is that

18    the doctor has conducted a physical face-to-face

19    examination and taken a medical history of that patient.

20            One of the other components of that valid

21     relationship and valid prescription is that the doctor's

22     actually a licensed doctor and are operating with their

23     scope of practice.

24            So the pharmacist has to make sure that you don't

25     have a podiatrist, or a foot doctor, prescribing

**Proceedings**

1   medication that an eye, ear, nose or throat doctor would

2   prescribe.  The pharmacist has to make sure it's within

3   that scope of practice.

4        A pharmacist also has to ascertain that there was

5   a reason for that patient to see that doctor.  There was

6   some sort of medical condition, some sort of problem.

7   That this wasn't a patient going in there trying to get a

8   prescription without a legitimate medical condition.

9        And then finally, the pharmacist has to put all

10  of those together and show that there is a logical

11  connection between the doctor's scope of practice, the

12  patient's physical examination, the diagnosis of a

13  medical condition or symptom, and then that that

14  medication is to treat that diagnosis, that condition,

15  that symptom.

16  *Q.*  Now, you mentioned around the top of that list a

17  face-to-face physical examination and -- and medical

18  history, correct?

19  *A.*  Yes, sir.

20  *Q.*  Why -- why are -- why are those things necessary in

21  order to be in compliance with the standards of

22  professional pharmacy practice?  What are the reasons?

23  *A.*  In accordance with the standards of practice, it's the

24  way that the physician can make a true assessment of that

25  patient's condition and symptoms is for them to physically

**Proceedings**

1    see that, to interact with the patient, and to be able to

2    pick up some things that perhaps the patient doesn't

3    communicate or that the patient may forget to communicate

4    or that the doctor needs to explore further with that

5    patient based upon information that the doctor may have.

6    *Q.*   But -- so that's as to the doctor and a patient, but

7    why are those things relevant to a pharmacist?

8    *A.*   The pharmacist's responsibility is the same.  Between

9    the doctor and the pharmacist, there is a corresponding

10   responsibility, and that responsibility is that the doctor

11   must provide a valid prescription, valid relationship, and

12   then the pharmacist needs that and needs to verify that to

13   make sure that the prescription they dispense won't harm

14   the patient, and that's a legitimate prescription that the

15   patient needs.

16        Without that corresponding responsibility and

17    complimentary interaction between the doctor and

18    pharmacist, the system wouldn't work and the safeguards

19    wouldn't be in place to make sure that the patient

20    receives the right medication.

21   *Q.*   Would it be within the standards of professional

22   pharmacy practice for a pharmacist to dispense medication

23   based solely upon a questionnaire submitted by a patient,

24   questionnaire submitted by a patient to a doctor?

25   *A.*   The standards of practice say that that wouldn't be

**Proceedings**

 1    the case and that wouldn't be -- meet the standards, and

 2    it would present a situation where a patient is able to go

 3    in, fill out a questionnaire or fill out an order form,

 4    turn it into the pharmacist, and say, Can you give me this

 5    medication?  The pharmacist wouldn't be able to do that in

 6    accordance with the standards of practice.  They need that

 7    consultation, that diagnosis from the doctor as well.

 8    *Q.*  Have you heard of the term "drug utilization review"?

 9    *A.*  Yes.

10    *Q.*  What is that and how does it relate to the

11    professional standards of pharmacy practice.

12    *A.*  Again, in accordance to standards of practice, before

13    a prescription is dispensed, a pharmacist must conduct a

14    drug utilization review.  They must look at the

15    prescription, and everything that I just mentioned prior

16    about a valid prescription, valid relationship must be in

17    place.  But they also have to look at that medication and

18    make sure it's appropriate for the patient.

19         If, for example, a young child had a prescription

20     but the doctor had written the dosage strength for an

21     adult, that wouldn't be an appropriate prescription

22     because that medication could harm the patient.  So the

23     pharmacist has to make sure that that is appropriate in

24     terms of the dose, the strength, what the condition may

25     be, and then they are also supposed to look at all the

**Proceedings**

1    other medications that the patient is taking so that the

2    patient doesn't have any interactions with the other

3    medications that could negate that prescription, make it

4    stronger or in some way influence that prescription.

5            An example would be one of the medications that

6    people take for headaches, Fiorinal, that contains

7    aspirin.  And if a patient is allergic to aspirin, and

8    the pharmacist doesn't know that or doesn't check that or

9    have that information, that patient could be helped --

10   could be harmed.  If the patient doesn't know there is

11   aspirin in there but then takes aspirin for other

12   purposes, they could overdose on aspirin.

13           So all those factors go into the pharmacist's

14   consideration and review before that prescription is

15   dispensed.

16   *Q.*  Now, the second component, the overall component you

17   mentioned was something you termed "fraud" or "diversion."

18   Can you explain what you meant by that and how that

19   relates to the standards of pharmacy practice?

20   *A.*  The standards clearly say that if a pharmacist

21   suspects there is something occurring with the

22   prescription that is not correct, that there is a fraud --

23   an instance of fraud.  Perhaps the individual is addicted

24   to a medication, and they have brought in a prescription

25   where they have stole the prescription or they forged the

**Proceedings**

```
 1   doctor's signature or perhaps they have misled the doctor
 2   and that prescription shouldn't have been written, the
 3   pharmacist's responsibility, according to standards, is
 4   not to dispense that prescription and to also inform law
 5   enforcement officials that there is some fraud occurring.
 6   Q.   Is it your opinion, then, that a pharmacist needs to
 7   have -- generally speaking, needs to have certain
 8   background information about the relationship between the
 9   doctor and the patient before the pharmacist may dispense
10   a prescription?
11   A.   Yes.
12   Q.   And are you -- is it your opinion, then, that in each
13   and every instance the pharmacist must question the
14   patient every time the patient comes in to pick up drugs?
15   A.   No.
16   Q.   And is it your opinion that the pharmacist must pick
17   up the phone or write an e-mail or something to the doctor
18   every time the patient presents himself in the pharmacy to
19   pick up drugs?
20   A.   No.
21   Q.   Well, can you provide, then, examples of when the duty
22   to make some type of inquiry under the standards of
23   professional practice would -- would be triggered.
24   A.   Sure.  Generally, again in accordance with standards
25   of practice, a pharmacist will be familiar with the
```

**Proceedings**

```
 1    doctors that they receive prescriptions for.  They verify

 2    what that scope of practice is, that that doctor is

 3    licensed, and what medications, what types of patients

 4    that doctor sees.  So they have already verified that

 5    information.  They also have that established and are very

 6    comfortable with that situation.

 7            They will also know what types of patients the

 8    doctors sees.  So if it's a pediatrician, they know that

 9    doctor is going to treat children.  If it's somebody that

10    deals with elderly patients, they will know that patient

11    population, and they will also know that those patients

12    have a connection to that doctor, whether they live close

13    to that doctor's office or some other connection, and the

14    pharmacist has verified and established that information

15    to say this is a legitimate doctor/patient relationship,

16    and this is a legitimate patient that I'm going to be

17    treating as a pharmacist.

18            However, if somebody presents -- if that

19    pediatric doctor's patient presented a prescription for a

20    controlled substance and they were an adult, that would

21    be a red flag that the pharmacist would have to say, Wait

22    a minute, this is not the usual course of practice, this

23    is not what I usually get from that doctor.  I need to

24    pick up the phone and verify what is happening.

25            Similarly, if a prescription was written very
```

**Proceedings**

1   poorly or was wrong and the information wasn't correct,

2   even that relationship existed with the doctor/patient,

3   they still would have to call to say, There is something

4   not right with this prescription.  Can we talk about

5   that, can I verify that this is the correct drug for this

6   patient?

7   *Q.*  Is the fact that a prescription is for a controlled

8   substance as opposed to some noncontrolled substance

9   relevant to this red flag inquiry of the pharmacist?

10  *A.*  Yes.

11  *Q.*  In what way?

12  *A.*  Generally not controlled substances are for diseases

13  or symptoms like diabetes or high blood pressure or

14  glaucoma, and those products have dosing regiments or

15  dosing requirements or standards, and the pharmacist is

16  familiar with that and familiar with what the doctor would

17  prescribe.

18        With controlled substances, because there is such

19   a great threat of abuse and addiction and how they can

20   harm people, the pharmacist is on alert immediately when

21   a controlled substance is presented to make sure that

22   medication is safe for that patient, and also because

23   those are the medications that are most frequently

24   abused, to make sure that medication isn't being abused

25   or being diverted.

**Proceedings**

1    *Q.*   To the extent that a prescription is for pills, for

2    instance, in your field are there generally known

3    quantities of pills that are normally dispensed for a

4    particular type of medication?

5    *A.*   Yes.

6    *Q.*   And what significance, if any, does the quantity of a

7    pill order have in terms of a pharmacist's duty to make

8    further inquiry or respond to what you've called a red

9    flag?

10   *A.*   The quantity should correspond to the treatment.  And

11   to what the accepted dosing is for that medication.  So if

12   somebody came in and they needed a prescription to help

13   them sleep at night, the usual dosage would be one

14   prescription in the evening as needed.  So you would

15   expect a prescription for 30 tablets, enough to get that

16   person through one month.

17          If a prescription came in and was written for 120

18    tablets, there would be some concern because, one, it

19    wasn't within the normal dosing range; and two, if that

20    patient took those -- those pills, they could overdose,

21    they could become in an altered state and injure

22    themselves by falling down.  There are so many

23    complications resulting from that that the pharmacist

24    would have to look at that, and it would be a red flag

25    for them to check with the doctor.

**Proceedings**

1    *Q.*  And what about the physical appearance of the patient,

2    his -- him or herself; would that -- could you -- is there

3    an example that you could think of that would trigger an

4    inquiry under the pharmacy practice standards prior to

5    dispensation of a prescription?

6    *A.*  Yes.  Again, with controlled substances, these being

7    more closely watched, if a patient came in and they were

8    extremely agitated or extremely nervous, wouldn't make eye

9    contact with the pharmacist, seemed to be trying to do

10   something that was inappropriate, their speech was perhaps

11   altered or there were some problems with that, that would

12   be another red flag and one of the signs pharmacists use

13   to make sure that this is an appropriated medication for

14   that patient.

15   *Q.*  What about in the diet pill context?

16   *A.*  A diet pill context, again the standards would call

17   for the pharmacist to interact within that patient.  If

18   somebody was getting a diet prescription and the patient

19   was significantly underweight, that would be a red flag

20   for the pharmacist to say, Wait a minute, this medication

21   is used to treat weight loss.  This patient is

22   significantly underweight just based upon my visual

23   observation.  Is there something else going on here I

24   don't know?  I need to check with the doctor, and if there

25   is something else going on, I need to make sure that I

**Proceedings**

1    intercede and take action.

2    *Q.*  If a pharmacist never sees the patient, is he or

3    she -- the pharmacist able to make that assessment and

4    inquiry?

5    *A.*  No.

6    *Q.*  Would it be within the standard of pharmacy practice

7    for a pharmacist to dispense a prescript -- to dispense

8    drugs based upon a patient order of those drugs?

9    *A.*  No, sir.

10   *Q.*  Where does the prescription have to come from?

11   *A.*  With all practice settings and based upon the

12   standards, all of those prescription come from the doctor

13   to the pharmacist.

14   *Q.*  Under the standards of practice, is it acceptable for

15   a pharmacist to dispense medication after the patient

16   chooses the quantity of the drugs that he or she desires?

17   *A.*  No.  There is nothing within the standards that would

18   allow a patient to self-select their medication or their

19   quantity.  That's a decision that the doctor makes.

20   *Q.*  Now, you testified a little while ago about certain

21   knowledge that a pharmacist -- the corresponding duty that

22   a pharmacist has of knowledge of the doctor/patient

23   relationship.

24          How do these standards apply in big city contexts

25    where there is CVS or Walgreens or drugstores of the like

**Proceedings**

1    and there is a million people living there?  Are you

2    saying that the standards of practice require a

3    pharmacist to know every single face and every single

4    doctor and put the two together?

5    **A.**  No, sir.

6    **Q.**  So, can you explain, then, how a pharmacist is

7    supposed to observe his professional standards in that

8    setting?

9    **A.**  Sure.

10          What happens in those large multi-pharmacy chains

11   is that some verification has occurred of that doctor and

12   that patient base, so to speak.  So that the doctor has

13   been validated that they have a license, they are

14   operating within their scope, and that information then

15   is available to the pharmacist in a central database.

16          Now, the pharmacist has two things that they have

17   to take note of and that they have to do.  One, that

18   database information has cleared the doctor and has said

19   this doctor is a valid doctor.  And the pharmacist then

20   knows what scope of practice they should be operating in.

21          Based upon that information, when a patient

22   brings in a prescription, if it's a patient that should

23   be treated by that doctor -- again, if it's a

24   pediatrician, it would be a child or some other internist

25   that would be treating those types of internal

**Proceedings**

```
 1    diseases -- the pharmacist can make that assessment and
 2    say, This is a legitimate relationship based upon
 3    information that I've already validated or is available
 4    to me that's already been validated.
 5           If at any time, though, in the second component
 6    that pharmacist suspects that there is something again
 7    not right, they have a responsibility to call that doctor
 8    and do their own verification.
 9           It doesn't remove that responsibility; it just
10    gives them some more information and resources so they
11    don't have to duplicate effort.
12    Q.  Placing before you a couple of folders with documents
13    in them that have been marked Exhibit 554 and 555.  I
14    would ask you to take a look at those, please.
15           Are you familiar with them?
16    A.  Yes, sir.
17    Q.  Does California, the state of California have any
18    rules relating to the standards of pharmacy practice?
19    A.  Yes, sir.
20    Q.  And do you recognize what Exhibit 554 is?
21    A.  Yes, sir.
22    Q.  And do you recognize what 555 is?
23    A.  Yes, sir.
24    Q.  And without getting into details, what are those?
25    A.  These are components of California's regulations that
```

**Proceedings**

```
 1   applies to doctors and pharmacists on what -- how they

 2   should dispense and how they should determine what a valid

 3   relationship is and how that pharmacist should then

 4   dispense that medication.

 5   Q.  And are those provisions a part of the standards of

 6   professional pharmacy practice?

 7   A.  Yes, sir.

 8          MR. STEVENS:  Your Honor, move to admit 554 and

 9   555.

10          THE COURT:  554 and 555 admitted.

11                (Plaintiff's Exhibits 554 and 555 were

12                 received in evidence.)

13   BY MR. STEVENS:

14   Q.  Directing your attention now to Exhibit 554, which is

15   Section B and P -- Business and Profession Code, Section

16   2241 -- 2242.1.

17          MR. STEVENS:  And if we could show the text just

18   in the first sub -- paragraph A.

19   BY MR. STEVENS:

20   Q.  And are you familiar -- have you familiarized yourself

21   with 2242.1(a)?

22   A.  Yes, sir.

23   Q.  And could you read that provision, please.

24   A.  "No person or entity may prescribe, dispense, or

25   furnish or cause to be prescribed, dispensed or furnished
```

**Proceedings**

1    dangerous drugs or dangerous devices, as defined in

2    Section 4022, on the Internet for delivery to any person

3    in the state without an appropriate prior examination and

4    medical indication, except as authorized by Section 2242."

5    *Q.*  And now, could you turn to -- could we move to Exhibit

6    555, please.

7              **MR. STEVENS:**  And just sub (a).  And the title.

8    Thank you.

9    **BY MR. STEVENS:**

10   *Q.*  And this is -- this is B & P Code 4067.  And would you

11   please read sub (a) of this provision, of 555.

12   *A.*  "No person or entity shall dispense or furnish, or

13   cause to be dispensed or furnished, dangerous drugs or

14   dangerous devices, as defined in Section 4022, on the

15   Internet for delivery to any person in the state without a

16   prescription issued pursuant to a good faith prior

17   examination of a human or an animal from the prescription

18   as meant.  If a person or entity either knew or reasonably

19   should have known that the prescription was not issued

20   pursuant to a good faith prior examination of a human or

21   an animal, or if the person or entity did not act in

22   accordance with Section 1761 of Title 16 of the California

23   Code of Regulation."

24   *Q.*  Now, do you know approximately when the original

25   version of these provisions were enacted?

**Proceedings**

1    *A.*   Yes, I believe around 2000.

2    *Q.*   And taking the two together, and can you describe the

3    concepts within them that relate to the standards of

4    professional pharmacy practice about which you've been

5    testifying -- before we go there, first of all, 554, does

6    that relate to the duty of the doctor or the pharmacist?

7    *A.*   554 is the physician, the doctor.

8    *Q.*   Okay.

9           And 555, to whom does that apply?

10   *A.*   Is the pharmacist, but there is a corresponding

11   responsibility that cuts across both of these.

12   *Q.*   Okay.

13          And so using the -- or these portions of the text

14    of 554A and 555A, what is it within that that relates to

15    the standards of professional pharmacy practice as you

16    believe them to be?

17   *A.*   This goes back to what we talked about earlier, those

18   components that have to be present for a doctor to have a

19   valid prescription, and it's clearly specified there.

20   Even if it's on the Internet, and the Internet is

21   specifically noted and this was noted back in 2000, there

22   has to be that physical examination.  There has to be that

23   medical indication.  So there has to be a valid basis and

24   a valid relationship for that doctor to write the

25   prescription.

**Proceedings**

1            On the other side of the equation for the

2     pharmacist, the pharmacist must ensure that that has

3     occurred, that that physical examination, that that

4     indication that the doctor operated in accordance with

5     what those standards of practice are, the pharmacist must

6     verify that, and the pharmacist is also held accountable

7     for those same standards.

8            So there's, of course, independent they have

9     responsibilities, and then together there is that

10    corresponding responsibility.

11    *Q.*  Now, are those two provisions, where depicted or

12    reflected in Exhibits 554 and 555, are they unique in the

13    United States?  Is California a rogue outlier in this

14    regard?

15    *A.*  No, sir.  These provisions are found in all of the

16    state pharmacy practice acts across the country.

17    *Q.*  Now, you -- in describing 554 and 555, you inserted a

18    word "physical examination," whereas at least up on the

19    screen here, it says "good faith prior examination."  Why

20    did you say that, why did you say "physical examination"?

21    *A.*  Within the standards there are terms of art that they

22    use, they may call it a good faith examination or a

23    medical examination.  But when you look at the standards

24    more closely and the standards that are advocated by the

25    American Medical Association, the Federation of State

**Proceedings**

```
 1    Medical Boards, and all of the other professional
 2    standards organizations, they clearly define that that
 3    examination must be a face-to-face physical examination.
 4    Q.   Is there certain types of information that is required
 5    -- that is required for -- to be on a prescription before
 6    a pharmacist can dispense medication?
 7    A.   Yes, sir.
 8    Q.   And just briefly, can you describe what is the data
 9    that is supposed to be on there?
10    A.   Sure.  If it's a noncontrolled substance prescription,
11    it would be the information you would normally expect:
12    The patient's name and address, the doctor's name and
13    address, what that medication is, the strength, how many
14    of those pills or tablets are dispensed, the directions
15    for use, and then whether or not there are any refills for
16    that patient.
17    Q.   And I'm sorry, did you -- was that as to controlled
18    and noncontrolled?
19    A.   That was for a noncontrolled.  If it's a controlled
20    substance, it has to also include the doctor's DEA number,
21    so the pharmacist can verify that that DEA -- that doctor
22    actually is registered with the DEA and can prescribe
23    controlled substances.  And then the doctor has to sign
24    those prescriptions.
25            No one can sign for the doctor, the doctor
```

**Proceedings**

1      themselves has to sign those controlled substance

2      prescriptions.

3      *Q.*   Now, under the standards of professional pharmacy

4      practice, is it sufficient if a pharmacist receives a

5      prescription and simply relies on the four corners of the

6      prescription itself or the information therein before

7      dispensing a prescription?

8      *A.*   No, sir.

9      *Q.*   And why not?

10     *A.*   That prescription is like a recipe or directions for

11     the pharmacist as to what they should do, but it's only

12     part of the information the pharmacist should look at.

13     They need to look at the patient, they need to talk to the

14     patient about allergies, they need to know other

15     information about medications they are taking.  That

16     prescription, although very important and contains

17     significant information, is just a part of what the

18     pharmacist is responsible for and should find out and work

19     with the patient to obtain.

20     *Q.*   Well, what about if the prescription was supplemented

21     by, say, a questionnaire that the patient had filled out

22     indicating various -- answering various questions about

23     the patient's condition and so forth?

24     *A.*   Again, the questionnaire would have to be something

25     that the doctor and patient had described -- or discussed,

**Proceedings**

1    and something the pharmacist would have the ability to

2    question the patient about to make sure the information

3    was correct.  And also to clarify the information in case

4    the patient did not understand the form or in case there

5    was information included in there that maybe wasn't

6    correct.

7    *Q.*  Now, the standards of professional pharmacy practice,

8    as to the method by which medications are prescribed and

9    dispensed, do those, in your opinion, change based on the

10   fact that the medications are prescribed and dispensed

11   over the Internet?

12   *A.*  No, sir.

13   *Q.*  Why not?

14   *A.*  What the Internet provides is just another

15   communication vehicle or a method for patients to actually

16   interface with their pharmacist to make the prescription

17   medications available to them.  It's no different than in

18   the early days of pharmacy when that patient would walk

19   into the pharmacy and have that direct interaction, and

20   then perhaps later the phone could be used where a doctor

21   could phone in a prescription or a patient could phone in

22   for a refill.  The Internet is all part of that evolving

23   technology to supplement but not to replace the patient

24   interaction with the doctor and pharmacist.

25            And the standards for Internet communications and

**Proceedings**

1        phone communications and face-to-face are all the same,

2        those professional standards must be observed and

3        implemented in all those different settings.

4    *Q.*   Then is it your opinion that Internet pharmacies are

5        always operating outside the scope of professional

6        pharmacy practice?

7    *A.*   No, sir.

8    *Q.*   You have testified earlier about some work you had

9        done in the field of Internet pharmacies.  In what ways --

10       can you describe, does the NABP have a certification

11       program for Internet pharmacies?

12   *A.*   Yes, sir.

13   *Q.*   And can you describe in what ways pharmacies operating

14       or using the Internet are in your opinion compliant with

15       the codes, standards of professional practice.

16   *A.*   Sure.

17            We accredit Internet pharmacies for the states,

18        and to date we have accredited probably about 5,000

19        Internet pharmacies that are operating in accordance with

20        the standards of practice.

21            And so what we look at is whether or not that

22        pharmacy is in compliance with all federal and state laws

23        and regulations as a first step.  We then verify how that

24        Internet pharmacy deals with things that are unique to

25        Internet practice.

**Proceedings**

1              So information that the patient provides to an

2       Internet pharmacy is provided over the Internet, and so

3       that pharmacy has to take certain precautions to make

4       sure that information isn't compromised, that people

5       don't have access to that information.  And so we check

6       those systems for that pharmacy to make sure that

7       communication is secure.

8              Whereas in a typical pharmacy, you would go in,

9       present that information, it would be stored there, it

10      wouldn't be transmitted over the Internet.  We look at

11      those differences to make sure that Internet pharmacy is

12      protecting the patient.

13             They mail the prescriptions to patients, so we

14      check to make sure their mailing facilities are operating

15      appropriately, that they have refrigeration when they

16      need to, and that they package the medications correctly.

17             So if they have a diabetic patient and they ship

18      insulin, and that patient lives in Arizona, they can't

19      ship that in a container where the heat is going to go up

20      above 90 or 100 degrees, and that insulin is going to be

21      adversely affected by it.

22             So we check all those components, and then we

23      accredit that Internet pharmacy, if they meet those

24      components and have hired a physical inspection of those

25      facilities, everything is in place.  But the basic

**Proceedings**

1    standards of practice that that traditional brick and

2    mortar follow, that Internet pharmacy must also follow as

3    well.

4    *Q.*  And the certification, is that -- that is not free, is

5    it?

6    *A.*  No, sir.

7    *Q.*  How much does the NABP charge for that?

8    *A.*  For a small pharmacy that's just one store, it costs

9    that pharmacy $1,000 for three years, so roughly $300 a

10   year.  And for the larger pharmacy operations, like a CVS

11   or a Longs, that fee is about $5,000.  And then there is a

12   fee to actually visit and inspect those facilities.  So

13   for a large chain, that fee could be somewhere between

14   5,000 and $7,000 for that certification, and that is over

15   a three-year period.

16   *Q.*  Now, all of the standards of professional pharmacy

17   practice about which you've been testifying, were those

18   accepted in the field of pharmacy as of at least the year

19   2000?

20   *A.*  Yes, sir.

21   *Q.*  I want to change subjects now to you testified earlier

22   about a certain video that you observed in connection with

23   forming your opinion, correct?

24   *A.*  Yes, sir.

25   *Q.*  And based upon the screen shots and the video that you

**Proceedings**

1   reviewed, I would ask you, have you formed certain

2   opinions about whether the Internet pharmacy reflected in

3   that video was operating consistent with the usual course

4   of pharmacy practice?

5   *A.*  Yes, sir.

6   *Q.*  And I would like to now display an exhibit that's

7   already been admitted, I believe, which is 4A.  And take

8   you through certain aspects of this exhibit and solicit

9   your opinions on certain portions of it.

10            4A, with respect to what is now reflected on the

11   -- what appears to be the home page of Exhibit 4A, what

12   observations, if any, do you have about whether -- about

13   information on there that bears on the subject of the

14   standards of pharmacy practice?

15  *A.*  When you look at this home page, there are some things

16   that immediately stand out.  The implication there that's

17   at the top talks about no waiting room, no prior

18   prescription needed.  It sends the message to the patient

19   that you can get these prescription medications without a

20   prescription.

21            Again, that's contrary to standards of practice.

22            And if you look immediately on the screen, what

23   you see are capsules or tablets that you can order, you

24   can see the price and you can see the quantity.

25            If you went on to an Internet pharmacy site that

**Proceedings**

1    we have accredited, the first home page screen looks as

2    if you are walking into a traditional brick and mortar

3    pharmacy.  There's some advertisement about the products

4    they sell, and the prescription information, the

5    prescription section requires you to register with that

6    pharmacy.  There are no offers on that home page of what

7    drugs you can buy and pick for yourselves and order.  It

8    asks you for information to register with them so they

9    can verify that you are a legitimate patient.

10        And when you register, then there is a

11   verification system where they interact with you through

12   your e-mail to make sure that you are not trying to

13   assume someone else's identity or do something

14   inappropriately before you can even get to a screen that

15   talks about the medications.  And when you get to that

16   medication screen, there aren't medications on there.

17   There is information for how to contact your doctor.

18        Significant difference from this screen, which

19   immediately puts the drugs there for the patient to order

20   as if they were walking into a candy store or some other

21   store and they wanted to just pick and choose what they

22   want.

23   *Q.*  Now, on the subject of the -- the types of drug that

24   are offered --

25        *MR. STEVENS:*  Can you turn to the next page,

Proceedings

1    please?

2    *BY MR. STEVENS:*

3    *Q.*  Did you review the actual video clip of the online

4    purchase in this case?

5    *A.*  Yes, sir.

6    *Q.*  And after the home page, what did you observe relative

7    to the types of drug that appear to be offered?

8    *A.*  The types of drugs were predominantly, if not

9    exclusively, lifestyle drugs and controlled substances.

10   And again, in accordance with other Internet pharmacies

11   that have been accredited based on standards of practice,

12   the medications that are available from those pharmacies

13   include the whole gamut, there are medications for

14   diabetes and high blood pressure.

15          The normal or average pharmacist, pharmacy

16    dispenses about 12 percent of their prescriptions as

17    controlled substances.

18          The screen shots in the -- the medications

19    available from this site were almost all controlled

20    substances with no other medications for high blood

21    pressure, diabetes, the typical diseases and symptoms

22    that a pharmacy would treat and would have medications to

23    treat.

24   *Q.*  Now, on the current screen that is being reflected in

25   Exhibit 4A is a section entitled "Section 4:  Your Item

**Proceedings**

1    Selection," and can you read what is stated underneath

2    "Your Item Selection"?

3    **A.**   Sure.  It says, "Please select the item that you would

4    like to order," and then it's a drop-down box where the

5    patient or the customer has the ability to select the

6    medicine they want.

7    **Q.**   And so what relevance, if any, does the fact that in

8    this particular exhibit the patient is selecting the type

9    of drug that he or she is ordering have to the standards

10   of practice?

11   **A.**   It operates completely different from the standards of

12   practice.  I'm not aware of any pharmacy where a patient

13   can walk in and select the medications they want, the

14   quantity, the strength, and then just give that order to

15   the pharmacist and say, Fill this prescription.

16   **Q.**   Well, why -- but if a patient did that, why is that

17   relevant to whether the pharmacy or the pharmacist is

18   within the standards of practice?

19   **A.**   The whole reason why this is a controlled substance,

20   why they are prescription drugs, is because a doctor and

21   pharmacist have to be involved because these are dangerous

22   products.  And if the patient isn't aware of those dangers

23   or self-medicates, the patient can do themselves harm.

24          So the doctor and pharmacist are deliberately

25    inserted in the system to avoid the patient causing

**Proceedings**

```
 1      themselves harm and taking drugs they shouldn't take.

 2      Q.  And moving now to Section 5 of the order form.

 3              MR. STEVENS:  If you just highlight the top part,

 4      thank you.

 5   BY MR. STEVENS:

 6      Q.  Does this section here where there is an opportunity

 7      to input date of birth, gender, height, weight, et cetera,

 8      and BMI, did that have any significance to you in forming

 9      your opinion about this particular website?

10      A.  Yes.

11      Q.  Can you explain what that is.

12      A.  Again, this type of information isn't solicited under

13      the standards of practice by other pharmacies.  This is

14      self-reported by the patient.  Unless this is verified

15      directly through a physical examination or interaction

16      with the patient, it's very difficult to know if this

17      information is really true.  Maybe if the person has made

18      a mistake or maybe they are making up these numbers just

19      so they can get a certain medication, there is no way to

20      verify that.

21      Q.  And turning now to Section 6.

22              I'm sorry, no, let's go back to 5, please.

23              MR. STEVENS:  Just to the questionnaire part.

24      That's fine, thank you.

25   BY MR. STEVENS:
```

**Proceedings**

1    *Q.*   Section 5, also includes what appears to be a

2    questionnaire.  Have you reviewed the nature of the

3    questions on this questionnaire?

4    *A.*   Yes.

5    *Q.*   And does the fact that a patient is responding to

6    questions of this nature have any significance to your

7    opinion about this Internet pharmacy?

8    *A.*   Yes, sir.

9    *Q.*   Can you explain what that is.

10   *A.*   Yes.

11         The questionnaire doesn't -- doesn't meet the

12   standards of practice.  It simply seems to be a

13   questionnaire that someone's inserted to try and

14   legitimize this process or to try to make it look like

15   it's a legitimate process.

16         The questions asked are leading questions that

17   will ensure that the patient receives the medication if

18   they answer the questions correctly.  They are not the

19   type of questions that a medical questionnaire would ask

20   that is really trying to find out information about the

21   patient and their diseases.  This seems like just a step

22   approach to say, If you can answer all these questions

23   correctly, then we're covered, we can prescribe the

24   medications for you.  And that simply doesn't meet the

25   standards of practice.

**Proceedings**

1   *Q.*  But at Roman numeral -- or excuse me, number 1 at the

2   top, there is a sentence or a portion of the sentence that

3   says, "Your prescription will be issued after a doctor

4   reviews the data provided."

5          Isn't that sufficient under the standards of

6    pharmacy practice for the doctor to prescribe something

7    relying on the answers the patient him or herself gives?

8   *A.*  The standards of practice have clearly said that a

9   prescription issued purely on the basis of a questionnaire

10  does not meet the standards of practice; that there has to

11  be that face-to-face medical examination by the doctor.

12         So a doctor simply reviewing a questionnaire does

13   not meet the standard of practice.

14         *MR. STEVENS:*  And if we could turn now to Section

15  6?  And continue.

16  *BY MR. STEVENS:*

17  *Q.*  There is an item known or referred to there as a

18  customer agreement at the top of Section 6.  And if we

19  could go to the Customer Responsibility Statement.

20         Have you had an opportunity to review the

21   Customer Responsibility Statement?

22  *A.*  Yes, sir.

23  *Q.*  What relevance does that have to your opinion about

24  whether this Internet pharmacy is operating within the

25  standards of professional pharmacy practice?

**Proceedings**

1    *A.*   Once again, these are not a part of the standards at

2    all.  I'm not aware of any patient that walks into a

3    pharmacy that is meeting the standards and asks the

4    patient to sign such a statement.

5              What this tries to do is take the responsibility

6    away from the pharmacy and pharmacist and place it on the

7    patient.  And that is not within the standards.  The

8    reason pharmacists are licensed is so the state ensures

9    that they assume this responsibility and that the state

10   holds them accountable, and that patients aren't supposed

11   to be responsible for this.  This is part of licensure

12   and the requirement of the standards of practice.

13   *Q.*   And if we could continue down to something known as

14   the Informed Consent Agreement, also within Section 6.

15             Have you reviewed the Informed Consent Agreement

16   on this Exhibit 4A?

17   *A.*   Yes.

18   *Q.*   And what is the relevance, if any, to this Informed

19   Consent Agreement about whether the standards of pharmacy

20   practice are being met?

21   *A.*   Many of the same comments as before.  I've never seen

22   a patient in a pharmacy have to sign a consent that says,

23   I'll be responsible if anything happens to me, because

24   that's the legal -- that's the responsibility of the

25   pharmacist under the standards of practice and why they

Proceedings

1       are licensed.

2               For a patient to execute this before a pharmacist

3        would dispense a prescription is contrary to any of the

4        standards of practice and not something that a pharmacy

5        meeting those standards would actually have in place.

6    *Q.*  Do you have an opinion as to whether the pharmacist

7        filling the prescriptions in the Internet pharmacy

8        depicted in Exhibit 4A was operating within the usual

9        course of professional pharmacy practice?

10   *A.*  Yes, sir.

11   *Q.*  What is your opinion?

12   *A.*  The pharmacist was not operating within those

13       standards.

14   *Q.*  And what is the basis of that opinion?

15   *A.*  Starting from the very beginning, the fact that the

16       pharmacist didn't verify that there was a valid

17       prescription.  But even more serious than that, the

18       information presented by a review of that website showed

19       that there was no valid prescription, there was no

20       relationship between that patient and doctor, that the

21       questionnaire was the sole reason for that prescription

22       being issued, which was contrary to the standards of

23       practice.

24               The fact that controlled substances were the only

25        or predominant medication issued for patients would have

**Proceedings**

1      been a red flag again for the pharmacist to say, I need

2      to do some verification or validation of this.  And the

3      fact that the patients selected their own medications,

4      were all red flags and were all factors that led me to my

5      opinion.

6              The other supplementing factors, of course, were

7      the statements that we just went through and some of the

8      other behaviors that were exhibited by this pharmacy in

9      terms of the information on the website and the lack of

10     information or the lack of counseling, drug utilization

11     review, that occurred as part of that process.

12  *Q.*  Now, that opinion was formed as to the pharmacist,

13     correct?

14  *A.*  Yes.

15  *Q.*  And do you have an opinion as to whether the pharmacy

16     itself was acting within the scope of professional

17     standards?

18  *A.*  Yes.

19  *Q.*  And what was your opinion about that?

20  *A.*  My opinion was that the pharmacy was also not

21     operating in accordance with the standard of practice.

22  *Q.*  And is the basis the same or similar to that which you

23     just described as to the pharmacist?

24  *A.*  Yes, sir.

25  *Q.*  Is the owner of a pharmacy accountable in some way for

**Proceedings**

1    operating within the standards of professional pharmacy

2    practice even if the owner him or herself is not a

3    pharmacist?

4    *A.*  Yes, sir.

5    *Q.*  Sir, without getting into laws or regulations and so

6    forth, just generally can you provide some general

7    elaboration on in what way an owner is accountable, owner

8    of a pharmacy is accountable, for operating within the

9    standards of practice?

10   *A.*  Sure.

11         Within the standards of practice, not only is the

12   pharmacist required to be licensed, but the pharmacy is

13   also licensed or registered with the state.  No business

14   or entity could say that they are a pharmacy unless they

15   meet all qualifications and then hold a permit of

16   registration with the state.

17         As part of that permit of registration, the owner

18   of that pharmacy is responsible for all the operations

19   that occur and to make sure that they have in place the

20   pharmacist or personnel and operations for that pharmacy

21   to comply with the law.

22         If they don't comply, then they can take action

23   and remove that permit and revoke that permit.

24         If the individual actions were contributing to

25   that, that they didn't provide the diligence they need,

**Catizone – Cross / Ellsworth**

```
 1        they were aware of what was happening, didn't do anything

 2        to correct it, they can also take action against that

 3        owner, but the owner is just as accountable for the

 4        operation of that pharmacy as the pharmacist is.

 5               MR. STEVENS:  Thank you, sir.

 6               I have no further questions, Your Honor.

 7               THE COURT:  Cross?  Cross-examination?

 8                      CROSS-EXAMINATION

 9   BY MR. ELLSWORTH:

10     Q.  Good morning, Mr. Catizone.

11     A.  Good morning, sir.

12     Q.  Your organization is a private organization, correct?

13     A.  It's a charitable organization, sir, yes.

14     Q.  And it doesn't have any governmental authority?

15     A.  No, sir.

16     Q.  Would you explain what kind of training -- let me back

17   up for a second.

18               Generally speaking, across the states -- and you

19    are familiar with all 50 states --

20     A.  Yes, sir.

21     Q.  -- in terms of pharmacy practice?

22     A.  Yes, sir.

23     Q.  Is the training a pharmacist receives basically the

24   same in each state?

25     A.  Yes, sir.
```

**Catizone — Cross / Ellsworth**

1    *Q.*  Okay.

2          Could you describe for us what type of training a

3    pharmacist has so they can make a judgment as to whether

4    or not something is a valid prescription or not.

5    *A.*  Yes, sir.

6          In their didactic or educational program, they

7    are made aware of all the diseases, conditions, and what

8    the clinical aspects of that practice is.  And that

9    consists of five years of didactic work.  Included and

10   interspersed throughout that program are legal and law

11   classes that talk about the validity of a prescription

12   and the validity of each of those situations that the

13   pharmacist is trained and educated about.

14         In the last year of their formal education, they

15   do a rotation in various practice settings where they

16   work under the direction of an externship director or a

17   pharmacist who has been trained and educated in this role

18   to teach them all the nuances of practice and how to make

19   those --

20   *Q.*  You used the word -- I didn't understand.

21         What does "didactic" mean?

22   *A.*  Didactic is the classroom teaching, lectures and that.

23   *Q.*  And they get a pharmacist who ultimately becomes

24   licensed, has classroom training in addition to sort of

25   on-the-job training?

**Catizone – Cross / Ellsworth**

1   *A.*  Clinical training yes, sir.

2   *Q.*  And the combination of years that it takes to get to

3   the point where you are able to determine the

4   corresponding duty, how long does that take?

5   *A.*  It begins in your first year, but when you are ready

6   for licensure, it's a six-year process.

7   *Q.*  Now, I think when Mr. Stevens was asking you about the

8   schedules of controlled substances, you talked about the

9   five schedules?

10  *A.*  Yes, sir.

11  *Q.*  Did you say cocaine was a Schedule I?

12  *A.*  Yes –– I'm sorry.  Heroin and marijuana are Schedule

13  I.  Cocaine is Schedule II.

14  *Q.*  That was just a mistake?

15  *A.*  That was my mistake, sir.

16  *Q.*  Okay.

17          So when we get to the schedules, to clear it

18   up ––

19  *A.*  Correct.

20  *Q.*  –– Schedule I would be a drug like marijuana or

21  heroin?

22  *A.*  Yes, sir.

23  *Q.*  And cocaine, which I think you initially said was a

24  Schedule I, that is actually Schedule II?

25  *A.*  Schedule II.  My mistake, sir.

1    *Q.*  That's okay.  Just wanted to -- okay.

2              *MR. ELLSWORTH:*  Now, if we could go to 554, Sam?

3         And if you could blow up the section that

4    Mr. Catizone read, section A.

5    *BY MR. ELLSWORTH:*

6    *Q.*  Now, that was something that Mr. Stevens covered with

7    you on direct examination?

8    *A.*  Yes, sir.

9    *Q.*  And Mr. Stevens correctly asked you, the word

10   "physical examination" that you used repeatedly, that's

11   not in there, is it?

12   *A.*  No, sir.

13   *Q.*  And another term you used repeatedly, "face-to-face

14   examination," that's not in there either, is it?

15   *A.*  No, sir.

16   *Q.*  Okay.

17             *MR. ELLSWORTH:*  Could we go to 555, Sam?

18        And again, thank you.

19   *BY MR. ELLSWORTH:*

20   *Q.*  Okay.

21        Same questions and the same ones asked by

22    Mr. Stevens:  The word -- in 555 is a pharmacy board

23    regulation, right?

24   *A.*  Yes, sir.

25   *Q.*  And the one we looked at before was a medical board

1      regulation?

2      **A.**  Yes, sir.

3      **Q.**  And I understand your testimony that the pharmacist

4      sort of has to have both of them in his or her head

5      because there is a corresponding duty.

6             In this definition of under the regulatory rules

7       for California pharmacist, they do not use the word

8       "physical examination," correct?

9      **A.**  Yes, sir.

10     **Q.**  And the word you used over -- or the term, I should

11     say, "face-that-face," that's not in there either?

12             **MR. ELLSWORTH:**  Thanks, Sam.

13     **BY MR. ELLSWORTH:**

14     **Q.**  And there are certainly times when a pharmacist is not

15     -- is going to dispense a medication but is not going to

16     see the patient, right?

17     **A.**  Yes, sir.

18     **Q.**  I mean, that could occur in a retail setting?

19     **A.**  Yes, sir.

20     **Q.**  And that could occur in a mail order setting?

21     **A.**  Yes, sir.

22     **Q.**  I mean, a pharmacist -- because I think you mentioned

23     that a pharmacist in some circumstances has an obligation

24     to look at the patient?

25     **A.**  Yes, sir.

**Catizone – Cross / Ellsworth**

1   *Q.*  And to talk to the patient?

2   *A.*  Yes, sir.

3   *Q.*  And to question the patient?

4   *A.*  Yes, sir.

5   *Q.*  But that doesn't happen in every circumstance?

6   *A.*  No, sir.

7   *Q.*  Mail order pharmacies, there are some large mail order

8   pharmacies in the United States?

9   *A.*  Yes, sir.

10  *Q.*  That ship thousands of prescription a day?

11  *A.*  Yes, sir.

12  *Q.*  And those pharmacies who are dispensing that

13  medication don't have an opportunity to talk to a patient?

14  *A.*  Not face-to-face.

15  *Q.*  Right.

16  *A.*  But via phone they do, sir.

17  *Q.*  So they don't have an opportunity to look at a

18  patient?

19  *A.*  Correct.

20  *Q.*  Have you had any academic positions in your career?

21  *A.*  Yes, sir.

22  *Q.*  Okay.

23       Have you ever been a professor at any university?

24  *A.*  Yes, sir.

25  *Q.*  Where at?

**Catizone — Cross / Chazin**

1     *A.*  At the University of Illinois, I was an adjunct

2     professor in the Department of Pharmacy Administration.

3     *Q.*  An adjunct professor, what does that mean?

4     *A.*  I was one of the staff or one of the faculty that

5     would teach the classes.

6     *Q.*  Is there a difference between adjunct professor and a

7     full professor?

8     *A.*  In terms of pay, yes, they didn't pay the adjunct

9     professors.

10    *Q.*  When was that?

11    *A.*  That was back in 1986, '87.

12    *Q.*  How long did you do that for?

13    *A.*  Two years.

14    *Q.*  Since 1986, '87, have you had any academic positions?

15    *A.*  Not formal, sir.

16          *MR. ELLSWORTH:*  That's all I have.

17                    <u>**CROSS-EXAMINATION**</u>

18  *BY MR. CHAZIN:*

19    *Q.*  Good morning, Mr. Catizone.

20    *A.*  Good morning, sir.

21    *Q.*  In your position as executive director, is it fair to

22    say that you spent a good amount of time over the course

23    of the past 10 to 15 years involved with education?  I

24    think you mentioned that a little bit.

25    *A.*  Some of my time, sir, yes.

**Catizone — Cross / Chazin**

1    *Q.*  Yeah.

2           And I assume that's somewhat important in your

3     mind, correct?

4    *A.*  Yes, sir.

5    *Q.*  In particular educating about not only pharmacies and

6     pharmaceuticals in general and proper dispensing, but

7     specifically as to Internet pharmacies?

8    *A.*  Yes, sir.

9    *Q.*  Is it fair to say that there has been a real need for

10    education in that area?

11   *A.*  Yes, sir.

12   *Q.*  And because not everyone is informed as they should be

13    in this area, right?

14   *A.*  Yes, sir.

15   *Q.*  And that includes even the professionals and public

16    alike, correct?

17   *A.*  Right.  To different degrees, but yes, sir.

18   *Q.*  Yeah.

19           And is it fair to say that in your experience,

20     that there is even a certain percentage of pharmacists

21     that are not -- who are not sufficiently apprised or

22     aware of all the rules regarding Internet pharmacies?

23   *A.*  There is probably a percentage of pharmacists, yes,

24    sir.

25   *Q.*  And that is why you have engaged in the education?

**Catizone – Cross / Chazin**

1   **A.**  Yes, sir.

2   **Q.**  You spoke a little bit about this with Mr. Ellsworth,

3   about the fact that you would normally want the pharmacist

4   to see the customer or patient, correct?

5   **A.**  Yes, sir.

6   **Q.**  And normally have a chance to talk with them, correct?

7   **A.**  Yes, sir.

8   **Q.**  Okay.

9          And you talked about the mail order situation,

10   which -- where there is every day -- they are dispensing

11    of thousands of prescriptions every day?

12   **A.**  Yes, sir.

13   **Q.**  Okay.

14          Where for the most part, the patient or customer

15    does not speak to nor ever see -- or the pharmacist never

16    sees the customer or patient, correct?

17   **A.**  Yes, sir.

18   **Q.**  And with regard to the retail operations like CVS,

19   Walgreen, whomever, Costco, there is a large percentage of

20   all the prescriptions that are being filled today that are

21   actually being filled through those companies and through

22   the mail order pharmacies, correct?

23   **A.**  Yes, sir.

24   **Q.**  A very large percentage; isn't that fair to say?

25   **A.**  Yes, sir.

**Catizone – Cross / Chazin**

1    *Q.*  Okay.

2           And isn't it quite common for the doctor to call

3    in a prescription or even the -- not even the doctor, but

4    one of the qualified professions within the doctor's

5    office?

6    *A.*  Yes, sir.

7    *Q.*  So it's actually quite common for the doctor to call

8    in a prescription, right?

9    *A.*  Yes, sir.

10   *Q.*  Okay.

11          And it's also pretty common for the customer or

12   patient to drop off -- if they have the actual

13   prescription, they will drop it off with the clerk at the

14   CVS counter, right?

15   *A.*  Yes, sir.

16   *Q.*  And the pharmacist is often usually in the back, like

17   we've all seen, in the back, working away and filling

18   prescriptions, correct?

19   *A.*  Yes, sir.

20   *Q.*  Okay.

21          And in that situation, the pharmacist never

22   really sees that customer, correct?

23   *A.*  No, sir, but there is the opportunity if the

24   pharmacist needs to, that the patient is there and the

25   pharmacist can interact with them.

**Catizone – Cross / Chazin**

 1    *Q.*  Right, yeah.

 2              But in that situation that I've just described

 3       typically, and which is actually quite common, the

 4       pharmacist never really does have any face-the-face

 5       contact and actually see that person?

 6    *A.*  They probably see the patient, but the direct contact

 7       is probably not there.

 8    *Q.*  If they have their head down and working on

 9       prescriptions, they probably won't even see the customer,

10       right?

11    *A.*  That's possible, yes, sir.

12    *Q.*  That's, in fact, quite common, isn't it?

13    *A.*  I'll take your word for it.

14    *Q.*  Well, I think we've all been there, right?

15    *A.*  Yes, sir.

16    *Q.*  Okay.

17              And the same, similarly, the pharmacist will

18       often fill the -- once he gets it from the clerk, go over

19       it, fill the prescription, they put it in like a bin for

20       pick up, customer comes back, maybe a couple hours later,

21       and they get it from the clerk, right?

22    *A.*  Right, but the clerk has to establish the patient's

23       identity before dispensing it.

24    *Q.*  They ask for an ID; is that what you are saying?

25    *A.*  If it's a controlled substance, they need an ID for

Catizone – Cross / Chazin

1    that to be dispensed and the clerk has to verify that

2    identity.

3    **Q.**  Okay.

4           And is it your belief that that is always

5     followed?

6    **A.**  My belief is that it should always be followed, and if

7    it's not, then it's a violation of the standards.

8    **Q.**  And won't often the family member pick up the

9    prescription for the customer?

10   **A.**  Yes, sir, again, but the clerk has to verify that

11   family member and make sure that they have the permission

12   of the family member to pick it up.  Because what also

13   governs that is the privacy laws, and under the Health

14   Insurance Portability Act, where you cannot discuss with

15   another person someone else's medication and treatment.

16   So you have to be very careful not to violate that.

17   **Q.**  But it is not uncommon for the relative to pick it up?

18   **A.**  Yes, sir.

19   **Q.**  And with regard to the pharmacy owner, would you agree

20   that it would be both advisable and wise for a potential

21   owner of a pharmacy to do due diligence with regards to

22   the legality of, let's say, an Internet pharmacy operation

23   or business to check with an attorney to make sure that

24   what they are doing is legal?

25   **A.**  It would be important to do due diligence.  Whoever

**Catizone — Cross / Chazin**

1    they talk to would be up to the owner.  But yes, I would

2    agree with the due diligence.

3    *Q.*  And, in fact, it would be that much more prudent if

4    they were to get a second opinion, a legal opinion, to

5    make sure that what they are doing was legal; isn't that

6    fair to say?

7    *A.*  Fair, but probably the best source would be the Board

8    of Pharmacy.  That would be the authority on what was

9    legal or not.

10   *Q.*  Okay.

11          But nonetheless, it would be that much more,

12    would you agree, if they got a second opinion?

13          *MR. STEVENS:*  Objection, asked and answered.

14          *THE COURT:*  Sustained.

15   *BY MR. CHAZIN:*

16   *Q.*  I think there was a little discussion earlier about

17   corresponding responsibilities.  There is both the

18   responsibility of the doctor as well as the pharmacist,

19   right?

20   *A.*  Yes, sir.

21   *Q.*  And is it fair to say that the responsibility of the

22   physician is different somewhat --

23   *A.*  Yes, sir.

24   *Q.*  -- from the responsibility of the pharmacist?

25   *A.*  Yes, sir.

**Catizone – Cross / Chazin**

1    *Q.*   In that the physician is trained in certain areas that

2    the pharmacist is not, correct?

3    *A.*   Yes, sir.

4    *Q.*   They have medical training and so on and so forth?

5    *A.*   Yes, sir.

6    *Q.*   And that -- and because of that, the pharmacist, for

7    instance, can't actually prescribe the drug, because it's

8    the medical doctor who has the expertise as to what type

9    of drugs should be prescribed for this patient?

10   *A.*   Yes, sir.

11   *Q.*   And the same for the pharmacist, the pharmacist has

12   certain expertise and training that the pharmacy owner

13   wouldn't be expected to have, correct?

14   *A.*   Yes, sir.

15   *Q.*   Okay.

16          So in that situation, the pharmacy owner in some

17    respects is reliant on the pharmacist to -- and that

18    pharmacist's expertise and training to perform their job

19    and so on and so forth?

20   *A.*   Reliant, but still responsible.

21   *Q.*   Yeah.

22          And that's why the owner can't actually dispense

23    the medication, because they are not qualified and don't

24    have the expertise; fair to say?

25   *A.*   Yes, sir.  Yes, sir.

**Catizone – Cross / Chazin**

1    *Q.*  Okay.

2            Now, you've been in this business a long time,

3    correct?

4    *A.*  Yes, sir.

5    *Q.*  Sounds like you have a lot of expertise, correct?

6    *A.*  Yes, sir.

7    *Q.*  And I assume one thing that you've learned, that it's

8    important to be thorough and well prepared, correct?

9    *A.*  Yes, sir.

10   *Q.*  And to make sure that you have all the relevant facts

11   when forming an opinion?

12   *A.*  Yes, sir.

13   *Q.*  And that makes your opinion more credible, right?

14   *A.*  Yes, sir.

15   *Q.*  Okay.

16            And it's a more professional approach as well?

17   *A.*  Yes, sir.

18   *Q.*  Because your opinion is really only as good as the

19   facts upon which it's based, right?

20   *A.*  Yes, sir.

21   *Q.*  And do you recognize the man sitting over there in the

22   white shirt?

23   *A.*  No, sir.

24   *Q.*  Okay.

25            You don't know him at all, right?

**Catizone – Cross / Chazin**

1    *A.*  No, sir.

2    *Q.*  Never spoke with him, Mr. Herholz?

3    *A.*  No, sir.

4    *Q.*  Okay.

5              Same thing with Mr. Arnold over here?

6    *A.*  No, sir.

7    *Q.*  Okay.

8              Now, the facts that you've reviewed with regards

9     to this case, I think you indicated were the indictment?

10   *A.*  Yes, sir.

11   *Q.*  And also you went over with us the controlled buys?

12   *A.*  And the affidavits, sir.

13   *Q.*  Right, okay.

14              And that was all supplied to you by the -- by

15    Ms. Ault or Mr. Stevens?

16   *A.*  Yes, sir.

17   *Q.*  Okay.

18              And you haven't reviewed any of the actual

19    testimony in this case, correct?

20   *A.*  No, sir.

21   *Q.*  And you haven't reviewed any of the actual witness

22    testimony specifically?

23   *A.*  No, sir.

24   *Q.*  And you also haven't reviewed any of the individual

25    witness's statements from the investigation reports in

**Catizone – Redirect / Stevens**

1   this case, correct?

2   *A.*  No, sir.

3   *Q.*  Okay.

4        So you really don't have all the facts of this

5   case, do you?

6   *A.*  Not all the facts, but the facts enough to render an

7   opinion.

8        *MR. CHAZIN:*  Thank you.

9        *THE COURT:*  Redirect?

10       *MR. STEVENS:*  Yes, Your Honor.

11              **REDIRECT EXAMINATION**

12  *BY MR. STEVENS:*

13  *Q.*  Mr. Catizone, during the initial cross-examination,

14  you were asked about Exhibit 554 and 555, I believe, the

15  California statutes, and whether the language said

16  "face-to-face" or "physical examination."

17       Do you remember that?

18  *A.*  Yes, sir.

19  *Q.*  Do you also recall in your direct testimony, you had

20  mentioned in passing some other entities upon which you

21  based your -- some other standards upon which you based

22  your opinion; namely, one of which was the Federal --

23  Federation of State Medical Boards of the United States.

24       Do you recall that?

25  *A.*  Yes, sir.

1              **MR. STEVENS:**   And I'd like to display now a

2      document that's already been admitted into evidence as

3      Exhibit 563, and, in particular, page 5.

4      **BY MR. STEVENS:**

5      **Q.**   And Section 5 and specifically under "Treatment," is

6      there the federal -- you mentioned FSMB, is this standard

7      one of the standards that you were referring to earlier in

8      your testimony?

9      **A.**   Yes, sir.

10     **Q.**   And is there any correlation, in your opinion, between

11     this particular provision as it relates to Internet

12     prescribing and the terminology used in the California

13     Business and Professions Code standards about good faith

14     examination?

15     **A.**   Yes, sir.

16     **Q.**   And can you read what it says there under "Treatment."

17     **A.**   "Treatment and consultation recommendations made in an

18     online setting, including issuing a prescription via

19     electronic means, will be held to the same standards of

20     appropriate practice as those in traditional

21     (face-to-face) settings.  Treatment based solely on an

22     online questionnaire or consultation does not constitute

23     an acceptable standard of care."

24     **Q.**   And, in your opinion, is this standard embodied within

25     the concept expressed in the California Business and

**Catizone – Redirect / Stevens**

1    Professions Code?

2    *A.*   Yes, sir, because those concepts were written in a

3    broad way to allow for the profession or the

4    practitioners, through professional standard setting

5    groups like the federation, to further define those,

6    because you can't put everything in a law or regulation.

7    And that's why they make them broad.

8             And there is different terminology, but they all

9     mean the same thing, and they all come back to the

10     standards that are then issued to clarify what that means

11     and what practitioners should be doing because that's the

12     standard of care.

13    *Q.*   Now, you had another question by the other attorney,

14    Mr. Chazin, regarding the owner and the application

15    process and lawyers and so forth, and your answer was

16    something to the effect of that the Board of Pharmacy was

17    the source of -- was, in your opinion, a valid -- the best

18    source of information about compliance with pharmacy rules

19    and standards?

20    *A.*   Yes, sir.

21    *Q.*   And in your experience, does the Board of Pharmacy

22    rely on truthful disclosures by applicants?

23    *A.*   Yes, sir.

24    *Q.*   And in your experience, does the Board of Pharmacy

25    issue permits relying upon the nature of the disclosures

**Catizone – Recross / Ellsworth**

1     made by the applicants?

2     **A.**  Yes, sir.

3          **MR. STEVENS:**  Thank you, I have nothing further.

4                    <u>RECROSS-EXAMINATION</u>

5     **BY MR. ELLSWORTH:**

6     **Q.**  Exhibits 554 and 555, which were the California

7     regulatory laws.

8     **A.**  Yes, sir.

9     **Q.**  Those were laws, right?

10    **A.**  Yes, sir.

11    **Q.**  And what you read -- what Mr. Stevens asked you to

12    read, that was a recommendation or a guideline by a

13    private organization, right?

14    **A.**  It was a standard.

15    **Q.**  A standard by a nongovernmental private organization?

16    **A.**  Yes, sir.

17          **MR. ELLSWORTH:**  But let's put that one up, if we

18    can.  Let's go to page 7, section 3.

19    **BY MR. ELLSWORTH:**

20    **Q.**  And that's the Federation of State Medical Boards?

21    **A.**  Yes, sir.

22    **Q.**  And that was part of what you relied upon for your

23    opinion today?

24    **A.**  Yes, sir.

25    **Q.**  Okay.

**Catizone – Recross / Ellsworth**

1          Could you read in that exhibit -- I know it's a

2     long one, but the second sentence, which I believe is a

3     long sentence, but it's the last sentence.

4     *A.*   The second sentence of the first paragraph or the

5     second?

6     *Q.*   "The relationship between."

7     *A.*   "Between physician and patient is complex and based on

8     a mutual understanding between the physician and patient

9     of the shared responsibility for the patient's health

10    care."

11    *Q.*   And the next one too.

12    *A.*   "Although the board recognizes that it may be

13    difficult in some circumstances, particularly an online

14    setting, to define precisely the beginning of the

15    physician-patient relationship, it tends to begin when an

16    individual seeks assistance from a physician with a

17    health-related matter for which the physician may provide

18    assistance."

19    *Q.*   And then it goes on to say, "However, the relationship

20    is clearly established when the physician agrees to

21    undertake diagnosis and treatment of the patient and the

22    patient agrees, whether or not there has been a personal

23    encounter between the physician or other supervised health

24    care practitioner and the patient."

25          Correct?

**Catizone – Recross / Ellsworth**

1    *A.*   Yes, sir.

2    *Q.*   And then it goes on to say that "the physician-patient

3    relationship is fundamental to the provision of acceptable

4    medical care.  It is the expectation of the board" -- and

5    by that they mean the private organization, the Federation

6    of State Medical Boards?

7    *A.*   No.  They are referring back to the individual medical

8    board, the state licensing authority.

9    *Q.*   And this is not necessarily the rules of that

10   particular medical board.  It's a suggested rule?

11   *A.*   Correct.

12   *Q.*   Okay.

13          So the suggested rule goes on to say that

14   "physicians recognize the obligation, responsibilities,

15   and patient rights associated with establishing and

16   maintaining an appropriate physician-patient

17   relationship, whether or not interpersonal contact

18   between physician and patient has occurred."

19          Correct, sir?

20   *A.*   Yes.

21          *MR. ELLSWORTH:*  Thank you.

22          *THE COURT:*  Anything further?

23          *MR. STEVENS:*  If I can have one minute, please,

24   Your Honor?

25          *THE COURT:*  Sure.

**Catizone – Further Redirect / Stevens**

1          **MR. STEVENS:**  Thank you.

2                          **(Pause in the proceedings.)**

3                          <u>FURTHER REDIRECT EXAMINATION</u>

4    **BY MR. STEVENS:**

5    **Q.**  Does the provision in that standard that was just read

6    to you alter the other provision that indicates that

7    online questionnaires is never an acceptable method by

8    which to base a prescription?

9    **A.**  No, because that information, if you read the entire

10   document and the context of that, talks about establishing

11   a relationship.  It doesn't say in those -- the sections I

12   just read, that that's the entire relationship or that's

13   the relationship needed to treat or write a prescription

14   for that patient.

15          A physician can have a relationship with a

16   patient without interpersonal contact that doesn't

17   require a prescription, doesn't require treatment, but

18   establishes some relationship for that patient.

19          The document and the standards clearly say that

20   for the physician to provide care and to issue a

21   prescription, there has to be that interpersonal contact

22   or that physical examination.

23          That's a clarification the standards make or

24   those recommendations make in the document later and

25   other publications.

**Catizone – Further Redirect / Stevens**

1   **Q.**  And if the pharmacist knows that the only -- or if the

2   only information the pharmacist is relying upon is a

3   questionnaire submitted to a physician, is that

4   questionnaire process alone within the standards of care

5   for pharmacy practice?

6   **A.**  No.

7              **MR. STEVENS:**  Nothing further.

8              **THE COURT:**  Okay.  Thank you very much.

9              **THE WITNESS:**  Thank you.

10              **THE COURT:**  Ladies and gentlemen, we are going to

11   take our recess now.  We will be in recess until 11:15.

12              Remember the admonition given to you:  Don't

13   discuss the case; allow anyone to discuss it with you;

14   form or express any opinion.

15                        **(Jury out at 10:53 a.m.)**

16                        **(The following proceedings were held**

17                        **outside the presence of the jury with**

18                        **both defendants present at 11:16 a.m.)**

19              **MR. STEVENS:**  Your Honor, may I have one moment

20   to speak with Mr. Swanson?

21                        **(Jury in at 11:18 a.m.)**

22              **THE COURT:**  Okay, pleased be seated.

23              Let the record reflect all jurors are present,

24   the parties are present.

25              Call your next witness.

1      **MR. STEVENS:**  The United States calls Special

2   Agent Jason Chin.

3                    <u>**JASON WAYNE CHIN**</u>,

4   called as a witness for the Government, having been duly

5   sworn, was examined and testified as follows:

6           **THE CLERK:**  Please state your full name, spell

7   your last name for the record.

8           **THE WITNESS:**  My name is Jason Wayne Chin.  My

9   last name is spelled C-H-I-N.

10                   <u>**DIRECT EXAMINATION**</u>

11  *BY MR. STEVENS:*

12  *Q.*  What is your occupation, sir?

13  *A.*  I am a special agent with the Drug Enforcement

14  Administration.

15  *Q.*  How long have you been a special agent?

16  *A.*  For approximately 7 years.

17  *Q.*  And where are you assigned?

18  *A.*  I'm assigned to the DEA San Francisco field division.

19  *Q.*  What are your -- generally speaking, what are your

20  duties as a DEA special agent?

21  *A.*  My duties as a DEA special agent primarily include

22  investigating violaters of the Federal Controlled

23  Substances Act.  And that's done through various

24  investigative techniques.

25  *Q.*  And did you participate in an investigation of an

**Chin – Direct / Stevens**

1    Internet pharmacy known as Pitcairn?

2    *A.*  Yes, sir.

3    *Q.*  And also related what are known as fulfillment

4    pharmacies?

5    *A.*  Yes.

6    *Q.*  When did -- approximately when did that investigation

7    begin?

8    *A.*  Approximately July 2005.

9    *Q.*  And what was your assignment within the investigation?

10   *A.*  My assignment was to conduct the financial

11   investigation into Pitcairn Group.

12   *Q.*  And why was -- why were you assigned to conduct the

13   financial investigation?

14   *A.*  I was assigned to conduct the financial investigation

15   because I wanted to identify the total proceeds that were

16   earned by Pitcairn Group through the online pharmacy

17   operation.  I wanted to identify the full scope of the

18   operation by identifying new financial leads, which would

19   lead to the identification of potential new targets and

20   new bank accounts and ultimately identify the beneficial

21   receiver of the proceeds.

22   *Q.*  And in addition to investigating you spoke about

23   controlled substances, are you -- does your investigation

24   include a determination of whether there was any money

25   laundering activity?

**Chin – Direct / Stevens**

1    *A.*   Yes.

2    *Q.*   Now, going to your investigative steps, generally

3    speaking, what investigative steps did you take in order

4    to conduct the financial tracing in this case?

5    *A.*   The steps I took was to gather financial records that

6    were related to this particular operation, and that would

7    include things like bank records, high asset purchase

8    records.

9    *Q.*   Okay.

10           And what -- by what methods did you gather those

11    types of records?

12    *A.*   The methods that were used were subpoena requests,

13    mutual legal assistance treaty requests for the foreign

14    bank accounts, and also through voluntary cooperation.

15    *Q.*   And could you just briefly explain what you mean by

16    "mutual legal assistance treaty requests"?

17    *A.*   Mutual legal assistance treaty requests, or MLAT, is a

18    formal request that is done by the United States

19    Government to other foreign countries.  And they are the

20    request records that are relevant to your investigation.

21    *Q.*   And so did you just send out requests and get all the

22    records back all at once?

23    *A.*   No.

24    *Q.*   Could you explain, then, how the process worked sort

25    of in a chronological fashion.

**Chin – Direct / Stevens**

1    *A.*  Sure.

2           Well, the first thing is to identify a particular

3    account that is associated with either the online

4    pharmacy operation, in this case Pitcairn Group, or the

5    individuals who are participating in the online pharmacy

6    investigation -- in the online pharmacy operation.

7           And once you establish or identify a bank

8    account, you analyze that bank account for potential new

9    leads.  And then as you identify new leads, you then make

10   requests such as an MLAT request to request those

11   particular records that you've newly identified.

12   *Q.*  Okay.

13          And in testifying just now, you have been using

14   terminology like "you do this" and "you could that."

15   What I'm asking is, did you do those things?

16   *A.*  Yes, I did those things.

17   *Q.*  Now, in your financial investigation, did you come

18   across financial accounts that were in the name of

19   businesses as opposed to human beings?

20   *A.*  Yes.

21   *Q.*  And what sort of investigation did you conduct to

22   determine who was operating the business?

23   *A.*  In the case where it was a business, I requested the

24   incorporation documents for that particular business so

25   that I could identify who was the owner of those

**Chin – Direct / Stevens**

1     businesses.

2     **Q.**  Now, as to the extent that you did –– or first of all,

3     did you receive responses to the various subpoenas and

4     MLATs and so forth?

5     **A.**  Yes.

6     **Q.**  And when you received those financial records, what

7     did you do?

8     **A.**  When I received the financial records, I went through

9     a process of conducting an analysis of those records.

10    That would include just general review of the records

11    themselves.  To the extent that it consists of bank

12    records such as statements, what I would do is, I would

13    take a look at each transaction that is included in those

14    bank statements and I would do that by –– by taking the

15    transactions and putting them into an Excel spreadsheet,

16    and then for analyzing those records, I would then conduct

17    sorts on those entries into the spreadsheets.

18    **Q.**  A sort is a –– can you explain, what do you mean by a

19    sort done in an Excel spreadsheet?

20    **A.**  Basically what you can do is, there are multiple ways

21    that you can sort a document in a spreadsheet.  It can be

22    done by date, or, in this particular case for specific

23    transactions, there are payees and various sources of

24    deposits.  You can sort it that way to identify the total

25    amount that was either deposited by a particular source

**Chin – Direct / Stevens**

 1   into the account or the total amount that was sent out of

 2   the account to a particular entity.

 3   *Q.*   Now, Special Agent Chin, I would like to, if you

 4   could, provide a general description of the flow of money

 5   in this case, based upon the analysis that you performed,

 6   direct your attention, there is a whole stack of folders

 7   in front of you --

 8   *A.*   Okay.

 9   *Q.*   -- one of which, hopefully the top one, is labeled

10   Exhibit 42.

11           Do you have that hard copy document in front of

12    you?

13   *A.*   Yes, I do.

14   *Q.*   And do you recognize what Exhibit 42 is?

15   *A.*   Yes, I do.

16   *Q.*   What is it?

17   *A.*   This particular exhibit is an overview of the flow of

18   funds, starting with a customer purchase from the Pitcairn

19   online pharmacy website, ultimately showing funds that

20   would have transited through Optimal Payments to Pitcairn

21   and then to the payment of various expenses associated

22   with the online pharmacy operation.

23   *Q.*   And was Exhibit 42 that you are looking at one of the

24   things that you or another investigator prepared in

25   connection with this online pharmacy investigation?

Chin – Direct / Stevens

```
1    A.  Yes.
2             MR. STEVENS:  Request that Exhibit 42 be admitted
3    into evidence.
4             THE COURT:  Admitted.
5                    (Plaintiff's Exhibit 42 was received in
6                    evidence.)
7             MR. STEVENS:  Display 42, please.
8    BY MR. STEVENS:
9    Q.  At a high level, Special Agent Chin, would you
10   describe the various steps -- first of all, are these
11   boxes and arrows reflective of the flow of -- general flow
12   of funds as based upon your financial investigation?
13   A.  Yes.
14   Q.  And would you at a high level, starting with the
15   customer, walk through that and explain what the various
16   steps are.
17   A.  Sure.
18             In this particular case, you have starting with
19    the customer, the customer would go to the ownership
20    pharmacy website, which is here in the middle, and they
21    would make their order for whatever drugs they wanted.
22    And after they input their credit card information, that
23    credit card information would be transferred or it would
24    be -- the transfer would be facilitated of that
25    information by Optimal Payments, which is here
```

```
 1      (Pointing.)

 2              Once that payment information is inputted into

 3      the electronic system, essentially there is communication

 4      between the acquiring bank and the issuing bank.  The

 5      issuing bank is the bank that would have issued the

 6      credit card to the customer.  And basically what happens

 7      in terms of the communication is, the acquiring bank

 8      would make an inquiry with the issuing bank to see if

 9      there is enough money available on this particular

10      customer's credit card.

11              Once that transaction has happened and the

12      acquiring bank gets the okay and the settlement is done

13      at the end of the day, the issuing bank will send money

14      to the acquiring bank like this (pointing).

15   Q.  Okay.

16              And then?

17   A.  And then once the acquiring bank receives the funds

18      from the issuing bank, the acquiring bank will then send

19      money to Optimal Payments, and then Optimal Payments will

20      send money to Pitcairn, and then once Pitcairn receives

21      the funds, Pitcairn will make payments to -- for the

22      various expenses associated with the online pharmacy

23      operation, which is this row at the bottom of the slide.

24              That would include payments to affiliates, to

25       doctors, shipping expenses, to pharmacies, and to other
```

**Chin – Direct / Stevens**

 1      individuals such as pharmacy recruiters.

 2      *Q.*  And Special Agent Chin, you can close up your exhibit

 3      that's in front of you there, 42.

 4              Now I direct your attention to the next folder in

 5       front of you, which should be marked Exhibit 40G.

 6              Do you have 40G in front of you?

 7      *A.*  40G?  No, I do not.  Next one I have is 154.

 8      *Q.*  Okay.

 9              *MR. STEVENS:*  May I have one moment, Your Honor?

10              **(Handing exhibit to witness.)**

11              *MR. STEVENS:*  Thank you, Your Honor.

12      *BY MR. STEVENS:*

13      *Q.*  And would you review, please, Exhibit -- or excuse me,

14      a document that's been marked Exhibit 40G.

15      *A.*  Yes.

16      *Q.*  And are you familiar with Exhibit 40G?

17      *A.*  Yes, I am.

18      *Q.*  And what is it?

19      *A.*  This is a slide that shows an overview of the online

20      pharmacy revenue that was generated by Pitcairn

21      investments and the related entities.

22      *Q.*  Well, before you get to the details, does 40G consist

23      of several pages?

24      *A.*  Yes, it does.

25      *Q.*  Okay.

**Chin – Direct / Stevens**

1              And is 40G a series of slides that you prepared

2      based upon your financial tracing analysis?

3  **A.**  Yes, it is.

4              **MR. STEVENS:**  Request that 40G be admitted into

5      evidence.

6                  **THE COURT:**  Admitted.

7                  How many pages is it?

8              **MR. STEVENS:**  Seven pages, Your Honor.

9              **THE COURT:**  Admitted.

10                      **(Plaintiff's Exhibit 40G was received in**

11                      **evidence.)**

12              **MR. STEVENS:**  Thank you.

13  **BY MR. STEVENS:**

14  **Q.**  Direct your attention now to the first page of 40G;

15      can you explain what the graphics there represent?

16  **A.**  Yes.  This slide covers the online pharmacy revenue

17      that was generated by Pitcairn Investments and its related

18      entities.

19              So in the top box, the orange-colored box, is --

20      represents the various U.S.-based online pharmacy

21      customers who made credit card purchases for drugs

22      through Pitcairn's online pharmacy sites.

23              The second row, which are the blue boxes,

24      identifies the payment processors that were used by

25      Pitcairn Investments to process the credit card payments

**Chin – Direct / Stevens**

1    from the online pharmacy customers.

2    *Q.*  Now, in your testimony, in the previous exhibit, you

3    had that graphic that depicted only Optimal Payments.  In

4    this row, second row, there is another blue square there.

5    Can you explain what that is?

6    *A.*  Yes.

7              The second blue square is another credit card

8     payment process -- payment processor, it was done by this

9     bank called Banque Invik, which was located in

10    Luxembourg.

11   *Q.*  And totaling the payments from online pharmacy

12   customers to Optimal Payments and Banque Invik, what is

13   the approximate amount of money that went from the

14   customers to these two processing entities?

15   *A.*  There -- it was approximately $70 million.

16   *Q.*  And during roughly what time frame was that received?

17   *A.*  It was received beginning in June 2005 through

18   August 2007.

19   *Q.*  Now, can you explain what that third row is with the

20   green boxes, light green boxes?

21   *A.*  Yes.  The light green boxes consist of the various

22   operating accounts for Pitcairn Investments that were

23   identified through the financial investigation that I

24   conducted.

25   *Q.*  Okay.

**Chin – Direct / Stevens**

1          And can you walk through what those accounts

2     were?

3     **A.**  Yes.  Starting on the left, the first light green box

4     is -- represents an account held in the name of Echo

5     International S.A., which was located at the Bank of Nevis

6     in St. Kitts in Nevis.

7          The total funds that identified into that account

8     from Optimal Payments was approximately $14.8 million.

9     And the time frame was between June 2005 through

10    February 2006.

11         The second box is -- represents an account held

12    in the name of Echo International S.A., which was the

13    Premer Banco del Istmo, which was located in Panama.

14    That account received approximately $2.1 million from

15    Optimal Payments over the time period of August 2005

16    through September 2005.

17         The third box represents an account held in the

18    name of Pitcairn Investments, Inc., at Credit Corp. Bank,

19    located in Panama.  That account received approximately

20    $25.5 million from Optimal Payments over the time period

21    of February 2006 through August 2006.

22         And the fourth box represents an account held in

23    the name of Digital Billing NV, which was located at RPTT

24    Bank in Curaçao.  That account received approximately

25    $9.3 million from Optimal Payments, and that time period

```
 1      occurred between November 2006 through August 2007.

 2              And the last box represents an account held in

 3      the name of Digital Billing NV, which was held in the

 4      name of Banque Invik in Luxembourg and identified

 5      approximately $17.8 million deposited into that account

 6      from Banque Invik Luxembourg.

 7              MR. STEVENS:  If we could take this page down and

 8      put in a document which has been admitted by stipulation,

 9      which is Exhibit 336.

10              THE COURT:  336 admitted.

11                      (Plaintiff's Exhibit 336 was received in

12                      evidence.)

13      BY MR. STEVENS:

14      Q.  And could we take -- do you have 336?

15              MR. STEVENS:  Your Honor, may I have one moment,

16      please?

17                      (Handing document to witness.)

18              THE WITNESS:  Yes, I have Exhibit 336.

19      BY MR. STEVENS:

20      Q.  And what does Exhibit 336 represent?

21      A.  Three -- Exhibit 336 represents a merchant account

22      application for Echo International at Optimal Payments.

23      Q.  Optimal Payments on the first exhibit was one of the

24      credit card processors for the customer Visa proceeds?

25      A.  Yes, that's correct.
```

**Chin – Direct / Stevens**

1      **MR. STEVENS:**   And if we could turn to the next

2      page of Exhibit 336, please.   And highlighting the top

3      couple of boxes.

4   **BY MR. STEVENS:**

5      *Q.*   What is the name of the business in which this account

6      is open?

7      *A.*   The name of the business is Echo International S.A.

8      *Q.*   And is there indicated on this account opening

9      document, a space for an authorized business

10      representative --

11      *A.*   Yes.

12      *Q.*   -- on the left-hand side?

13      *A.*   Yes, there is.

14      *Q.*   And what is that?

15      *A.*   It says Mike Johnston.

16      *Q.*   Is there a website listed on there as well?

17      *A.*   Yes, there is.

18      *Q.*   And what is that?

19      *A.*   Www.echorx.net.

20      *Q.*   Okay.

21           And to the right-hand side, is there any

22      telephone contact information?

23      *A.*   Yes, there is.

24      *Q.*   And what is that number?

25      *A.*   (800)242-5942.

1        **MR. STEVENS:**  And if we could scroll down a

2    little bit on the page?

3    **BY MR. STEVENS:**

4    **Q.**  On the second box at the top does it list the

5    ownership?

6    **A.**  Yes, it does.

7    **Q.**  Whose name is the ownership?

8    **A.**  Diego Paes.

9            **MR. STEVENS:**  If we could turn now back to

10   Exhibit 40G, please, and the second page of that?

11   **BY MR. STEVENS:**

12   **Q.**  And if you could please describe what that various --

13   is this another step of the analysis that you conducted

14   based upon your obtaining and analyzing financial records?

15   **A.**  Yes, it is.

16   **Q.**  And can you describe what the -- what the boxes on

17   this page represent?

18   **A.**  Yes.  This slide represents the various expenses paid

19   by Pitcairn.  The expenses include several categories.

20   And they were all paid for from operating accounts owned

21   by Pitcairn, as indicated in the green box at the top.

22   **Q.**  Okay.

23           And what are the types of expenses and the

24    amounts and date ranges that they were -- that these

25    transfer occurred?

**Chin – Direct / Stevens**

1   *A.*  The first expense that was identified, that I

2   identified, was expenses paid to pharmacies, and the

3   amount was approximately $13.6 million.  And the date

4   range for that occurred between May 2005 through

5   January 2007.

6          The second category was expenses related to

7   doctors, in this case it was Dr. Alfred Valdivieso, and

8   the amount was approximately a million dollars.  And the

9   time period was June 2005 through December 2006.

10         The second -- or the third, rather, box

11  represents expenses paid to affiliates.  That amount was

12  approximately $16.8 million.  And that occurred between

13  September 2005 through January 2007 --

14  *Q.*  Let me stop you there.

15         Based on your investigation, what are

16  affiliates -- how do they fit into this flow of funds?

17  *A.*  Affiliates are -- affiliates are considered

18  advertisers.  So in this particular case for Pitcairn,

19  they would own online pharmacy websites and they would

20  direct traffic to Pitcairn's online pharmacy program.

21  *Q.*  All right.

22         And moving beyond that to pharmacy recruiter,

23  what's that?

24  *A.*  That is -- that is expense totaling approximately

25  $2 million.  And that occurred over the time period of

**Chin – Direct / Stevens**

1    May 2005 through January 2007.

2    *Q.*   Are you familiar with someone, based on your knowledge

3    of this case, who acted as the pharmacy -- or a pharmacy

4    recruiter?

5    *A.*   Yes, I am.

6    *Q.*   Who was that?

7    *A.*   Salvatore Lamorte.

8    *Q.*   And moving beyond that to the next series of boxes.

9    *A.*   The next category would be shipping expenses, and that

10   totaled approximately $3.3 million and occurred between

11   June 2005 through January 2007.

12   *Q.*   Okay.

13   *A.*   The next box are expenses paid by Backend Software.

14   *Q.*   What does that mean?

15   *A.*   Backend Software was the actual software program that

16   was used by Pitcairn Group to power their online pharmacy.

17   Those expenses were paid starting in August 2005 through

18   January 2007.

19   *Q.*   And you have an entry, the next box up is doctor

20   recruiter David John; what does that refer to?

21   *A.*   David John, through this investigation, was identified

22   as the recruiter who recruited Dr. Hassan Gaafar.  And

23   those expenses totaled approximately $136,000.

24   *Q.*   And where did David John work, based on what you know?

25   *A.*   David John was identified as the chief financial

**Chin – Direct / Stevens**

1    officer of United Care Pharmacy.

2    *Q.*  And up on the top you have a -- relative to all the

3    other amounts, a fairly small amount of 8,870.75.  What

4    does that represent?

5    *A.*  Those are expenses associated with graphic design.

6    *Q.*  Who was the graphic designer, based on your

7    investigation?

8    *A.*  Ebon Weston-Savage.  And the amount that was paid for

9    that was approximately $9,000.  And that occurred between

10   May 2005 through December 2006.

11           *MR. STEVENS:*  If we could turn to the next page

12   of 40G, please?

13   *BY MR. STEVENS:*

14   *Q.*  So in the previous slide you identified one of the

15   boxes was transfer from Pitcairn related account to

16   pharmacy, and there you had approximately 13 -- well, you

17   had 13,585,454,039, correct?

18   *A.*  Yes.

19   *Q.*  And on this slide, what does this slide represent

20   relative to that prior figure and slide that I just

21   referenced?

22   *A.*  This would represent the breakdown to payments of

23   specific pharmacies that were involved with Pitcairn.

24   *Q.*  And how did you determine -- how did you make this

25   analysis?

**Chin – Direct / Stevens**

1   *A.*   The analysis was done by my review of various

2   operating accounts associated with Pitcairn, which were

3   located in the green box at the top.

4   *Q.*   And then how did you know whether a particular

5   transfer landed in a particular pharmacy such as Budget or

6   United Care?

7   *A.*   I conducted a review of the transactions from these

8   particular accounts, and they indicated that the payments

9   were sent to these various pharmacies.

10   *Q.*   So starting with -- are these pharmacies arrayed from

11   left to right in chronological order?

12   *A.*   Yes.

13   *Q.*   And so what was the earliest pharmacy indicated there?

14   *A.*   The earliest pharmacy is Budget Pharmacy or -- also

15   money as Budget, Inc.  And the date for that was May 2005

16   through September 2005.  And the amount was approximately

17   $494,000.

18   *Q.*   And what's the next pharmacy?

19   *A.*   The next pharmacy is United Care Pharmacy.

20   *Q.*   Now, is there some -- that doesn't follow directly

21   from September 2005, does it?

22   *A.*   No.

23   *Q.*   So what's the explanation for that?

24   *A.*   There was some overlap.  Pitcairn would utilize

25   different pharmacies.  Sometimes the pharmacies they used

**Chin – Direct / Stevens**

1    would be at the same time.

2    *Q.*   And United Care Pharmacy, what's the approximate

3    amount there and the date range?

4    *A.*   The approximate amount is 3.6 million.  And that

5    occurred from July 2005 through March 2006.

6    *Q.*   And the next pharmacy?

7    *A.*   The next pharmacy is Kwic Fill.

8    *Q.*   And continue.

9    *A.*   And the amount --

10   *Q.*   The amount?

11   *A.*   Yeah.  The amount of funds that were paid by Pitcairn

12   to Kwic Fill was approximately 1.5 million.  And that

13   occurred between February 2006 through April 2006.

14   *Q.*   And what happened with respect to the fund transfer

15   pattern after April 2006?

16   *A.*   The next pharmacy that was indicated would be payment

17   to Woodbury Pharmacy.  And those payments occurred between

18   April 2006 through August 2006.

19   *Q.*   Okay.

20   *A.*   And the amount was approximately $2.8 million.

21   *Q.*   And from there?

22   *A.*   From there, the next pharmacy would be -- it's a

23   little bit out of chronological order here, but the next

24   box is DAFIRM, Inc., Central Express Pharmacy, and

25   payments there occurred over the time period,

**Chin – Direct / Stevens**

1    November 2006 and this June, it's actually a typo, it

2    should be January 2007.  And the amount was approximately

3    $2.8 million.

4    *Q.*  And the next pharmacy?

5    *A.*  The next pharmacy is Alpha Pharmacy, also known as

6    Alpha, Inc.  The date range on that is July 2006 through

7    August 2006.  And it was approximately $133,000.

8    *Q.*  And just continue on for the last two.

9    *A.*  Okay.

10          The next one is Mail Meds, the time period for

11    that is July 2006 through October 2006.  And the total

12    was approximately 1.8 million.

13          And the last pharmacy was Sane Solutions.  And

14    that was from August 2006 to October 2006.  And the total

15    payment to that was approximately 315,000.

16    *Q.*  Okay.

17          So the total date span represented on this page

18    of 40G was from what month and year starting to what

19    month and year ending?

20    *A.*  May 2005 through January 2007.

21    *Q.*  Okay.

22          And based on your investigation, do you know why

23    the fund transfers switched from one pharmacy to another

24    to another?

25    *A.*  Yes.  Some of the pharmacies that are listed on this

**Chin – Direct / Stevens**

 1    particular slide were closed down through either

 2    administrative action or law enforcement action.

 3              **MR. STEVENS:**  Turning now to the next page of

 4    40G, please?

 5  **BY MR. STEVENS:**

 6  **Q.**  One of the pharmacies on the prior slide you mentioned

 7    was Kwic Fill Pharmacy.  Do you recall that?

 8  **A.**  Yes.

 9  **Q.**  What does this slide focus on in particular?

10  **A.**  This slide represents payment that were made to Kwic

11    Fill Pharmacy from two operating accounts for Pitcairn

12    Investments.

13  **Q.**  And how much money did the -- or, first of all, did

14    you identify the Kwic Fill, Inc., First South Bank

15    account?

16  **A.**  Yes.

17  **Q.**  And directing your attention now to a folder, which

18    would be marked Exhibit 154.

19  **A.**  Okay.

20  **Q.**  And if you could open that and review it, please.

21              This is a document that has been admitted by

22     stipulation, as well.

23  **A.**  Okay.

24              **MR. STEVENS:**  If we can show 154, please --

25    actually, 154A?

**Chin – Direct / Stevens**

1   *BY MR. STEVENS:*

2   *Q.*  What is that document?

3   *A.*  This is a signature card for a First South Bank

4   account held in the name of Kwic Fill, Inc.

5             *MR. STEVENS:*  And if we could look at the bottom

6   portion of the card?

7   *BY MR. STEVENS*

8   *Q.*  Who is the -- who are the signatories on this account?

9   *A.*  The signatories on this account are Jeffrey Herholz

10  and Carl Patterson.

11  *Q.*  Do you see Mr. Herholz in the courtroom today?

12  *A.*  Yes, I do.

13  *Q.*  Where is he?

14  *A.*  He is sitting at the table over there.  He is sitting

15  at the table, at the defense table, on the right-hand side

16  of the courtroom to my right.

17  *Q.*  And what color shirt is he wearing?

18  *A.*  He is wearing a white shirt.

19             *THE COURT:*  Let the record indicate he has

20  identified the defendant.

21             *MR. STEVENS:*  Thank you, Your Honor.

22  *BY MR. STEVENS:*

23  *Q.*  There is another individual on there; do you know who

24  that is?

25  *A.*  Carl Patterson.  He was the accountant for

**Chin – Direct / Stevens**

1    Mr. Herholz.

2              **MR. STEVENS:**  And if we could turn now back to

3    the 40G exhibit, the page on which we were last

4    discussing.

5    **BY MR. STEVENS:**

6    **Q.**  The purple box for Kwic Fill, do you know the

7    approximate date range in which Kwic Fill received

8    transfers totaling approximately $1.5 million?

9    **A.**  Yes.  It's February 2006 through April 2006.

10   **Q.**  So roughly three months?

11   **A.**  Yes.

12   **Q.**  Now, what does the next line of the next row of boxes

13   indicate?

14   **A.**  The next row indicates the expenses that were paid by

15   Kwic Fill to include drug wholesalers and payments made to

16   Mr. Herholz himself.

17   **Q.**  Now, can you explain why the two boxes, the light blue

18   and the red, totaled together are more than the amount

19   that went from the green box, i.e., Pitcairn, to Kwic

20   Fill?

21   **A.**  Yes.

22   **Q.**  What is the explanation for that?

23   **A.**  The 1.5 million figure only represents payments that

24   identified originating from Pitcairn Investments'

25   operating accounts.  And the expenses paid by Kwic Fill

**Chin – Direct / Stevens**

1    exceed that amount because Kwic Fill filled orders for

2    other online pharmacy organizations.

3    *Q.*  Now, I would like to direct your attention to a folder

4    in front of you labeled 154C -- or, first of all, before

5    we get there:  Staying on this page of 40G, what does the

6    red box represent?

7    *A.*  The red box represents payments to Jeff Herholz.

8    *Q.*  Is that information that you traced from the Kwic Fill

9    First South Bank account --

10   *A.*  Yes.

11   *Q.*  -- to him?

12   *A.*  Yes.

13   *Q.*  And what is that basis for your attributing the 1.3

14   million to him personally?

15   *A.*  It was through my review of the withdrawals from the

16   Kwic Fill account.

17   *Q.*  And turning your attention now to Exhibit marked 154C,

18   which has been admitted by stipulation.

19        Do you recognize the documents in 154C?

20   *A.*  Yes, I do.

21        *MR. STEVENS:*  If we may turn to the next page,

22   please?

23   *BY MR. STEVENS:*

24   *Q.*  So, first of all, what are the documents in 154C?

25   *A.*  They consist of copies of checks from the Kwic Fill

**Chin – Direct / Stevens**

1    account.

2    *Q.*  And to whom is this particular check written?

3    *A.*  This check is made out to Sal Lamorte.

4    *Q.*  And in what amount?

5    *A.*  $18,000.

6         *MR. STEVENS:*  If we could turn to the next page,

7    please?  On the screen.  I'm sorry.

8    *BY MR. STEVENS*

9    *Q.*  Special Agent Chin, have you identified within Exhibit

10   154C checks written to Mr. Herholz?

11   *A.*  Yes, I have.

12   *Q.*  Can you give us an idea of approximately how far into

13   the exhibit that the pages start appearing?

14   *A.*  Yes.  It's approximately the fifth page after the

15   Sal Lamorte check.

16   *Q.*  And is there a -- do you see the check on the screen

17   now?

18   *A.*  Yes, I do.

19   *Q.*  Is this the first of the checks within the exhibit as

20   it's ordered in front of you?

21   *A.*  Yes, it is.

22   *Q.*  I would like you to walk through the checks that you

23   see, although we can use the screen.

24         So what's the first one?

25   *A.*  The first check ends in check No. 347, and it's a

**Chin – Direct / Stevens**

1    check made available payable to Jeff Herholz in the amount

2    of $50,000.

3    *Q.*   What is the date on that check?

4    *A.*   March 24, 2006.

5          *MR. STEVENS:*   If we may turn to the next page in

6    the exhibit, please?

7    *BY MR. STEVENS:*

8    *Q.*   If you would describe this check, please.

9    *A.*   Yes.  This is a check made out to Jeff Herholz, dated

10   March 24, 2006, in the amount of $45,000.

11         *MR. STEVENS:*   And the next page, please -- oops,

12   I think we need to go back.

13         Can we go to the slides that precede the first

14   $50,000 check about which Special Agent Chin testified?

15         *THE WITNESS:*   This is a check that ends in check

16   No. 346.  And this is a check made payable to Jeff Herholz

17   in the amount of $50,000, and it's dated March 24, 2006.

18         *MR. STEVENS:*   And I believe if we go to the image

19   prior to this one.

20   *BY MR. STEVENS*

21   *Q.*   Is that the last check in your exhibit that is written

22   to Mr. Herholz?

23   *A.*   Yes, it is.

24   *Q.*   And is it in the same amount and on the same date as

25   the other $50,000 checks?

**Chin – Direct / Stevens**

1   **A.**   Yes, it is.

2   **Q.**   So all totaled, those four checks added up to how

3   much?

4   **A.**   Oh, approximately $195,000.

5   **Q.**   And they were all written on the same date?

6   **A.**   Yes, they were.

7   **Q.**   And based on the bank records, were they deposited?

8   **A.**   Yes, or they were at least endorsed and cashed by --

9   at least endorsed and cashed.

10  **Q.**   Okay.

11          I would like now to return to Exhibit 40G, your

12  slides.

13          The prior slides focused on payments from the

14  Pitcairn accounts to suppliers, correct?

15  **A.**   Yes.

16  **Q.**   And did you also -- did your tracing analysis end at

17  the payment of suppliers?

18  **A.**   No, it did not.

19  **Q.**   What else did you trace aside from payments from --

20  payments to suppliers?

21  **A.**   I traced funds that ended with the owner of the

22  company.

23  **Q.**   Did you attempt to trace funds to accounts that were

24  affiliated with the defendant, Michael Arnold?

25  **A.**   Yes.

**Chin - Direct / Stevens**

1   *Q.*  And does this page represent some of that analysis?

2   *A.*  Yes, it does.

3   *Q.*  And would you explain, then, starting at the top row,

4   of what this analysis on this page of the exhibit

5   represents?

6   *A.*  Yes.

7           The boxes on the top row represent various

8    operating accounts for Pitcairn Investments.

9   *Q.*  Where are the arrows going to?

10  *A.*  The arrows are pointing to a box that represents bank

11  accounts held in the name of Direct Connect International

12  S.A. at Banco Continental in Panama.

13  *Q.*  And how much money was transferred into that account

14  from the various Pitcairn and Echo accounts?

15  *A.*  Well, also on the bottom as well.

16  *Q.*  I'm sorry.  And on the bottom, thank you.

17  *A.*  It was approximately $5.9 million.

18  *Q.*  And what was that date range during which those

19  transfers were deposited?

20  *A.*  June 2005 through August 2006.

21  *Q.*  Now, you have parentheses there, attributed this

22  account to the defendant, Michael Arnold, correct?

23  *A.*  Yes.

24  *Q.*  And I would like to turn your attention now to a

25  document or a folder in front you that's been marked 355.

**Chin – Direct / Stevens**

1    **A.**   Okay.

2    **Q.**   You have that?

3    **A.**   Yes, I do.

4    **Q.**   Okay.

5              **MR. STEVENS:**   May I have a moment, Your Honor?

6    Thank you.

7                    **(Counsel confer.)**

8    **BY MR. STEVENS:**

9    **Q.**   Directing your attention to Exhibit 355, do you

10   recognize that document?

11   **A.**   Yes, I do.

12   **Q.**   And is there also -- what is that document?

13   **A.**   This document is a signature card for an account held

14   in the name of Direct Connect International S.A., at Banco

15   Continental.

16   **Q.**   And was this a document among those that you received

17   pursuant to a mutual legal assistance treaty request to

18   the -- to Panama?

19   **A.**   Yes.

20             **MR. STEVENS:**   Your Honor, I would ask that

21   Exhibit 355 be moved into evidence.

22             **THE COURT:**   Admitted.

23                    **(Plaintiff's Exhibit 355 was received in**

24                    **evidence.)**

25   ///

**Chin – Direct / Stevens**

1    *BY MR. STEVENS:*

2    *Q.*   Now, you made the attribution on your slide that

3    Direct Connect International Banco Continental is

4    affiliated with Mr. Arnold.  Would you explain what is

5    depicted now on the first page of Exhibit 355, relative to

6    that conclusion that you reached?

7    *A.*   Yes.

8            Exhibit 355, the first page here identifies

9    Michael Arnold as the sole signatory authority for Direct

10   Connect International.

11           *MR. STEVENS:*   If we could turn to the next page,

12   please?  And highlighting the top, or at least blowing up

13   the top of it.

14   *BY MR. STEVENS:*

15   *Q.*   Now, all right.

16           Do you speak Spanish, Agent Chin?

17   *A.*   No, I do not.

18   *Q.*   Have you seen a translation of this -- these account

19   opening documents?

20   *A.*   Yes, I have.

21   *Q.*   And without getting into Spanish, what is the company

22   that is indicated -- or what's the name, corporate name,

23   indicated at the top of this image that's being shown now

24   on the screen?

25   *A.*   Direct Connect International S.A.

**Chin – Direct / Stevens**

1    *Q.*  And do you see further down, a few lines down, where

2    it's indicative of a type of business, sort of a

3    description of a business?

4    *A.*  Yes.

5    *Q.*  What are those words?

6    *A.*  It says "advertising/marketing."

7            *MR. STEVENS:*  And then further down, if we could

8    move down a few levels until around where the stamp is on

9    the document?

10   *BY MR. STEVENS:*

11   *Q.*  Do you see anywhere in that text an e-mail address?

12   *A.*  Yes, I do.

13   *Q.*  And what is that e-mail address?

14   *A.*  Mike@dcpanama.com.

15   *Q.*  And turning further in the exhibit, 355, and this is

16   at Bates label 90630, is there any other indicia in here

17   as to whose account this is that is more definitive than

18   somebody's written name?

19   *A.*  Yes.  There is a copy of a Florida driver's license

20   and a U.S. passport for Michael Arnold.

21   *Q.*  And do you see Defendant Arnold in the courtroom

22   today?

23   *A.*  Yes, I do.  He is standing --

24           *THE COURT:*  Let the record reflect he has

25   identified the defendant.

**Chin — Direct / Stevens**

```
 1              MR. STEVENS:  Now, going back to the slide,
 2      Exhibit 40G, please.
 3      BY MR. STEVENS:
 4      Q.  Next to Direct Connect International, there is another
 5      blue box.  Can you describe what that is and how obtained
 6      information about that account?
 7      A.  Yes.  The next box represents an account held in the
 8      name of Romina Enterprises S.A. at VP bank in
 9      Liechtenstein.  And these records were -- for this
10      particular account were obtained via MLAT request to
11      Liechtenstein.
12      Q.  Were there any transfers into this account from the
13      Pitcairn account, from Echo account on the top portion of
14      this page of the exhibit?
15      A.  No, there were not.
16      Q.  How was this -- from what account did this Romina
17      account receive transfers?
18      A.  This account, the Romina account, was funded by
19      transfers originated by Digital Billing NV at Banque Invik
20      in Luxembourg.
21      Q.  And approximately how much was transferred in and what
22      date range?
23      A.  Approximately 1.5 million was transferred into the
24      Romina account.  And that occurred from November 2006
25      through June 2007.
```

**Chin - Direct / Stevens**

1    *Q.* Now, I want to direct your attention to an exhibit, a

2    folder in front of you that's been -- in a folder marked

3    390.

4            And would you review that exhibit, please.

5    *A.* Okay.

6    *Q.* Do you recognize the documents that comprise the

7    exhibit marked in front of you, 390?

8    *A.* I do.

9    *Q.* What are they?

10   *A.* They are documents related to an account at VP Bank

11   held in the name of Romina Enterprises.

12   *Q.* Are these among the documents that you received based

13   upon a mutual legal assistance treaty request to the

14   country of Liechtenstein?

15   *A.* Yes.

16           *THE COURT:* Admitted.

17                   **(Plaintiff's Exhibit 390 was received in**

18                   **evidence.)**

19           *MR. STEVENS:* Turning to the second page of

20   Exhibit 390.  Is there a next page, please?

21           This would be -- I'm sorry, this would be ending

22   in Bates label 138011.

23   *BY MR. STEVENS:*

24   *Q.* Do you have that in front of you, Special Agent Chin?

25   *A.* Yes, I do.

**Chin – Direct / Stevens**

1    *Q.*  We'll just proceed with that, with what you have.

2    *A.*  Okay.

3    *Q.*  What is reflected in -- what are you looking at?

4    *A.*  I am looking at a withdrawal slip from the Romina

5    Enterprises S.A. account.  It indicates that a withdrawal

6    was made from this account on October 23rd, 2007, in the

7    amount of approximately 1.9 million Swiss francs.

8    *Q.*  And do you see the screen now?  I believe that Ms. Oki

9    has been able to retrieve this.

10   *A.*  Yes.

11   *Q.*  Is that the same document you were just reading about?

12   *A.*  Yes.

13   *Q.*  Do you know approximately how much, as of

14   October 23rd, 2007, that amount of francs was worth in

15   U.S. dollars?

16   *A.*  It would be approximately 1.6 million.

17   *Q.*  And that was -- can you tell from this bank -- from

18   this document as to the manner in which it was withdrawn?

19   In other words, was it a wire transfer or electronic

20   transfer somewhere?

21   *A.*  It appears to be a cash withdrawal, as indicated here.

22   *Q.*  Has your -- did you, as part of your financial

23   analysis, attempt to determine whether a cash deposit was

24   made of a similar amount on the same day as this

25   particular withdrawal was made?

**Chin – Direct / Stevens**

1   *A.*  Yes.

2   *Q.*  And what was your determination in that regard?

3   *A.*  I identified a deposit in the amount of 1.6 million

4   Swiss francs that was deposited on October 23rd, 2007,

5   into a Swiss account held in the name of Cheswold

6   Investments.

7   *Q.*  And this account here in Liechtenstein, what city is

8   that based in in Liechtenstein?

9   *A.*  Vaduz.

10  *Q.*  Where was that Cheswold account?

11  *A.*  In Zurich, Switzerland.

12  *Q.*  Do you have any idea, based upon public sources, how

13  close those two are together?

14  *A.*  According to the public source, it's a approximately

15  an hour and a half.

16  *Q.*  And do you know, during the course of the

17  investigation, at what point did investigators make

18  personal contact with Mr. Arnold?

19  *A.*  Yes.

20  *Q.*  And just give us a month and a year for that.

21  *A.*  August 2007.

22       *MR. STEVENS:*  Now, if we could go back to the 40G

23  chart, please?

24  *BY MR. STEVENS:*

25  *Q.*  And moving beyond Romina Enterprises, what is the next

**Chin – Direct / Stevens**

1    account into which funds were transferred from digital

2    billing and that you have determined to be affiliated with

3    Mr. Arnold?

4    **A.**   The next one is an account held in the name of NSF

5    Treuhandkonto Septo TF, which was an account at first

6    Swiss Bank in Liechtenstein.  And the amount that was

7    deposited into that account was approximately $35,000.

8    And that was in October 2006.

9    **Q.**   If you could turn to a folder marked 385A, please.

10   **A.**   Okay.

11   **Q.**   You have 385A?  Can you describe what 375A is, please.

12   **A.**   385A is an account application for an account at Swiss

13   First Bank held in the name of NSF Trust, Septo TF.

14   **Q.**   Is that among the documents you received pursuant to

15   your MLAT request of Liechtenstein?

16   **A.**   Yes.

17            **MR. STEVENS:**  Your Honor, we move to admit 385A.

18            **THE COURT:**  Admitted.

19                   **(Plaintiff's Exhibit 385A was received**

20                   **in evidence.)**

21   **BY MR. STEVENS:**

22   **Q.**   Now, you said -- what is the account holder name in

23   this particular account, based on the first page of 385A?

24   **A.**   NSF Trust, Septo TF.

25   **Q.**   Is there any information in 385A that would indicate

**Chin – Direct / Stevens**

1    to you who the beneficial owner of the account was of the

2    money in the account?

3    **A.**  Yes.

4    **Q.**  Can you return to the last page or the page ending at

5    139451.

6    **A.**  Yes.

7    **Q.**  Okay.

8    **A.**  The beneficial owner -- the beneficial owner is

9    identified as Michael Arnold.

10   **Q.**  Residing where?

11   **A.**  At 2234 North Federal Highway, Number 489, in Boca

12   Raton, Florida.

13          **MR. STEVENS:**  Now, if we could go back to the

14   screen, the flow chart at 40G, please?

15   **BY MR. STEVENS:**

16   **Q.**  And the next account beyond the NSF account?

17   **A.**  Is an account in the name of Neptune Capital

18   Management S.A.  And that was at Swiss First Bank in

19   Liechtenstein.

20   **Q.**  And give us amounts and the date range for that,

21   please.

22   **A.**  Sure.  The amount deposited was approximately

23   2.2 million.  And the date range was November 2006 through

24   June 2007.

25   **Q.**  And this account -- if you would turn to a folder

**Chin – Direct / Stevens**

1    labeled Exhibit 379, please.

2              Do you have that in front of you?

3    **A.**  Yes, I do.

4    **Q.**  Do you recognize those documents?

5    **A.**  Yes, I do.

6    **Q.**  What are they?

7    **A.**  They are account records for an account at Swiss First

8    Bank held in the name of Neptune Capital Management S.A.

9              **THE COURT:**  Admitted.

10             **MR. STEVENS:**  Thank you, Your Honor.

11                     **(Plaintiff's Exhibit 379 was received in**

12                     **evidence.)**

13   **BY MR. STEVENS:**

14   **Q.**  And you have labeled on your Exhibit 40G that this is

15   an account in the name of Neptune Capital Management S.A.

16             Is that the name of the account holder

17    represented in the first page of 379?

18   **A.**  Yes, it is.

19   **Q.**  And given that fact, is there any information in here

20   indicative of the beneficial owner of the account?

21   **A.**  Yes.

22   **Q.**  And is that on page ending 135364?

23   **A.**  Yes.

24             The beneficial owner on this page is identified

25    as Michael Arnold at 2234 North Federal Highway,

**Chin − Direct / Stevens**

```
 1        Number -- it's a little bit illegible, looks like it says

 2        No. 48, in Boca Raton, Florida.

 3   Q.   Did the account opening information include any

 4   additional data about the relationship between the account

 5   holder, Neptune Capital Management S.A., and another

 6   corporate entity that may be affiliated with Mr. Arnold?

 7   A.   Yes.

 8   Q.   Could you flip to or turn, please, to the page ending

 9   135383.

10   A.   Okay.

11   Q.   Do you have that?

12   A.   Yes, I do.

13   Q.   And can you explain what that is and how it relates to

14   the structure of the corporate account holder of this

15   particular bank account?

16   A.   Yes.

17            This is a resolution which transfers ownership of

18    Neptune Capital Management S.A., which is a Panamanian

19    company, to Neptune -- to another company in the name of

20    Neptune International S.A., which is a Nevis company.

21   Q.   And further in the documents at page 135392, is there

22   any further information in these account opening documents

23   that would -- indicated to you who was the owner of

24   Neptune International S.A.?

25   A.   Yes.
```

**Chin – Direct / Stevens**

1    *Q.* Can you turn to that document, please, at 135392.

2    *A.* Yes.

3    *Q.* And describe what that is and how it relates to what

4    you just testified about Neptune Capital Management.

5    *A.* This is a document that records the transfer of all

6    rights of Neptune International S.A. to Michael Arnold.

7    This occurred on September 14, 2006.  And the rights were

8    transferred by Eugene Herbert.

9    *Q.* So to summarize, this account itself is held in the

10   name of Neptune Capital Management S.A.?

11   *A.* Correct.

12   *Q.* Which, in turn, the shares of which were transferred

13   to Neptune International S.A.?

14   *A.* Correct.

15   *Q.* Which in turn was transferred to Michael Arnold?

16   *A.* Correct.

17   *Q.* Who is the beneficial owner of this account?

18   *A.* Correct.

19          *MR. STEVENS:* Now, if we may return to Exhibit

20   40G, please?

21   *BY MR. STEVENS:*

22   *Q.* And what's the final account amounts and dates of

23   transfers?

24   *A.* This represents an account held in the name of Assure

25   Technology S.A. at Banco Cuscatlan, Panama.  And the

1    amount that was deposited into that account from Pitcairn

2    operating accounts was $926,000.  And that occurred from

3    December 2006 to June 2007.

4            MR. STEVENS:  And, Your Honor, perhaps I'm at a

5    point where --

6            THE COURT:  Okay, good.  Ladies and gentlemen, we

7    will be in recess until 1:30.

8            Remember the admonition given to you:  Don't

9    discuss the case; allow anyone to discuss it with you;

10   form or express any opinion.

11                    **(Jury out at 12:15 p.m/luncheon recess**

12                    **taken at 12:16 p.m.)**

13                    **(The following proceedings were held**

14                    **outside the presence of the jury with**

15                    **both defendants present at 1:33 p.m.)**

16           THE COURT:  About how long is this scintillating

17   testimony?  I get the sense that this case is being tried

18   in realtime; is that right?

19                    **(Laughter.)**

20           THE COURT:  I mean, look, I got it.  You got to

21   prove your case, and you got to -- that's just how we got

22   to here, and this is how we got to there, and this is how

23   we got to there.

24           Okay.  I just needed to say it.

25           MR. STEVENS:  I can offer some encouragement,

**Chin — Direct / Stevens**

```
 1    Your Honor, in that the parties -- I don't know that we

 2    have the exact language now, but Mr. Swanson and

 3    Mr. Chazin and the Government have entered into

 4    stipulation with respect to some of the foreign bank

 5    records that have allowed this testimony to proceed faster

 6    than it otherwise would have.

 7              THE COURT:  Good.

 8              MR. SWANSON:  Doing what we can.

 9              THE COURT:  Sorry?

10              MR. SWANSON:  We're doing what we can from this

11    table.

12              THE COURT:  Okay.

13              When this is over today, I do want to discuss --

14    before tomorrow, I want to discuss where we are on the

15    Dr. V question.  I've reviewed the United States

16    Attorney's declaration, and I have some thoughts.

17                     (Jury in at 1:34 p.m.)

18              THE COURT:  Please be seated.

19              Let the record reflect you -- that all parties

20    are present, the jurors are present.

21              You may continue.

22              MR. STEVENS:  Thank you, Your Honor.

23    BY MR. STEVENS:

24    Q.  Special Agent Chin, in your Exhibit 40G, the slides,

25    the analysis as reflected there begins in 2005; is that
```

Chin — Direct / Stevens

1    correct?

2    **A.**  Yes.

3    **Q.**  And aside from that exhibit, did you conduct tracing

4    analysis that dated prior to 2005?

5    **A.**  Yes.

6    **Q.**  And were you able to trace money to accounts

7    associated with Mr. Arnold as of 2003?

8    **A.**  Yes.

9    **Q.**  And is there a reason why this Exhibit 40G starts in

10   2005?

11   **A.**  The reason why this starts in 2005 is because this is

12   the time that we identified that Mike Arnold was receiving

13   proceeds from Pitcairn.

14   **Q.**  And prior to that?

15   **A.**  Prior to that, Mr. Arnold was receiving commission

16   payments for affiliate marketing for various online

17   pharmacies.

18   **Q.**  Now, also on the chart, Exhibit 40G, you had indicated

19   that one of the slides in there was for a category you

20   define as "Backend software."

21   **A.**  Yes.

22        **MR. STEVENS:**  And could we put 40G up, please?

23   **BY MR. STEVENS:**

24   **Q.**  And with respect to back end software, that amount of

25   money and the time frame, to whom was that money

**Chin – Direct / Stevens**

1    transferred specifically based on your analysis of the

2    records?

3    **A.**  Went to a corporation called Blue Shield Consultants.

4    **Q.**  And did you investigate who the -- who controlled or

5    owned Blue Shield Consultants?

6    **A.**  The owner of that company was identified as Martin

7    Toha.

8              **THE COURT:**  Spell that.

9              **THE WITNESS:**  T-o-h-a.

10             **MR. STEVENS:**  I would like to now place on the

11   screen, if we could, two documents that have already been

12   admitted into evidence, which is 355 and 509, side by

13   side.

14   **BY MR. STEVENS:**

15   **Q.**  Starting with 355, are you able to see on 355 a phone

16   number beginning with area code 561?

17   **A.**  I'm still looking for it.

18   **Q.**  I'm sorry, 355.

19            You can look at the screen, on the left-hand side

20    is 355?

21   **A.**  There is nothing on my screen.

22             **THE COURT:**  Nothing on your screen?

23             **THE WITNESS:**  No, sir.

24            Yes, the telephone number that is on the left

25    side of the screen is (561)702-0556.

Chin – Direct / Stevens

1    BY MR. STEVENS:

2    Q.  And Exhibit 509 is on the right-hand side, which is

3    entered into evidence as a document from Budget Drugs, do

4    you see that same phone number there?

5    A.  Yes, I do.

6    Q.  Now, moving back to Exhibit 40G, the slides.

7            And you concluded your testimony before the lunch

8     break with the Assure Technology account, correct?

9    A.  Correct.

10   Q.  Now, did you also analyze some of the methods or the

11   manner in which funds from the Direct Connect/Banco

12   Continental account were expended?

13   A.  Yes, I did.

14           MR. STEVENS:   And could we have the next page of

15   Exhibit 40G, please?

16   BY MR. STEVENS:

17   Q.  Does this page of 40G represent expenditures that you

18   analyzed out of the Direct Connect/Banco Continental

19   account?

20   A.  Yes, it does.

21   Q.  And starting from the top, can you just briefly run

22   through what those are?

23   A.  Sure.  The top box indicates approximately $203,000

24   payments to Ferrari Beverly Hills, and that was for the

25   purchase of a Ferrari.  The date on that is February 2006

Chin – Direct / Stevens

1    through March 2006.

2           The next box is -- represents an account held in

3    the name of VSecure Networking, which is in Scottrade,

4    which is a U.S.-based account.  The proceeds from Direct

5    Connect total approximately 2.4 million, and the time

6    frame on that is June 2005 through August 2006.

7           The next box represents transfers from Direct

8    Connect to Les Bijoux/Brilliance Fine J & W, and that

9    amount was approximately $1 million or $1.1 million,

10   rather.  The time frame for that was May 2006 through

11   August 2006, and that was identified as a jewelry store

12   located in Boca Raton, Florida.

13          The next box indicates transfers made to Pitcairn

14   Investments, Incorporated, at a bank account at Credicorp

15   Bank in Panama.  That was in August 2006, it was

16   approximately $886,000.

17          The next box represents transfers made to a

18   corporation in the name of Haven Technologies,

19   Incorporated, which had its account at Credicorp Bank in

20   Panama.  The date of transfer was August 2006, and the

21   amount is $498,000.

22          The next box represents transfers -- a transfer

23   approximately in the amount of $45,000 in November 2005

24   to Bill Ussery Motors.

25   Q.  Let me stop you there.

**Chin – Direct / Stevens**

1              Turning your attention now to a folder that has

2      been marked Exhibit 236.  This is a document that has

3      been admitted pursuant to a stipulation.

4              Do you recognize the contents of that document?

5      *A.*  Yes, I do.

6      *Q.*  And what is it?

7      *A.*  It is purchase paperwork for a Mercedes-Benz from Bill

8      Ussery Motors.

9      *Q.*  And what is the address listed there under the name

10     Michael J. Arnold?

11     *A.*  33 Harbor Bay Plaza, Number 486, in Nassau.

12     *Q.*  Now, turning back to 40G on this page of your -- that

13     you were going through the expenditures with Direct

14     Connect, the final two are to a law firm and you have a

15     large number for "unknown," correct?

16     *A.*  Correct.

17     *Q.*  And when you say "unknown," why is that indicated as

18     "unknown"?

19     *A.*  It's indicated as "unknown" because the disposition of

20     those funds, I was unable to trace.

21     *Q.*  Did you attempt to trace proceeds from the Internet

22     pharmacy to the purchase of a residence?

23     *A.*  Yes, I did.

24          *MR. STEVENS:*  And could we turn to the next page

25     of 40G, please?

**Chin – Direct / Stevens**

 1   *BY MR. STEVENS:*

 2   *Q.*  Were you able to ascertain whether Mr. Arnold

 3   purchased a residence in Boca Raton, Florida?

 4   *A.*  Yes.

 5   *Q.*  And does this page of 40G represent a summary of your

 6   analysis in that regard?

 7   *A.*  Yes, it does.

 8   *Q.*  And the row on the top, what does those reflect?

 9   *A.*  Those reflect three separate accounts that transferred

10   money into a VSecure Networking account and a Michael

11   Arnold Scottrade account.

12   *Q.*  And you are referring to VSecure Networking and

13   Michael Arnold Scottrade, are those domestic accounts?

14   *A.*  Yes, they are.

15   *Q.*  And then once funds were transferred into the VSecure

16   Networking, Michael Arnold Scottrade account, how much of

17   that money was transferred into the subsequent account in

18   the light green box?

19   *A.*  Approximately $3.4 million.

20   *Q.*  And then there is another box below that that is

21   entitled "Les Bijoux."  What was that transfer?

22   *A.*  Those were transfers from Les Bijoux, the jewelry

23   store, amounting to $1,120,000 to VSecure to a Michael

24   Arnold Mercantile Bank account.

25   *Q.*  Were those transfers from Les Bijoux made all at once?

**Chin – Direct / Stevens**

1   *A.*  No, they were not.

2   *Q.*  Do you have with you a folder entitled "40E"?

3          *MR. STEVENS:*  Excuse me, Your Honor.

4          *THE WITNESS:*  Yes.

5   *BY MR. STEVENS:*

6   *Q.*  Do you recognize the document labeled 40 -- actually

7   40E.1?

8   *A.*  Yes, I do.

9   *Q.*  And what is it?

10  *A.*  It's a chart showing funds transferred from Direct

11  Connect International and Haven Technologies to Les

12  Bijoux, and ultimately funds transferred from Les Bijoux

13  to Michael Arnold.

14  *Q.*  And is this one of the -- a chart prepared by another

15  investigator as part of the investigation into the fund

16  tracing?

17  *A.*  Yes.

18  *Q.*  And is it based on a bank analysis?

19  *A.*  Yes.

20         *MR. STEVENS:*  Request that 40E.1 be admitted?

21         *THE COURT:*  Admitted.

22                 **(Plaintiff's Exhibit 40E.1 was received**

23                 **in evidence.)**

24  *BY MR. STEVENS:*

25  *Q.*  And based upon this exhibit, how much money was

**Chin – Direct / Stevens**

1    transferred into the Les Bijoux/Brilliance Fine J & W from

2    Direct Connect and Haven Technologies?

3    **A.**   It was approximately 2.3 million.

4    **Q.**   And then from there, where did the money go, and

5    without getting into step by step?

6    **A.**   The money went from Les Bijoux to Michael Arnold's --

7    to Michael Arnold accounts and Mercantile Bank.

8    **Q.**   And approximately how many payments, again without

9    counting payment by payment, but on the top box, how many

10   are there?

11   **A.**   There is approximately 15.

12   **Q.**   And that's from November '06 through May '07?

13   **A.**   Yes.

14   **Q.**   Now, turning back to Exhibit 40G.  And the next page.

15           And based upon the green box, how much money was

16    sent from the VSecure Networking/Michael

17    Arnold/Mercantile domestic accounts towards the purchase

18    of the house at Spanish Trail in Boca Raton?

19   **A.**   Approximately 3.9 million.

20   **Q.**   And do you know where the remaining -- how much was

21   the total house price?

22   **A.**   It was approximately 9 million.

23   **Q.**   And do you know the source of the remaining funds?

24   **A.**   Yes.

25   **Q.**   What was that?

Chin – Direct / Stevens

1    **A.**   It was in the form of a mortgage from Century Bank.

2    **Q.**   And have you reviewed the mortgage application

3    materials?

4    **A.**   Yes, I have.

5    **Q.**   And directing your attention now to a document that

6    has been admitted by stipulation, 243C.

7              **MR. STEVENS:**   If we may have that?   Thank you.

8    **BY MR. STEVENS:**

9    **Q.**   And are the documents in 243C part of the mortgage

10    application documents that you obtained?

11    **A.**   Yes.

12    **Q.**   And directing your attention now to a page ending in

13    Bates Number 601893.

14              And would you –– first of all, to whom is this

15     letter addressed?

16    **A.**   The letter is addressed to Chin with Complete Mortgage

17    Financing, Incorporated.

18    **Q.**   And what is the name under the signature block of this

19    letter?

20    **A.**   Juan Montes.

21    **Q.**   And could you summarize or just read what the first

22    couple of sentences there on this letter are?

23    **A.**   "Please note that the wires sent in 2005 and 2006 to

24    the Scottrade Account Number 82801289 of VSecure

25    Networking, Inc., were in payment for technology

**Chin – Direct / Stevens**

1    consulting services and commission invoices."

2    *Q.* And the rest of it?

3    *A.* "The following invoices are outstanding and should be

4    paid via wire transfer by December 8th, 2006."

5    *Q.* And concluding?

6    *A.* "We have worked" –– well, it lists out three different

7    amounts starting with November 30, 2006, for 670,000;

8    December 5th, 2006, for 350,000; December 8th, 2006, for

9    190,000.

10          And then it goes to say, "We have worked with

11    VSecure Networking since January 26, 2005, and are

12    extremely happy with the professional services provided."

13   *Q.* Now, up to the first sentence, have you analyzed the

14   VSecure/Scottrade account to determine whether indeed

15   there were wire transfers from 2005 and 2006 from Direct

16   Connect International into that account?

17   *A.* Yes.

18   *Q.* And according to your investigation of the Banco ––

19   Direct Connect/Banco Continental account, who was the

20   sole –– who had sole signatory authority over that Banco

21   Continental/Direct Connect International account?

22   *A.* Michael Arnold.

23   *Q.* And based upon those bank records, who is the only

24   person who could have, therefore, authorized the transfer

25   from that account into the V trade –– VSecure/Scottrade

**Chin – Direct / Stevens**

1    account?

2    *A.*  Michael Arnold.

3    *Q.*  Now, with respect to the second line regarding

4    "invoices are outstanding and should be paid by wire

5    transfer by December 8, 2006," did you analyze the Direct

6    Connect International/Banco Continental account to

7    determine whether indeed wire transfers of that amount

8    were made from Direct Connect to the Scottrade account?

9    *A.*  Yes.

10   *Q.*  And what did you find?

11   *A.*  I could not locate any of -- any wire transfers in

12   these amounts because the Direct Connect International

13   account was closed in August 2006.

14   *Q.*  Looking at it from the other direction, did you

15   analyze the Scottrade account to determine whether in the

16   time frame, November and December 2006, there were wire

17   transfers from some other source amounting to

18   approximately 1.2 million indicated in this letter?

19   *A.*  Yes, I did.

20   *Q.*  And from what account did you see transfers of that

21   nature?

22   *A.*  I did not see any transfers in these amounts into the

23   Scottrade account.

24   *Q.*  Did you analyze the Les Bijoux transfers into this

25   Scottrade account?

**Chin – Direct / Stevens**

1    *A.*  Yes, I did.

2    *Q.*  And what was the approximate amount of those transfers

3    relative to this number here in this letter in Exhibit --

4    *A.*  It was approximately 1.1 million.

5    *Q.*  And was the time frame of those transfers roughly the

6    same as indicated in this letter?

7    *A.*  Yes.

8    *Q.*  And I want to direct your attention now to a document

9    that's already been admitted into evidence.

10         *MR. STEVENS:*  If we could have this on the screen

11   in split screen format?  It's Exhibit 206.

12   *BY MR. STEVENS:*

13   *Q.*  Which was a document admitted in connection with the

14   testimony of someone you've mentioned earlier, the website

15   designer, who was that person?

16   *A.*  Ebon Weston-Savage.

17   *Q.*  Turning now to a document that's in a folder before

18   you labeled Exhibit 43.

19         Do you see -- do you have that in front of you?

20   *A.*  Yes.

21   *Q.*  And is this a document -- a chart that you prepared

22   related to your financial tracing efforts?

23   *A.*  Yes.

24         *MR. STEVENS:*  We request that document --

25   Exhibit 43 be admitted into evidence.

Chin – Direct / Stevens

1    **THE COURT:** Admitted.

2                **(Plaintiff's Exhibit 43 was received in**

3                **evidence.)**

4         **MR. STEVENS:** May we have that on the screen,

5    please?

6    **BY MR. STEVENS:**

7    **Q.** What does the document -- the information in

8    Exhibit 43 reflect?

9    **A.** It reflects the total online pharmacy revenue that I

10   identified from Optimal Payments in Bank of Nevis

11   deposited into the Pitcairn operating accounts.  And also

12   the distribution of those -- of those online pharmacy

13   proceeds.

14   **Q.** What was the total online pharmacy revenue based on

15   your analysis?

16   **A.** It was approximately 70 million.

17   **Q.** And as far as on this pie chart, natural persons,

18   human being, who was the individual who received most of

19   these fund transfers from the proceeds?

20   **A.** Michael Arnold.

21   **Q.** And that was approximately how much?

22   **A.** 10.6 million.

23   **Q.** And who received the next most, according to your

24   analysis?

25   **A.** Seven -- I'm sorry, Diego Paes.

**Chin – Direct / Stevens**

1   *Q.*  And that was how much?

2   *A.*  Approximately 7.2 million.

3   *Q.*  And now there are two other entries beneath that.

4   Could you tell us what those are?  Ruaha and Gezbo?

5   *A.*  Yes, those were identified as affiliates.

6   *Q.*  And those are the website affiliates you testified

7   about earlier?

8   *A.*  Correct.

9   *Q.*  Have you made an attempt to review certain tax returns

10  submitted by Mr. Arnold to make a comparison between

11  income on those versus the proceed number that you have on

12  Exhibit 43 of roughly 10.6 million?

13  *A.*  Yes.

14  *Q.*  And then turn your attention now to documents that

15  have been admitted pursuant to stipulation, which are

16  Exhibits 330, –31, and –32.

17          And we can just use 330 for this purpose.

18          Do you have 330 in front you?

19  *A.*  Yes.

20  *Q.*  And what was the –– what was –– what did you calculate

21  when you were determining the income based on tax returns

22  for the years 2005, '6, and '7?

23  *A.*  I calculated a total income of approximately

24  6.5 million.

25  *Q.*  And further on Exhibit 330, did you find in this a

**Chin – Direct / Stevens**

1    provision in it that called for or that asked the question

2    about foreign accounts?

3              If we could turn to page 10 -- or Bates Number

4     101 of Exhibit 330.

5    **A.**  Yes.

6              **MR. STEVENS:**  It's Bates number ending in 101.

7    Next page.

8              If you could highlight the bottom, please.  Just

9    the very bottom box, please.  Thank you.

10   **BY MR. STEVENS:**

11   **Q.**  And would you read 7A, please.

12   **A.**  "At any time during 2005, did you have an interest in

13   or signature or other authority over a financial account

14   in a foreign country such a bank account, securities

15   account or other financial account?"

16   **Q.**  And what is the answer of that according to this

17   return?

18   **A.**  The answer is "No."

19   **Q.**  And did you make that same review for the tax returns

20   for 2006 in Exhibit 331 and tax returns for 2007 in

21   Exhibit 332?

22   **A.**  Yes.

23   **Q.**  And what was the answer in those two?

24   **A.**  The answer was "No."

25   **Q.**  Turning your attention now to -- well, the financial

**Chin – Direct / Stevens**

```
 1    analysis that you have described in Exhibit 40G, was that
 2    the totality of all the analysis that you conducted?
 3    A.  No.
 4    Q.  And I'd like to direct your attention to a chart.
 5         Do you know what is on the other side of that
 6     chart?
 7                    (Laughter.)
 8         THE WITNESS:  Yes.
 9  BY MR. STEVENS:
10    Q.  What is it?
11    A.  It's a flow chart showing the funds from Pitcairn.
12    Q.  And is that something that you prepared?
13    A.  Yes.
14         MR. STEVENS:  We would ask that Exhibit 40 be
15    admitted.
16         THE COURT:  Exhibit 40 admitted.
17              (Plaintiff's Exhibit 40 was received in
18              evidence.)
19         MR. STEVENS:  And now if you could turn that
20    over.
21         THE COURT:  Well --
22              (Laughter.)
23         THE COURT:  I don't think -- you know, we are
24    still in suspense; that is to say, I can't read it.
25         MR. STEVENS:  No, Your Honor, I --
```

1              **THE COURT:**  Do we have a smaller version of that?

2              **MR. STEVENS:**  We -- I think we do, but I don't

3        intend to -- I simply --

4   **BY MR. STEVENS:**

5        *Q.*  The point at this juncture, subject to redirect, is

6        that does the tracing on Exhibit 40 reflect the analysis

7        you've been discussing today?

8        *A.*  Yes.

9        *Q.*  And does it reflect additional analysis as well that

10       you have conducted?

11       *A.*  Yes, it does.

12       *Q.*  All relating to the tracing of proceeds from the

13       Internet pharmacy?

14       *A.*  Yes.

15       *Q.*  I'd like to turn your attention to a different topic

16       very briefly, a couple of different topics, and that is to

17       a folder that would be marked Exhibit 542.

18              Do you have 542 in front of you, and specifically

19        542D?

20       *A.*  Yes, I do.

21       *Q.*  And Special Agent Chin, did you -- well, it's not --

22              **MR. STEVENS:**  Oh, it is.  Okay.  I'm informed

23       that 542D is already in evidence.

24              **THE COURT:**  Are we talking about D, as in David?

25              **MR. STEVENS:**  D, as in David.

Chin – Direct / Stevens

1          **THE COURT:**  Okay.

2    **BY MR. STEVENS:**

3      **Q.**  Did you participate in or did you execute a search

4      warrant on a *Yahoo!* e-mail account in the name of David

5      John?

6      **A.**  I did, it was DavidJohnCPA@yahoo.com.

7      **Q.**  And Mr. John, based on your earlier testimony, what

8      was his role?

9      **A.**  He was the chief financial officer of United Care

10     Pharmacy as well as the recruiter who recruited Dr. Hassan

11     Gaafar.

12     **Q.**  Now, I'm directing your attention to 542D,

13     specifically.  From whom is this e-mail sent?

14     **A.**  It's sent from tech@pitcairngroup.com.

15     **Q.**  To Mr. John?

16     **A.**  To Mr. John and as well as some others.

17          **MR. STEVENS:**  And could you turn to the text of

18     the e-mail, please, on the screen.

19     **BY MR. STEVENS:**

20     **Q.**  And this refers to an attachment.  Did you review the

21     attachment behind Exhibit 42?

22     **A.**  Yes, I did.

23          **MR. STEVENS:**  And if we could just show the first

24     page of the attachment, please, the next page?

25

**Chin – Direct / Stevens**

1  *BY MR. STEVENS:*

2  *Q.*  And what is -- what information appears to be

3  reflected in the attachment to 542?

4  *A.*  Information concerning various drug orders originating

5  from Pitcairn Group.

6  *Q.*  And what is the -- as far as you could tell from

7  interpreting this e-mail, what is the purpose of sending

8  these drug orders to the David John e-mail?

9  *A.*  The purpose appears to be for reconciliation of the

10  total amount of funds due to United Care Pharmacy versus

11  amount of money that was wired to -- from Pitcairn to

12  United Care Pharmacy.

13  *Q.*  And turning back to the first page of 542D.

14       And could you read the second sentence on that,

15   please.

16  *A.*  "Can you please get David set up with a secure

17  Hushmail account.  We would be happy to reimburse any cost

18  for setup."

19  *Q.*  Directing your attention now to -- I think within the

20  same folder, is 542F in there?

21  *A.*  Yes.

22  *Q.*  And is this a similar e-mail where tech@pitcairn is

23  sending to Mr. John and others a report attaching drugs

24  and a reconciliation?

25  *A.*  Yes.

**Chin – Direct / Stevens**

1    *Q.*  And again, if we could look at the second sentence --

2    third sentence on that, and if you could read that,

3    please.

4    *A.*  "Could we please sign David up for secure encrypted

5    Hushmail account.  We would be happy to cover the expense

6    for a paid account and will include with our next wire."

7    *Q.*  And finally 542I.

8            And again, the question to you, is this a similar

9     e-mail sending a weekly report and reconciliation?

10   *A.*  Yes.

11   *Q.*  And as far as the addresses that are CC'ed in here on

12   the last two, was Mr. -- or was there an e-mail address at

13   least under the CC related to Sal Lamorte?

14   *A.*  Yes.

15   *Q.*  Turning now to a different subject, Exhibit 156 --

16   excuse me, Exhibit 130.

17            I believe that this document has also been

18    admitted into evidence.

19            What is Exhibit 130?

20   *A.*  It is the log of Skype chats.

21   *Q.*  And did you review this log for any particular

22   information?

23   *A.*  Yes, I did.

24   *Q.*  What was that?

25   *A.*  I searched the Skype chats for a phone number.

**Chin -- Direct / Stevens**

1    *Q.*  And on the page ending 39808, could you indicate what

2    phone number you found there?

3           Or just read the text of the chat entry.

4    *A.*  "Let me give you my cell number in case you ever need

5    to get me.  (910)309-9625."

6    *Q.*  And who is the sender of that chat message?

7    *A.*  It's Wonderful J.

8    *Q.*  To?

9    *A.*  Pitcairn_inv.

10   *Q.*  And that was in February '06?

11   *A.*  Yes.

12   *Q.*  Now, any of the bank records that you reviewed contain

13   a similar phone number?

14   *A.*  Yes.

15   *Q.*  And whose bank record was that?

16   *A.*  It was a New Century Bank account for Jeff Herholz.

17   *Q.*  And directing your attention to one -- Exhibit 156.

18   In the folder.

19          You see that?

20   *A.*  Yes.

21   *Q.*  Is that part of the bank records of New Century Bank

22   for Mr. Herholz that you received?

23   *A.*  Yes.

24          *THE COURT:*  156 admitted.

25   ///

1              (Plaintiff's Exhibit 156 was received in

2         evidence.)

3              MR. STEVENS:  Thank you.

4    BY MR. STEVENS:

5    Q.  And does the number that you just read from the Skype

6    chat appear on the second page of this exhibit?

7    A.  Yes, it does, next to the home phone number.

8              MR. STEVENS:  Can I have one moment, please,

9    Your Honor?  Thank you.

10             (Pause in the proceedings.)

11             MR. STEVENS:  Your Honor, I have nothing further.

12             THE COURT:  Okay.

13             Cross?

14                   CROSS-EXAMINATION

15   BY MR. SWANSON:

16   Q.  Good afternoon, Agent Chin.

17   A.  Good afternoon.

18   Q.  I want to start where you started with Exhibit 42.

19             MR. SWANSON:  Can you put that up on the screen?

20   BY MR. SWANSON:

21   Q.  I'll just put it up on the screen which might save you

22   looking through everything.  This was the chart that was

23   the money laundering chart, it's called.

24             And you described how the money flowed from a

25    customer through a bank, through Pitcairn into various

**Chin – Cross / Swanson**

1    entities, right?

2    **A.**  Correct.

3    **Q.**  To be clear, it's money laundering if the underlying

4    activity is illegal, right?

5    **A.**  Yes.

6    **Q.**  In other words, what this describes is how the money

7    flowed.  The question is whether the underlying activity

8    is illegal, correct?

9    **A.**  Correct.

10   **Q.**  All right.

11          **MR. SWANSON:**  Now, we can take that down.

12   **BY MR. SWANSON:**

13   **Q.**  Now, you went through a number of bank records with us

14   today, and you were pointing out -- if we go to Exhibit

15   355A, page 2.

16          You pointed out the description of the business

17    here as advertising and marketing, right?

18   **A.**  Correct.

19   **Q.**  Now, in some -- that's -- this is in connection with

20   Direct Connect International, right?

21   **A.**  Yes.

22   **Q.**  In connection with other accounts that were opened,

23   other information was provided about the underlying

24   business, correct?

25   **A.**  Yes.

**Chin – Cross / Swanson**

1    *Q.*  Okay.

2          For example, you testified that you traced funds

3    to a company called Optimal Payments, right?

4    *A.*  Traced funds from Optimal Payments.

5    *Q.*  Funds from Optimal Payments.  The -- the company is

6    connected to Michael Arnold.  Pitcairn had a relationship

7    with Optimal Payments, right?

8    *A.*  Takes.

9    *Q.*  Optimal Payments was the company that processed the

10   credit card payments for the online pharmacy, right?

11   *A.*  That's correct.

12   *Q.*  And you obtained documents from them in connection

13   with trying to trace all of the funds, right?

14   *A.*  Correct.

15        *MR. SWANSON:*  If we could put up Exhibit 336.

16   *BY MR. SWANSON:*

17   *Q.*  In opening up an account with Optimal Payments, you

18   found that -- that Pitcairn required certain information

19   from -- sorry, Optimal Payments required certain

20   information from Pitcairn, right?

21   *A.*  Correct.

22        *MR. SWANSON:*  If we can go to page 4.

23        It's too teeny for me to see where it says the

24   actual business.

25

**Chin – Cross / Swanson**

1    *BY MR. SWANSON:*

2    *Q.*  So it says here, "Please describe in as much detail as

3    possible the products and services being sold."  Said

4    "Online pharmacy," right?

5    *A.*  Correct.

6    *Q.*  Right there in the middle, correct?

7    *A.*  Correct.

8    *Q.*  They also submitted a more detailed description that

9    you recovered in connection with the documents you seized,

10   right?

11   *A.*  Yes.

12            *MR. SWANSON:*  If we can go to page 33 of this

13   exhibit.

14            And just blow up the text here.

15   *BY MR. SWANSON:*

16   *Q.*  This was a letter from Echo International to Barbara

17   Benelli, right?

18   *A.*  Yes.

19   *Q.*  And Barbara Benelli worked for Optimal Payments,

20   correct?

21   *A.*  Correct.

22   *Q.*  And this was regarding the procedure for assessing

23   online prescription requests, right?

24   *A.*  Yes.

25   *Q.*  This was a document that when you obtained the records

**Chin – Cross / Swanson**

1    from Optimal Payments about Pitcairn, was one of the

2    documents that they had in connection with opening the

3    account, right?

4    **A.**  Correct.

5    **Q.**  And it said, "We use an online pharmacy specific

6    back-end application called BackOffice, right?

7    **A.**  Yes.

8    **Q.**  Goes on to say in the second paragraph, "All patient

9    orders have their address confirmed via an address" --

10   sorry, before that, it says, "BackOffice has more than

11   four years of experience verifying patient information for

12   online pharmacy orders," right, in that first paragraph?

13   **A.**  Yes.

14   **Q.**  And then the second paragraph, it talks about address

15   verification, explains that the date of birth is required

16   and verified, that no customers under the age of 18 are

17   allowed to place online orders or the system will

18   automatically decline their order, right?

19   **A.**  Yes.

20   **Q.**  It says that weight, height and body mass index or BMI

21   measurements are required for diet prescriptions, right?

22   **A.**  Correct.

23   **Q.**  Went on to describe how the operation worked.  It

24   said, "Our patients' medical history is assessed via our

25   online medical questionnaire," right?

1    **A.**  Yes.

2    **Q.**  And the questionnaire is defined and reviewed by a

3    licensed physician, correct?

4    **A.**  Correct.

5    **Q.**  Went on to explain the physician can approve, decline

6    or place a patient medication request on hold for a more

7    detailed follow-up, right?

8    **A.**  Yes.

9    **Q.**  And then if a physical examination is required, the

10   patient is referred to the local primary care physician,

11   right?

12   **A.**  Yes.

13   **Q.**  And it goes on to say, "All orders are shipped with a

14   valid prescription."

15            So this was in the material that was provided by

16   Pitcairn to Optimal, right, in connection with opening an

17   account?

18   **A.**  Correct.

19   **Q.**  They also -- in connection with opening one of the

20   accounts that we have looked at here, I believe the Bank

21   of Nevis account --

22            **MR. SWANSON:**  If we can go to Exhibit 395?

23   **BY MR. SWANSON:**

24   **Q.**  This is one of the accounts if you see here, Diego

25   Paes is a beneficial owner, right?

**Chin – Cross / Swanson**

1    **A.**  Yes.

2    **Q.**  This is one of the accounts that you traced, right?

3    **A.**  One of the accounts that I analyzed, yes.

4    **Q.**  Beg your pardon?

5    **A.**  One of the accounts that I analyzed, yes.

6    **Q.**  One of the accounts that you analyzed, right.

7              And in connection with opening up that account,

8      there were documents that were obtained explaining the

9      business activities of Pitcairn, right?

10   **A.**  Yes.

11   **Q.**  All right.

12             I'm going to show you what has been marked as

13     Exhibit 802.

14             Do you recognize this document?

15   **A.**  Yes.

16   **Q.**  This is a document that was obtained in connection

17     with the document request directed to the Bank of Nevis,

18     right?

19   **A.**  Yes.

20             **MR. SWANSON:**  Your Honor, I would ask that 802 be

21     admitted.

22             **THE COURT:**  Admitted.

23                    **(Defendant's Exhibit 802 was received in**

24                    **evidence.)**

25   ///

**Chin – Cross / Swanson**

1   *BY MR. SWANSON:*

2   *Q.*  And in this it describes --

3            *MR. SWANSON:*  Can we put this up?  Just the first

4   paragraph there.

5   *BY MR. SWANSON:*

6   *Q.*  Says, "Please find enhanced details explaining our

7   business's activities and the relationships between our

8   companies.  The companies are separated based on their

9   primary business purposes."  Right?

10  *A.*  Yes.

11           *MR. SWANSON:*  So then let's blow up the next

12  section.

13  *BY MR. SWANSON:*

14  *Q.*  It describes Echo International as the parent and

15  hundred percent owner of Pitcairn Investments, right?

16  *A.*  Yes.

17  *Q.*  And it explained that this -- that it conducted credit

18  card processing for licensed online pharmacy websites,

19  right?

20  *A.*  Yes.

21  *Q.*  It also explained how the relationship worked with

22  Optimal Payments, that Optimal Payments is a public NASDAQ

23  company, and that they handle the credit card settlements,

24  right?

25  *A.*  Yes.

**Chin – Cross / Swanson**

1    *Q.*  It also said find a legal opinion for our business

2    model, correct?

3    *A.*  Yes.

4    *Q.*  And then it explained Pitcairn, a fully owned

5    subsidiary of Echo, right?

6    *A.*  Yes.

7    *Q.*  And then it goes on to explain the work that Pitcairn

8    did as a subsidiary of Echo handling various aspects of

9    the online pharmacy business, right?

10   *A.*  Correct.

11   *Q.*  And this again was something that was submitted to --

12   or, sorry, it was located in the files of the documents in

13   the Bank of Nevis account, right?

14   *A.*  Yes.

15   *Q.*  There was also a bank account that you talked about,

16   the RBTT Bank, do you recall that?

17   *A.*  Yes.

18   *Q.*  In Curaçao; is that correct?

19   *A.*  Correct.

20          *MR. SWANSON:*  If we could go to Exhibit 414, page

21   4.

22          And if you'll highlight the description of the

23   major business activity, nature of transactions?

24   *BY MR. SWANSON:*

25   *Q.*  It said, "Online billing services and order processing

**Chin – Cross / Swanson**

1    services for licensed online pharmacies," right?

2    **A.**   Yes.

3    **Q.**   So that was in the information disclosed to the RBTT

4    Bank that was for digital billing, right?

5    **A.**   Yes.

6    **Q.**   Okay.

7              Now, in addition, in seeking documents from --

8     from Liechtenstein, you obtained documents about the

9     Triton Foundation, correct?

10   **A.**   Correct.

11   **Q.**   T-r-i-t-o-n.

12   **A.**   Yes.

13   **Q.**   Right?

14             And this was a foundation that was being set up

15    by Mike Arnold, right?

16   **A.**   Yes.

17   **Q.**   In connection with asset management and investment,

18    right?

19   **A.**   Yes.

20   **Q.**   And you submitted an MLAT, an official document

21    request from the U.S. to the Liechtenstein authorities, to

22    get a copy of these documents, right?

23   **A.**   Correct.

24   **Q.**   And in those documents you found, before we get into

25    them, that they had -- that there was a contract for

**Chin — Cross / Swanson**

 1    Mr. Arnold's services with Echo International, right?

 2    *A.*  Yes.

 3    *Q.*  And also a description of an interaction where Michael

 4    Arnold was presenting information about the work he did,

 5    right?

 6    *A.*  Correct.

 7    *Q.*  Okay.

 8            *MR. SWANSON:*  This will be Exhibit 801.

 9            *THE COURT:*  801?

10            *MR. SWANSON:*  Yes.

11    *BY MR. SWANSON:*

12    *Q.*  And is this one of the documents that you obtained

13    through the MLAT submitted to the Liechtenstein

14    authorities?

15    *A.*  Yes.

16            *THE COURT:*  801 admitted.

17                    **(Defendant's Exhibit 801 was received in**

18                    **evidence.)**

19            *MR. SWANSON:*  Thank you.

20            Somebody put this up on the screen.

21    *BY MR. SWANSON:*

22    *Q.*  This is a Technology Support and Development Agreement

23    between Echo International and Mike Arnold, correct?

24    *A.*  Correct.

25    *Q.*  And this address that we see here, that's the same

**Chin – Cross / Swanson**

1    address that was in the PayPal accounts, right, next to

2    Mr. Arnold's name, right here (indicating)?  One of them

3    had the business address?

4    *A.*  I believe so.

5    *Q.*  Okay.

6         Now, this agreement describes the relationship

7    that Mr. Arnold will have to Echo International, correct?

8    *A.*  Yes.

9         MR. SWANSON:  And if we go to the next page?

10   *BY MR. SWANSON:*

11   *Q.*  Under compensation, 3.1, it explains that, "The

12   consultancy fee paid to the consultant for providing the

13   technology support and development service pursuant to

14   this agreement shall be equal to 15 percent of the net

15   revenue defined herein generated from the principal's

16   website."

17        MR. SWANSON:  Oh, I'm really sorry.

18        *THE COURT:*  Just take your time.  They took

19   plenty of time.

20        MR. SWANSON:  I'll try to take less.

21   *BY MR. SWANSON:*

22   *Q.*  "The consultancy fee paid to the consultant for

23   providing the technology support and development service

24   pursuant to this agreement shall be equal to 15 percent of

25   the net revenue defined herein generated from the

Chin – Cross / Swanson

1    principal's website," right?

2    **A.**   It says that.

3    **Q.**   Okay.

4           Now, there was also, as we said, a document

5    describing the information that Mr. Arnold had provided

6    to set up the Triton Foundation, correct?

7    **A.**   Yes.

8    **Q.**   Exhibit 803.  Do you recognize this document?

9    **A.**   Yes, I do.

10   **Q.**   Is this document one of the documents that you

11   obtained through the MLAT to the Liechtenstein

12   authorities?

13   **A.**   Yes, it is.

14           **THE COURT:**  803 admitted.

15                 **(Defendant's Exhibit 803 was received in**

16                 **evidence.)**

17           **MR. SWANSON:**  All right, if we could put that on

18   the screen?

19   **BY MR. SWANSON:**

20   **Q.**   So it explains in the beginning, just at the very top

21   here, that this was a meeting with Mr. Arnold regarding

22   the establishment of a Liechtenstein foundation, right?

23           **MR. STEVENS:**  Your Honor, I have an objection

24   based on hearsay.

25           **THE COURT:**  Well --

1          **MR. STEVENS:**  It's being offered for the truth.

2          **MR. SWANSON:**  It's being offered, Your Honor, to

3     show that Mr. Arnold was being -- was providing

4     information, detailed information about his work, not

5     necessarily the truth of the matter asserted, but to rebut

6     the assertion that all he was saying was he was a

7     technology consultant when he was opening these accounts.

8          **THE COURT:**  Well, okay, I mean, I think it comes

9     in for a limited purpose, and let me advise the jury of

10    it.

11         This is a document -- I don't know how many

12    pages -- six pages or so, that was apparently submitted by

13    Mr. Arnold to -- is it the Liechtenstein bank?

14         **MR. SWANSON:**  It's the Triton Foundation,

15    Your Honor, which was one of the entities in

16    Liechtenstein.

17         **THE COURT:**  Okay.

18         And a number of things are said in it.  It is not

19    being offered for the truth, which is what is said in here

20    is true.  What it's being offered for is simply that it

21    was said.  In other words, the defendant, as I understand

22    it, has -- is presenting this document to show what he

23    said to the bank or the foundation, or whatever it is, at

24    a given time.  So that's the limiting instruction, so it's

25    only to be considered by you for that purpose only and not

1    any other purpose.

2    **BY MR. SWANSON:**

3    **Q.**   And to be clear, this was a communication with an

4    asset management and investment advice firm, right?

5    **A.**   Yes.

6    **Q.**   The NSF, I think you talked about them on your direct

7    exam, correct?

8    **A.**   Correct.

9    **Q.**   Okay.  So if we go down to the second -- the

10   midsection under "Echo International."

11            So it explains that he had a contract, which we

12   just saw, entitling him to 15 percent of the net profit.

13   And then it said that Echo has several customers, the

14   company basically consists exclusively of pharmacies in

15   the U.S.  These pharmacies want to sell drugs via the

16   web, parens, online shop, closed parens.

17            Upon our questions, he confirmed that all of

18   these pharmacies are licensed and only sell drugs

19   accordingly.  Goes on to explain that he is setting up an

20   infrastructure to deal with this.

21            And then if we skip down a little further,

22   explains there are several pharmacies in the U.S. who

23   want to distribute drugs via the web.

24            And flip over, if you could, to the next page.

25            In the third paragraph down it explains that

 1    there is also a doctor network which apparently allows

 2    doctors to order and coordinate the drugs for their

 3    patients.  They also have access to the Backend System.

 4         That is correct, right?  That's what was in that

 5    document that you found?

 6    **A.**  That's what this document says.

 7    **Q.**  Right.

 8         And this again was a document submitted to the

 9    investment and asset management firm that you obtained in

10    your requesting records, correct?

11    **A.**  Correct.

12    **Q.**  Okay.

13         Also, you got documents in connection with the

14    Credit Corps account for Pitcairn Investments, right?

15    **A.**  Yes.

16         **MR. SWANSON:**  If we could put up 361A, please?

17    **BY MR. SWANSON:**

18    **Q.**  And it says here this is regarding Pitcairn

19    Investments, the main business line or occupation of the

20    depositor online pharmacy order processing and marketing,

21    right?

22    **A.**  Yes.

23    **Q.**  Okay.

24         Now, in going through these records, some of

25    these are held in an individual's name, some of these

Chin – Cross / Swanson

```
1        accounts, right?

2   A.   Correct.

3   Q.   Some of them are held in a business's name, right?

4   A.   Some of the accounts, yes.

5   Q.   Some of the accounts, right.

6            And when there is a business name, there will be

7        a contact person so that you've got a human being that

8        you can deal with, right?

9   A.   Yes.

10  Q.   And you'll have a beneficial owner often, right?

11  A.   Yes.

12  Q.   The beneficial owner is the person who actually can

13       control the funds?

14  A.   Correct.

15  Q.   And even where it's actually under a company's name,

16       correct?

17  A.   Yes.

18  Q.   And that's standard practice for a company opening up

19       a bank account, right?

20  A.   Well, in this particular case, that is what happened.

21  Q.   Right.

22           But I mean when a company opens up a bank

23       account, they'll often have a contact person or a

24       beneficial owner or a human being whose name is also on

25       the account, right?
```

**Chin – Cross / Swanson**

```
 1    A.   There is.

 2    Q.   Now, you've identified a number of accounts that

 3    contain the names of Diego Paes and others with Mike

 4    Arnold, right?

 5    A.   Yes.

 6    Q.   So I want to just briefly review these.

 7              MR. SWANSON:   If we could go first to the

 8    Optimal Payments application, Exhibit 336, page 3?

 9    BY MR. SWANSON:

10    Q.   In this case, the ownership of a corporation

11    apparently is in Diego Paes's name, ownership 100 percent,

12    right?

13    A.   Yes.

14    Q.   All right.

15              And then if we go to Digital Billing, the Banque

16    Invik account, which is 341, page 4, I'm sorry.

17              This again is -- the representative here for

18    Digital Billing is Diego Paes, right?

19    A.   Yes.

20              MR. SWANSON:   If we can go to the Bank of Nevis,

21    395, page 1?

22    BY MR. SWANSON:

23    Q.   The beneficial owner of this account, Diego Paes,

24    right?

25    A.   Yes.
```

 1              **MR. SWANSON:**  If we go to the HSBC account, 365A,

 2       page 1.

 3   **BY MR. SWANSON:**

 4       **Q.**  And when we're looking at 365A, that means it's a

 5       translation, right?

 6       **A.**  Correct.

 7       **Q.**  The signature here, this has been transcribed that the

 8       signature on this account is Diego Paes, right?

 9       **A.**  Correct.

10       **Q.**  If we go to the Credit Corps, 361A, page 1, the point

11       of contact here is and the name of the signatory is Diego

12       Paes, right?

13       **A.**  Yes.

14       **Q.**  And if we go to the RBTT account, Exhibit 414, page 5,

15       the person identified here is the -- under the beneficial

16       owner declaration is Diego Paes, right?

17       **A.**  Right.

18       **Q.**  There were other accounts that had Mike Arnold's name

19       on them, right?

20       **A.**  Correct.

21              **MR. SWANSON:**  Let's go to the Neptune Capital

22       Management account that's Exhibit 379, page 5.

23   **BY MR. SWANSON**

24       **Q.**  This has Mike Arnold's name on it, right?

25       **A.**  Yes.

**Chin - Cross / Swanson**

1   *Q.*  And this again is that address that we were talking

2   about on Federal Highway that is in the PayPal accounts,

3   right?

4   *A.*  Correct.

5   *Q.*  If we go to the NSF Trust account, Exhibit 385A, page

6   4, same thing, Mike Arnold, same address, right?

7   *A.*  Yes.

8   *Q.*  As the beneficial owner of that account?

9   *A.*  Correct.

10  *Q.*  The Banco Continental account, 355A, at 2 -- actually

11  go down to point of contact as well.

12          So the primary contact is Mike Arnold, and the

13   address we see here that's -- that was his home address,

14   right --

15  *A.*  Correct.

16  *Q.*  -- the Northeast Mizner in Boca Raton.

17          Now, you testified about tracing the expenditures

18   of Pitcairn from 2005 through 2007, right?

19  *A.*  I testified to the flow of the funds from the Pitcairn

20  operating accounts.

21  *Q.*  I'm sorry.  You testified to what you found about the

22  flow of the funds out of the accounts, right?

23  *A.*  Correct.

24  *Q.*  And one of the things that you found in reviewing

25  these accounts was that in January of 2007, the funds

**Chin — Cross / Swanson**

1    stopped flowing out of the Pitcairn account, right?

2    *A.*  Right.

3    *Q.*  I mean, what we saw is that in 2007, after

4    January 2007, there were no more affiliate expenses,

5    right?

6    *A.*  Correct.

7    *Q.*  There were no more doctor recruiter expenses?

8    *A.*  Right.

9    *Q.*  No more doctor expenses?

10   *A.*  Right.

11   *Q.*  There were no more pharmacy recruiter expenses, right?

12   *A.*  Right.

13   *Q.*  There were no more payments for Pitcairn Backend

14   Software, right?

15   *A.*  Right.

16   *Q.*  And after January of -- January 11th of 2007, there

17   were no more shipping expenses, right?

18   *A.*  Right.

19   *Q.*  As of that date, neither you nor anyone from the DEA,

20   to your knowledge, had contacted Mike Arnold about these

21   activities, right?

22   *A.*  Correct.

23   *Q.*  And no one, to your knowledge, from the DEA, neither

24   you nor anyone else, had contacted anyone at Pitcairn

25   about these activities, correct?

**Chin – Cross / Chazin**

 1    *A.*   Correct.

 2    *Q.*   The first time that you or anyone from the DEA had any

 3    contact with Mike Arnold about these activities was in

 4    August of 2007?

 5    *A.*   Correct.

 6    *Q.*   And that is when you and Agent Bridgers came to

 7    Mr. Arnold's home, right?

 8    *A.*   I did not go to...

 9    *Q.*   Agent Bridgers did?

10    *A.*   Yes.

11    *Q.*   And that was in connection with serving a civil lis

12    pendens on his home?

13    *A.*   Yes.

14    *Q.*   And that was the first contact, to your knowledge,

15    that anyone from the DEA had with Mike Arnold about these

16    activities, right?

17    *A.*   Correct.

18            *MR. SWANSON:*   No further questions at this time,

19    Your Honor.

20            *THE COURT:*   Okay.

21                       CROSS-EXAMINATION

22    *BY MR. CHAZIN:*

23    *Q.*   Good afternoon, Agent Chin.

24    *A.*   Good afternoon.

25    *Q.*   In your investigation, with regard to Mr. Herholz, you

**Chin – Cross / Chazin**

1    never uncovered the fact that he in any way ever tried to

2    use an alias, correct?

3    **A.**  No.

4    **Q.**  And also, you never gathered any information that

5    Mr. Herholz and Mr. Arnold had ever spoken, correct?

6    **A.**  Well, there were the Skype chats, which shows

7    involvement between Mr. Herholz and representative of

8    Pitcairn.

9    **Q.**  Yeah, but with regards to Mr. Arnold?

10   **A.**  I am not aware.

11   **Q.**  Thank you.

12          Okay.  And you never located any offshore or

13    foreign accounts with regard to Mr. Herholz, did you?

14   **A.**  I did not.

15   **Q.**  He just had the two local accounts in Fayetteville,

16   right?

17   **A.**  He had multiple domestic accounts, yes.

18   **Q.**  All in Fayetteville?

19   **A.**  Yes.  In and around that area.

20   **Q.**  And with regards to the -- you had pointed out that

21   there had been this payment to Mr. Herholz's account,

22   one-point-some million, right?

23   **A.**  Yes.

24   **Q.**  Okay.

25          Now, Mr. Herholz also had certain costs in

**Chin – Cross / Chazin**

 1       running the business, correct?

 2    *A.*  That's correct.

 3    *Q.*  Okay.

 4            And including purchasing the pills, correct?

 5    *A.*  Yes.

 6    *Q.*  And, in fact, pharmaceuticals they add up, pretty

 7    expensive, right?

 8    *A.*  That is correct.

 9    *Q.*  Okay.

10            In fact, the cost of the pills was perhaps over a

11     million dollars?

12    *A.*  Yes.

13    *Q.*  Okay.

14            And maybe more than that, right?

15    *A.*  Yes.

16    *Q.*  Did you ever really fully determine exactly how much

17    he paid out in costs for pills?

18    *A.*  It was approximately 2 -- a little over $2 million.

19    *Q.*  Okay.

20            And he had other costs, I think you're agreeing,

21     right?

22    *A.*  Yes.

23    *Q.*  For instance, to pay for employees, labor costs?

24    *A.*  Correct.

25    *Q.*  Did you ever calculate exactly how much that was?

**Chin - Cross / Chazin**

1    *A.*  I did not calculate exactly how much that was.

2    *Q.*  Okay.

3         Did ever calculate approximately how much that

4    was?

5    *A.*  I did not calculate that particular expense.

6    *Q.*  Right.  Okay.

7         And with regards to -- he also had to pay

8    commissions to Mr. Russo and Mr. Lamorte, right?

9    *A.*  They were payments to Mr. Russo and Mr. Lamorte.

10   *Q.*  Right.

11        And he also had -- he repaid them also for

12   certain upfront costs, right?

13   *A.*  Like I said, there were payments to Russo and Lamorte.

14   *Q.*  And they were getting commissions as well?

15   *A.*  Exactly what constitutes the payments, I do not know,

16   I'm not aware of, but I did see payments going to those

17   individuals.

18   *Q.*  Right.

19        And you were aware, at least, that there was some

20   information that both Mr. Russo and Mr. Lamorte had

21   fronted him some money to help pay for expenses because

22   the overhead was really high?

23   *A.*  Yes, there appear to be payments like that.

24   *Q.*  Okay.

25        He also had other expenses like rent on the

**Chin – Cross / Chazin**

1   building?

2   *A.*   There were other expenses, yes.

3   *Q.*   Did you calculate exactly how much the rent was?

4   *A.*   No, I was not focused on calculating that specific

5   expense.

6   *Q.*   Right.

7          And also, for instance, like pill bottles, he had

8   to pay for those, right?

9   *A.*   Correct.

10  *Q.*   And you didn't calculate that either, right?

11  *A.*   It was analyzed as a transaction, but I did not

12  calculate that amount.

13  *Q.*   Okay.

14         And the same thing for insurance, he had

15  insurance that he had to pay for, right?

16  *A.*   I do not recall specific insurance transaction.

17  *Q.*   You didn't verify that either way?

18  *A.*   I didn't identify one for that.  I wasn't looking

19  specifically for that.

20  *Q.*   Sure.

21         And therefore, you don't really now how much he

22  may have paid in that, right?

23  *A.*   No, I do not.

24  *Q.*   All right.

25         And the same thing for office supplies and

**Chin — Redirect / Stevens**

```
 1        computers, right?

 2   A.   There were expenses -- various expenses for.

 3   Q.   Right.

 4             And as to office supplies and computers, you

 5        didn't calculate how much that may have cost him, right?

 6   A.   I did not.

 7   Q.   Okay.

 8             And with regards to legal fees that he incurred

 9        as a result of the business, you didn't calculate that

10        either, right?

11   A.   I did not.

12   Q.   And shipping costs as well, right?

13   A.   No.  But most of the shipping cost were paid for by

14        the online pharmacies.

15   Q.   Okay.

16             But there certainly may have been other shipping

17        costs as well, right?

18   A.   There is a possibility.

19   Q.   And you didn't calculate that?

20   A.   I didn't calculate that.

21             MR. CHAZIN:  Thank you.

22             MR. STEVENS:  May I, Your Honor?

23                    REDIRECT EXAMINATION

24   BY MR. STEVENS:

25   Q.   Special Agent Chin, Mr. Chazin asked you some
```

**Chin – Redirect / Stevens**

1    questions about whether certain expenses were calculated

2    in connection with the Kwic Fill and Mr. Herholz, correct?

3    **A.**   Correct.

4    **Q.**   And earlier in your direct testimony, you testified

5    about how much you had traced to him personally.  Do you

6    recall that?

7    **A.**   Yes.

8    **Q.**   And approximately how much was that?

9    **A.**   It was approximately one point -- a little over a

10   million dollars.

11   **Q.**   A million three?

12   **A.**   Yes, a million three.

13   **Q.**   And was that -- were there expenses paid out of that

14   money?

15   **A.**   No.

16   **Q.**   That was just straight to him?

17   **A.**   Correct.

18   **Q.**   And about how much time was the time period for those

19   transfers to him?

20   **A.**   It was approximately three months.

21   **Q.**   Now, Mr. Swanson asked you some questions about

22   Optimal Payments and the certain account documents.  Do

23   you recall those questions?

24   **A.**   Yes.

25   **Q.**   And where is Optimal Payments located?

**Chin — Redirect / Stevens**

1    *A.*   In Canada.

2    *Q.*   And the other processor for the Pitcairn pharmacies,

3    Digital Billing, where was that account located?

4    *A.*   In Luxembourg.

5    *Q.*   Were there any U.S.-based credit card processors who

6    processed money for Pitcairn?

7    *A.*   I did not identify any.

8    *Q.*   Do you know why that is?

9    *A.*   The reason why is because the credit card processors

10   domestically did not want to process for online

11   pharmacies.

12   *Q.*   Now, with respect to -- you also reviewed, during the

13   cross-examination, foreign bank records, account opening

14   documents, with Mr. Swanson.  Do you recall that?

15   *A.*   Yes.

16   *Q.*   And on certain of the entries, there were descriptions

17   of the online pharmacy business.

18   *A.*   Correct.

19   *Q.*   Have you been able -- were you able to review the

20   account opening documents for Mr. Arnold's

21   domestic-related accounts?

22   *A.*   Yes.

23   *Q.*   And do you remember, as you sit here, whether there

24   were business descriptions of what he did in those?

25   *A.*   I don't specifically recall.

**Chin — Redirect / Stevens**

1    *Q.*  Do you remember whether there was any reference in

2    there to his occupation as an Internet pharmacist or owner

3    or involved in an Internet pharmacy in some way?

4    *A.*  No, it would not have said that.

5    *Q.*  Mr. Swanson also covered with you some documents

6    indicating Mr. Diego Paes as being the beneficial owner of

7    several of the relevant accounts in your Exhibit 40G

8    analysis, correct?

9    *A.*  Correct.

10   *Q.*  And do you recall your Exhibit 43 when you made a

11   comparison between the amounts of proceeds recovered or

12   traceable to Mr. Arnold versus that of Mr. Paes?

13   *A.*  Yes.

14   *Q.*  And approximately how much more did Mr. Arnold receive

15   in proceeds than Mr. Paes?

16   *A.*  Approximately 3 million more.

17   *Q.*  Okay.

18          And you were also shown or introduced through

19    you, an exhibit, a Defense Exhibit 802.  Do you have

20    that?

21   *A.*  Yes, I have.

22   *Q.*  This is the technology support and development

23   agreement, correct?

24   *A.*  802, no.  801 is the technology support and

25   development agreement.

Chin – Redirect / Stevens

```
 1     Q.   Thank you.
 2          801.  Have you seen a document that is nearly
 3     identical to Exhibit 801 in connection with your
 4     investigation?
 5     A.   Yes, I have.
 6     Q.   Is that a technology agreement also between Echo
 7     International and some other person?
 8     A.   Yes.
 9     Q.   Who is the other person?
10     A.   Diego Paes.
11     Q.   So according to those documents, both Mr. Arnold and
12     Mr. Paes are technology consultants for Echo
13     International?
14     A.   That's what these contracts would say.
15     Q.   If they're to be believed, correct?
16     A.   Yes.
17          MR. STEVENS:  I have nothing further.
18          MR. SWANSON:  No further questions, Your Honor.
19          MR. CHAZIN:  No questions.
20          THE COURT:  Thank you very much.
21          MR. STEVENS:  Your Honor, I'm sorry --
22          THE COURT:  Not so fast.
23              (Laughter.)
24          THE COURT:  Have a seat.
25          MR. STEVENS:  Someone was being efficient behind
```

 1    my back and I didn't even notice, so my apologies.

 2          I would like to -- well --

 3  **BY MR. STEVENS:**

 4    *Q.*  I'm going to hand you now a document Bates labeled on

 5    the first page NAP00130982.  And it runs through 988.

 6          Do you recognize this document?

 7    *A.*  Yes, I do.

 8    *Q.*  And what is that?

 9    *A.*  It's a technology support and development agreement

10    between Pitcairn Investments and Diego Paes.

11    *Q.*  Was that recovered by you as part of your analysis in

12    the investigation?

13    *A.*  Yes.

14          *MR. STEVENS:*  We request that that be moved in

15    as...

16          *MS. AULT:*  586.

17          *MR. STEVENS:*  586.

18          *THE COURT:*  586 admitted.

19                **(Plaintiff's Exhibit was 586 received in**

20                **evidence.)**

21  **BY MR. STEVENS:**

22    *Q.*  And the testimony you just gave a minute or two ago

23    about the agreements that were substantially identical, is

24    the one, 586, I've just handed you what you were talking

25    about?

1    **A.**  Yes.

2              **MR. STEVENS:**  Thank you.  I have nothing further.

3              **MR. SWANSON:**  Just to be clear, if I could, Your

4    Honor.

5                      <u>**RECROSS-EXAMINATION**</u>

6    **BY MR. SWANSON**

7    **Q.**  Exhibit 586, that is a contract between Mr. Paes and

8    Pitcairn, right?

9    **A.**  That's correct.

10   **Q.**  Exhibit 801 is a contract between Echo and Mike

11   Arnold, right?

12   **A.**  Yes.

13             **MR. SWANSON:**  All right.  No further questions.

14             **THE COURT:**  Thank you.

15             Okay, ladies and gentlemen, we are going to take

16   our afternoon recess until 3:00 o'clock.

17             Remember the admonition given to you:  Don't

18   discuss the case; allow anyone to discuss it with you;

19   form or express any opinion.

20                    **(Jury out at 2:43 p.m.)**

21                    **(The following proceedings were held**

22                    **outside the presence of the jury with**

23                    **both defendants present at 3:01)**

24             **MS. AULT:**  So I just wanted to apprise the Court

25   of scheduling issues.

**Proceedings**

```
 1              THE COURT:  There are no issues.

 2                     (Laughter.)

 3         MS. AULT:  Okay.

 4         So this is our plan, if it is acceptable to the

 5   Court.

 6         We will not finish with Special Agent Bridgers

 7   today, so -- and we have a slew of civilian witnesses

 8   coming.

 9              THE COURT:  You can interrupt him at any time.

10         MS. AULT:  So that's what we would like to do is

11   interrupt him, put the others on, and then...

12              THE COURT:  No problem.

13         MR. SWANSON:  That's fine with us.  We just don't

14   want it to start now and end at the very end of their case

15   so that it sort of sits there unchallenged for days and

16   days.

17              THE COURT:  Oh, well, I don't know.  I'm not

18   going to do that.  I don't know.  I wouldn't -- it sounds

19   like this ought to be a Ninth Circuit rule that you don't

20   end with the case agent, right?  I mean, that's the worst

21   thing you could do is end with a special agent.  That is

22   reversible plain error.

23         MR. SWANSON:  I see the Court has been doing some

24   research.

25         No, Your Honor, we will address it if we need to.
```

```
 1        I don't think it's an issue.
 2              THE COURT:  What we'll do is give them a holiday.
 3                     (Jury in at 3:02 p.m.)
 4              THE COURT:  Okay, let the record reflect all
 5        jurors are present.  Please be seated.
 6              Yes, please.
 7              MS. AULT:  Thank you, Your Honor.
 8              The United States would like to welcome back to
 9        the stand Special Agent Brandon Bridgers.
10              THE COURT:  Okay.
11              MS. AULT:  Now, Special Agent Bridgers --
12              THE COURT:  Well, I would like to have him
13        re-sworn.
14              MS. AULT:  Yes.
15              THE COURT:  Only because he is now testifying as
16        a fact witness.
17              MS. AULT:  He is, Your Honor, and we would
18        appreciate an instruction.
19              THE COURT:  Right.
20                        BRANDON BRIDGERS,
21        called as a witness for the Government, having been duly
22        re-sworn, was examined and testified as follows:
23              THE CLERK:  Please state your full name, spell
24        your last name for the record.
25              THE WITNESS:  Brandon Bridgers, B-R-I-D-G-E-R-S.
```

1    **THE COURT:**  Ladies and gentlemen, as you no doubt

2    recall, Special Agent Bridgers testified earlier as an

3    expert giving his opinion with respect to the area of the

4    Internet, and I'm sure you recall that testimony.

5         Now, he is wearing a different hat, the hat of an

6    investigator in this particular case, and he is going to

7    testify, I would imagine on what he saw, what he found,

8    what he heard.  So in this case, in this aspect of it, he

9    is, quote, a "fact witness."

10        Nevertheless, as I will instruct you with respect

11   to both opinion evidence and fact evidence, that you are

12   to evaluate it according to the criteria that the Court

13   will give you with respect to witnesses according to a

14   standard that I'll set out for you in greater detail at

15   the close of the case.

16        Okay, you may proceed.

17    **MS. AULT:**  Thank you very much, Your Honor.

18                   <u>**DIRECT EXAMINATION**</u>

19   **BY MS. AULT:**

20   **Q.**  Special Agent Bridgers, you are part of the financial

21   investigative team, correct?

22   **A.**  Yes, ma'am, that is correct.

23   **Q.**  All right.

24        And how long have you been investigating Internet

25    pharmacies?

**Bridgers – Direct / Ault**

1    *A.* Since July or August of 2005.

2    *Q.* And as part of your investigation, did you participate

3    in a number of undercover purchases of drugs from various

4    websites?

5    *A.* Yes, ma'am, I did.

6    *Q.* In fact, did you participate in all of the undercover

7    purchases that were testified about at this trial?

8    *A.* Yes, ma'am, I participated in each one.

9    *Q.* All right.

10           And I just want to talk about one more, fill in a

11    little gap.

12           If you could look at -- handing you Exhibit 25A

13    and B.

14           Are those -- can you tell me what those are?

15    *A.* These are screen shots of prescriptiontrends.com,

16    which is a website.

17    *Q.* Are those screen shots of an undercover purchase that

18    you made?

19    *A.* Yes, ma'am, that is correct.

20           *MS. AULT:* Your Honor, we would like to move

21    Exhibits 25A and B into evidence.

22           *THE COURT:* Admitted.

23                **(Plaintiff's Exhibits 25A and 25B were**

24                **received in evidence.)**

25           *MS. AULT:* If we could have the first page of

**Bridgers – Direct / Ault**

```
 1    25A?

 2    BY MS. AULT:

 3    Q.   Now, when Mr. Sheppard, the private investigator from

 4    AOL, testified, is this the same website that he went to?

 5    A.   Yes, ma'am, that is correct.

 6    Q.   Okay.

 7              And what drug did you purchase from them?

 8    A.   I purchased phentermine, 37.5 milligrams.  I believe

 9    it was 90 pills.

10    Q.   Okay.

11              And when did you make this purchase,

12     approximately?

13    A.   I believe this was in January or...

14    Q.   Of what year?

15    A.   Of 2006.

16    Q.   Okay.

17              And did you generally follow the same process

18     that all of the other witnesses have testified about to

19     obtain the drugs?

20    A.   Yes, ma'am, I did.

21    Q.   Okay.

22              MS. AULT:   Can you go to page 3?

23    BY MS. AULT:

24    Q.   So you chose the drugs, filled out the form, gave your

25     credit card, all of that?
```

**Bridgers – Direct / Ault**

1    **A.**  Yes, ma'am, I did.

2    **Q.**  Okay.

3           And can you look at Exhibit 25B.

4           Can you tell me what that is?

5    **A.**  25B is an e-mail receipt pertaining to the purchase of

6    the phentermine that I just talked about in 25A.

7    **Q.**  Okay.

8           And according to this receipt, what's the name of

9     the website that you purchased the drug from?

10   **A.**  Chronopay and Myrx1.

11   **Q.**  Myrx1?  Okay.

12          Where would you have to go to get customer

13    service?  What's the e-mail for customer service?

14   **A.**  Support@chronopay.com.

15   **Q.**  Did you receive the drugs?

16   **A.**  Yes, ma'am, we did.

17   **Q.**  Have to see a doctor?

18   **A.**  No, ma'am, we did not.

19   **Q.**  Talk to a doctor?

20   **A.**  No, ma'am we did not.

21   **Q.**  I'm just going to go through various pieces of your

22    investigation.

23          As part of your investigation, did you obtain

24    shipping records from UPS, United Parcel Service?

25   **A.**  Yes, ma'am, I did.

**Bridgers – Direct / Ault**

1    *Q.*  Look at Exhibit 145 and tell me what that is.

2    *A.*  145 is pharmacies associated with shipments from

3    Pitcairn Group UPS account, account number --

4    *Q.*  Okay.

5             Before you go on, I want them to be able to see

6     it.

7             So generally, what is that document?

8    *A.*  It is a list of total packages shipped by pharmacies

9    associated with Pitcairn Group's UPS account.

10            *MS. AULT:*  Is it in?  Okay.

11            If you could blow up that package or that screen.

12   *BY MS. AULT:*

13   *Q.*  Okay.

14            Now can you please tell us what it is?

15   *A.*  This is a representation of pharmacies associated with

16   shipments from their pharmacies and associated with the

17   Pitcairn Group UPS account, account number.

18   *Q.*  Okay.

19   *A.*  Account number 05X00A.

20   *Q.*  Okay.

21            So does that mean the Pitcairn Group was paying

22    for all of these shipments?

23   *A.*  Yes, ma'am, that is correct.

24   *Q.*  All right.

25            So this gives the pharmacy name to the left and

**Bridgers – Direct / Ault**

1    then the total packages shipped is what's on the right?

2    **A.**  Yes, ma'am, that is correct.

3    **Q.**  And what are some of -- the names of some of the

4    pharmacies?

5    **A.**  Woodbury, Inc., W-O-O-D-B-U-R-Y, I-N-C; Alpha

6    Pharmacy; Mail M, which through my investigation I learned

7    was Mail Meds; United, LLC; Sane Solutions; Kwic Fill;

8    Metrogen; Coral Springs, Dawn Pharmacy.

9    **Q.**  Okay.

10          Now, is Budget Drugs on this list?

11   **A.**  No, ma'am, Budget is not on this list.

12   **Q.**  Okay.

13          But did Pitcairn use Budget Drugs to fill

14    pharmacy orders?

15   **A.**  Yes, ma'am, they did.

16   **Q.**  Why is Budget not on this list?

17   **A.**  Because Budget was earlier on, and Pitcairn also had a

18   FedEx account.

19   **Q.**  So Pitcairn used the FedEx account to ship with Budget

20   Drugs?

21   **A.**  Yes, ma'am, that is correct.

22   **Q.**  How many total packages were shipped from pharmacies

23   using Pitcairn's UPS account?

24   **A.**  678,675.

25   **Q.**  Did you make some other exhibits referencing

**Bridgers – Direct / Ault**

```
 1    Pitcairn's UPS data?

 2    A.  Yes, ma'am, I did.

 3    Q.  I'm going to show you Exhibit 39.

 4              If you could just generally describe what that

 5     is.

 6    A.  This is a representation of the orders shipped from

 7    Kwic Fill, as well as orders in the databases for Kwic

 8    Fill labeled as M1 and N2.

 9    Q.  Okay.

10              MS. AULT:  Your Honor, we'd like to move Exhibit

11    39 into evidence.

12              THE COURT:  Admitted.

13              MR. CHAZIN:  Your Honor, we would object based

14    upon our prior objection.  And assumes facts not in

15    evidence.

16              THE COURT:  Well, assumes facts not in evidence?

17    I don't know what facts it assumes.  It is a fact.

18  BY MS. AULT:

19    Q.  Is this simply a summary chart?

20    A.  Yes, ma'am, that is correct.

21    Q.  And compiled from which data sources?

22    A.  It's compiled from blue1.econsmile.com,

23    red2.econsmile.com, and UPS shipping records.

24              THE COURT:  They will come in subject to a motion

25     to strike.
```

Bridgers – Direct / Ault

1              **(Plaintiff's Exhibit 39 was received in**

2                  **evidence.)**

3              *MS. AULT:*  Okay.  Thank you.

4          If we could have the first page.

5          Now, if we could just blow up maybe that top,

6    yeah that will work.

7    **BY MS. AULT:**

8    *Q.*  So what data did you summarize here?  What orders --

9    is this simply certain selected orders and shipments?

10   *A.*  Yes, ma'am, it is.  It's shipments that was picked up

11   by UPS from February 2nd, 2006, until February 4th, 2006.

12   *Q.*  Okay.

13          So these are shipments that were picked up at

14    Kwic Fill before February 6, 2006?

15   *A.*  Yes, ma'am, that is correct.

16   *Q.*  And approximately how many orders did Kwic Fill ship

17   before February 6, 2006?

18   *A.*  Approximately 920.

19   *Q.*  Now, how do you know that those orders were actually

20   shipped from Kwic Fill?

21   *A.*  There is a field called "Sender" and that sender is

22   identified as Kwic Fill, Inc., 3535 Gillespie Street,

23   G-I-L-L-E-S-P-I-E, Fayetteville, North Carolina 28306.

24          And in addition, there is a field labeled

25    "S_Company" and that says "Kwic Fill, Inc."

**Bridgers – Direct / Ault**

```
 1    Q.   Okay.

 2              While she's getting that, let me just ask you:

 3      Did you review invoices that were found at Kwic Fill?

 4    A.   Yes, ma'am, I did.

 5              MS. AULT:  Actually, can I get 115 through...

 6              THE CLERK:  115 through?

 7              MS. AULT:  Through 119.

 8    BY MS. AULT:

 9    Q.   The invoices you reviewed, were they all invoices that

10      were taken from Kwic Fill?

11    A.   Yes, ma'am.  All the invoices that were taken from

12      Kwic Fill.

13    Q.   So those were in Exhibits 115 through 119.

14              Exhibit 120, could you tell me what that is?

15    A.   There is a summary of the exhibits we just -- that you

16      just showed me.

17              MS. AULT:  Your Honor, we would like to move

18      Exhibit 120 into evidence.

19              THE COURT:  I think it's been admitted, hasn't

20      it?

21              MS. AULT:  120?

22              MR. CHAZIN:  Same objection.

23              THE COURT:  Right.

24    BY MS. AULT:

25    Q.   Okay.
```

**Bridgers – Direct / Ault**

1                    Now, what information does this exhibit

2       summarize?

3       **A.**   This exhibit summarizes the purchases of

4       pharmaceuticals from several wholesalers, Allscripts,

5       Martek, Stat, and I believe Direct Dispensing.

6                    And FMC Distributors of Nevada, as well as the

7        total tablets that were shipped to Kwic Fill --

8       **Q.**   Okay.

9       **A.**   -- and their schedules.

10      **Q.**   Now, how long was Kwic Fill open?

11      **A.**   Kwic Fill was open for approximately two months.

12      **Q.**   Okay.

13                    Now, when we look over in the column that says

14      "Schedule" --

15                    **MS. AULT:**  Maybe we can flip over to the next

16      page?

17      **BY MS. AULT:**

18      **Q.**   There is a Roman numeral III, a Roman numeral IV, and

19      an NC.  What do those mean?

20      **A.**   Roman numeral III means it's a Schedule III controlled

21      substance.  Roman numeral IV means it's a Schedule IV.

22      And NC means it's noncontrolled.

23      **Q.**   Okay.

24                    **MS. AULT:**  Can we get -- go to the last page,

25      page 10?

Bridgers – Direct / Ault

1    *BY MS. AULT:*

2    *Q.*  So about how long was Kwic Fill open?

3    *A.*  Approximately two months.

4    *Q.*  All right.

5         So in that time, how many pills total did Kwic

6    Fill order for that two-month period?

7    *A.*  7,888,030.

8    *Q.*  And how many of those were controlled substances?

9    *A.*  7,618,400.

10   *Q.*  All right.

11        How many were Schedule III?

12   *A.*  429,000.

13   *Q.*  And how many were Schedule IV?

14   *A.*  7,109,400.

15   *Q.*  And how many were noncontrolled?

16   *A.*  269,630.

17   *Q.*  So what percentage of those substances that Kwic Fill

18   ordered were controlled substances?

19   *A.*  97 percent.

20   *Q.*  If you could look at Exhibit 124C.

21        If you could pull the whole thing out.

22   *A.*  Oh.

23   *Q.*  Okay.

24        So what is that stack of papers?

25   *A.*  These are the orders that were shipped from Kwic Fill.

**Bridgers – Direct / Ault**

1    *Q.*   Is it a summary of those orders?

2    *A.*   Yes, ma'am, that is correct.

3            *MS. AULT:*   Your Honor, we would like to move

4    Exhibit 124C into evidence.

5            *MR. CHAZIN:*   Same objection.

6            *THE COURT:*   124C admitted subject to a motion to

7    strike.

8                    **(Plaintiff's Exhibit 124C was received**

9                    **in evidence.)**

10           *MS. AULT:*   If we could just have the first -- the

11   second page.  And if we could blow up maybe the top

12   portion of it?

13   *BY MS. AULT:*

14   *Q.*   How did you create this exhibit?

15   *A.*   So the first four fields -- order, name, order date,

16   QTY-item, name -- were taken from the ACL printouts that

17   were found on Exhibit M1.

18           *MS. AULT:*   Could you put up 124B?

19   *BY MS. AULT:*

20   *Q.*   So these printouts is what you used?

21   *A.*   Yes, ma'am, that is correct.

22   *Q.*   Now, 124B just contains a sample of those; is that

23   right?

24   *A.*   Yes, ma'am, that is correct.

25   *Q.*   So you looked at actually all of them?

**Bridgers – Direct / Ault**

1    **A.**  Yes, ma'am, that is correct.

2           **MS. AULT:**  If we could go back to 124C page 2?

3    **BY MS. AULT:**

4    **Q.**  And then the next columns?

5    **A.**  So in order to get the order count, I had to break the

6    fields up into quantity, the type of drug, the tablet

7    count, the unit, and then that would calculate your total

8    tablets shipped, as well as the particular schedule that

9    the drug was in.

10   **Q.**  Okay.

11          All right.  And then -- and so that big stack up

12    there, that's all of the orders that were contained on

13    that computer at Kwic Fill N1; is that correct?

14   **A.**  Yes, ma'am, that is correct.

15   **Q.**  And are those all of the orders, period, or all of the

16   orders for a particular Internet pharmacy?

17   **A.**  That is all the orders for a particular Internet

18   pharmacy.  This is red -- I'm sorry, it was

19   blue1.econsmile.com, which was a website associated with

20   Pitcairn.

21   **Q.**  Okay.

22          **MS. AULT:**  Now, if we could go to the first page

23   of that exhibit?

24          If we could blow up --

25   ///

**Bridgers – Direct / Ault**

1  *BY MS. AULT:*

2  *Q.*  So the first page, what is this?

3  *A.*  This is a graphical representation of what I just

4  discussed.

5  *Q.*  Okay.

6        So how many total orders are contained in

7  Exhibit 124C?

8  *A.*  30,051.

9  *Q.*  And how many pills were contained in those 30,051

10  orders?

11  *A.*  2,695,910.

12  *Q.*  All right.

13        And of those orders, what percentage of those

14  orders were controlled substances?

15  *A.*  98 percent.

16  *Q.*  Now, if you could look at Exhibit 133C.

17        Can you tell me what that exhibit is?

18  *A.*  Yes, ma'am.  This is the exact same thing that we

19  talked about on N1, except for this is with N2.  So this

20  is a summary of the orders processed by Kwic Fill.

21  *Q.*  But just on the other computer?

22  *A.*  Yes, ma'am, that is correct.

23        *MS. AULT:*  We'd like to move 133C into evidence.

24        *THE COURT:*  Admitted.

25                    **(Plaintiff's Exhibit 133C was received**

Bridgers – Direct / Ault

```
 1                    in evidence.)

 2          MR. CHAZIN:  Same objection.

 3  BY MS. AULT:

 4    Q.  So does Exhibit 133C contain the same general data as

 5  124C?

 6    A.  Yes, ma'am, it does, except it's for

 7  red2.ecomsmile.com.

 8    Q.  Is that also a Pitcairn website?

 9    A.  Yes, ma'am, that is correct.

10    Q.  So these are the records of individual orders placed

11  by Pitcairn customers?

12    A.  Yes, ma'am, that is correct.

13    Q.  And that were filled by Kwic Fill, obviously?

14    A.  Yes, ma'am, that is correct.

15          MS. AULT:  If we could look at the first page?

16  BY MS. AULT:

17    Q.  So on this second computer with the second website,

18  how many orders did Kwic Fill fill in that two months that

19  it was open?

20    A.  7,706.

21    Q.  All right.

22          And how many tablets was that?  Or pills?

23    A.  616,680.

24    Q.  All right.

25          And what percentage of the orders were controlled
```

**Bridgers – Direct / Ault**

1    substances?

2  *A.*  98 percent.

3  *Q.*  Showing you Exhibit 14 –– oh, I guess I need to do

4    this first.

5        So if you could look at Exhibit 144 and tell me

6    what that is?

7  *A.*  This is a summary of orders shipped or not shipped

8    from Kwic Fill associated with –– different Internet

9    pharmacy other than Pitcairn.

10  *Q.*  Okay.

11        What was the name of the other Internet pharmacy?

12  *A.*  It was known as Affpower.

13  *Q.*  Okay.

14        So were Affpower and Pitcairn competitors?

15  *A.*  Yes, ma'am, that is correct.

16  *Q.*  But Kwic Fill filled orders for both of them?

17  *A.*  Yes, ma'am, that is correct.

18  *Q.*  And so what does Exhibit 144 show?

19  *A.*  It shows –– it breaks down the shipments by date, or

20    if it wasn't shipped, by date and the total orders.

21  *Q.*  Okay.

22        *MS. AULT:*  We'd like to move 144 into evidence.

23        *MR. CHAZIN:*  Same objection.

24        *THE COURT:*  Admitted.

25  ///

**Bridgers – Direct / Ault**

```
 1              (Plaintiff's Exhibit 144 was received in
 2              evidence.)
 3              MS. AULT:  This does not come from --
 4              THE COURT:  Where does 144 come from?
 5              MS. AULT:  144 is a business record.  There is a
 6    certification for it.
 7              THE COURT:  144 admitted.
 8    BY MS. AULT:
 9    Q.  All right.
10              So can you tell us what data you put in this
11     exhibit?
12    A.  Um, I put in the date that the -- the order was
13    shipped or not shipped, as well as the total orders
14    shipped or not shipped by day.
15    Q.  Okay.
16              And so what's the most orders that Kwic Fill
17     filled for Affpower in a single day?
18    A.  5,356.
19    Q.  And what day was that?
20    A.  It was March 29th, 2006.
21    Q.  Okay.
22              And that's just for the single Internet pharmacy
23     Affpower?
24    A.  Yes, ma'am, that is correct.
25    Q.  All right.
```

**Bridgers – Direct / Ault**

1          Was Kwic Fill also filling drug orders for other

2     Internet pharmacies on that day?

3   **A.**  Yes, ma'am, they were.

4   **Q.**  Okay.

5          Now, if you can go to the next page, what

6     information is displayed on that second page?

7   **A.**  It is exactly the same information that I just

8     discussed, except for another website that was associated

9     with Affpower.  And they were known as GRB Global.

10  **Q.**  Okay.

11         And so I think that unfortunately we cut off the

12    days.

13         But do you know which one of those is March 29th,

14    off the top of your head?

15  **A.**  I believe it's the second one, but I'm not 100 percent

16    sure.

17         **MR. CHAZIN:**  I would move to strike the document,

18    then, Your Honor.  It's not clear, the document is not

19    clear and he can't recall.

20         **MS. AULT:**  Do you have the old one?

21  **BY MS. AULT:**

22  **Q.**  In an effort to make it clear, if you could tell me if

23    what I'm just handing you now is the same thing but with

24    the dates actually in there?

25  **A.**  Yes, ma'am, that is correct.

**Bridgers – Direct / Ault**

1   *Q.*  All right.

2          And so could you tell me how many orders were

3   shipped for GRB Global on March 29th, 2006?

4   *A.*  1508.

5   *Q.*  Okay.

6          So just between Affpower and GRB Global, how many

7   orders did Kwic Fill ship on March 29th, 2006?

8   *A.*  You are going to make me add?

9                    **(Laughter.)**

10         **MS. AULT:**  I know you love to do that when you

11  are on the stand.

12         **MR. CHAZIN:**  Let the record reflect he is using a

13  calculator.

14         **THE COURT:**  So noted.

15                    **(Laughter.)**

16         **THE WITNESS:**  6,864.

17                    **(Laughter.)**

18  *BY MS. AULT:*

19  *Q.*  Okay.

20         Showing you Exhibit 223.  This is broken into

21   three parts, A through C.

22         **MS. AULT:**  If we could look at -- can you go to

23  the next page.  And can you blow up there?

24  *BY MS. AULT:*

25  *Q.*  So, Special Agent Bridgers, what is 223A?

**Bridgers – Direct / Ault**

1    **A.**  These are records received from Axis Point, the

2    telecom that was associated with telephone number

3    (800)242-5942.

4    **Q.**  Okay.

5           And who originally subscribed to this number in

6     January of 2005?

7    **A.**  Denzel Investments.

8    **Q.**  And --

9    **A.**  And the authorized signature was Diego Paes.

10   **Q.**  And did that subscriber name change?

11   **A.**  Yes, ma'am, it did.

12   **Q.**  So when did that subscriber name change?

13   **A.**  May 31st, 2005.

14   **Q.**  And what did it change to?

15   **A.**  Pitcairn Investment, Inc.

16   **Q.**  And who was the signatory on that?

17   **A.**  Juan Montes.

18   **Q.**  Okay.

19           And have you -- have you reviewed these records?

20   **A.**  Yes, ma'am, I have.

21   **Q.**  So can you tell me where did that number,

22   (800)242-5942, where did that ring?

23   **A.**  That was supposed to ring to a Illinois number,

24   (815)572-0929.

25   **Q.**  Okay.

**Bridgers – Direct / Ault**

1              So it didn't ring to Dr. Valdivieso's number in

2    Puerto Rico?

3    *A.*  No, ma'am, it did not.

4    *Q.*  And it didn't ring to Dr. Gafaar's number in New York?

5    *A.*  No, ma'am, it did not.

6    *Q.*  And it didn't ring to Kwic Fill?

7    *A.*  No, ma'am, it did not.

8    *Q.*  Or United Care Pharmacy?

9    *A.*  No, ma'am it, did not.

10           *MR. CHAZIN:*  Your Honor, I'm going to object to

11   that and move to strike.  It assumes facts not in evidence

12   how he would know that.

13           *THE COURT:*  Oh, okay.  Lay a foundation.

14   *BY MS. AULT:*

15   *Q.*  What was the phone number for Kwic Fill, was it -- was

16   this -- was the 815 number a number for Kwic Fill?

17   *A.*  No, ma'am.  The Kwic Fill would have had a 910 area

18   code because they were in North Carolina.

19   *Q.*  Okay.

20           And was that the phone number for Dr. Valdivieso?

21   *A.*  No, ma'am.  He would have had, I believe, a 787 number

22   for Puerto Rico.

23   *Q.*  And was that phone number for Dr. Gafaar?

24   *A.*  No, ma'am, it was not.

25   *Q.*  And was that the phone number for United Care?

**Bridgers – Direct / Ault**

```
 1    A.  No, ma'am, it was not.

 2    Q.  What it was?

 3    A.  It would have been a 910.  I don't know the exact

 4    number.

 5    Q.  Okay.

 6           I'm going to show you two exhibits --

 7           MR. CHAZIN:  Your Honor, I'm still --

 8           THE COURT:  Fine, it's called cross-examination.

 9    You cross-examine him, you ask him how he knows that

10    whatever the question is.  That's cross-examination.

11           MR. CHAZIN:  Understood.

12    BY MS. AULT:

13    Q.  Show you Exhibits 226 and 227.

14           What is Exhibit 226?

15    A.  This is an application for a mailbox for Michael J.

16    Arnold.

17    Q.  Okay.

18           And what does he list as his residence on this?

19    A.  102 Northeast Second Street, Number 112, Boca Raton,

20    Florida.

21    Q.  Okay.

22           MS. AULT:  And if we could flip to page 5?

23    BY MS. AULT:

24    Q.  And if you could tell me the address of the mailbox

25    that he's renting in here.
```

**Bridgers – Direct / Ault**

1   *A.*  He is renting 2234.

2   *Q.*  If you could hold on one second.

3          *MS. AULT:*  Yes, that's right.  If you could blow

4   up that section.

5   *BY MS. AULT:*

6   *Q.*  I'm sorry, Special Agent Bridgers, what address is he

7   renting?

8   *A.*  2234 North Federal Highway, No. 489, Boca Raton,

9   Florida.

10  *Q.*  Okay.

11         And Exhibit 227, what is that?

12         *MS. AULT:*  If you could blow up this part.

13         *THE WITNESS:*  This is another mailbox associated

14  with the UPS store.

15  *BY MS. AULT:*

16  *Q.*  Okay.

17         And on this application, what does he list as his

18   home address?

19  *A.*  2234 North Federal Highway, No. 489, Boca Raton,

20  Florida.

21  *Q.*  So that's the other mailbox that we saw?

22  *A.*  Yes, ma'am, that is correct.

23  *Q.*  And what's the address of this mailbox?

24         *MS. AULT:*  And I think that's page 4, maybe.

25

**Bridgers – Direct / Ault**

 1   *BY MS. AULT:*

 2    *Q.*  So the address to be used for delivery?

 3    *A.*  Is 102 Northeast Second Street, No. 404, Boca Raton,

 4   Florida 33432.

 5    *Q.*  Okay.

 6          And is that the address that he used as his

 7    residence address on the other mailbox application?

 8    *A.*  No, he used No. 112.

 9    *Q.*  Okay.

10          So a different mailbox at the same store?

11    *A.*  Yes, ma'am, that is correct.

12    *Q.*  All right.

13          *MS. AULT:*  Could we take a look at --

14   *BY MS. AULT:*

15    *Q.*  So we've heard testimony from several people who

16   bought drugs from Pitcairn that were delivered by Kwic

17   Fill.  Are you one of the agents who identified those

18   customers?

19    *A.*  Yes, ma'am, I was.

20    *Q.*  And how did you identify those people?

21    *A.*  They were randomly selected from Pitcairn's

22   Optimal Payments credit card report.

23    *Q.*  Okay.

24          So you just looked at credit cards records and

25    found some people who lived around here?

1    **A.**  Yes, ma'am.  We found customers that lived in the Bay

2    Area, and we attempted to interview them.

3    **Q.**  Okay.

4            I'm going to show you Exhibit 553.

5            **MS. AULT:**  Is that already in evidence?

6            **THE CLERK:**  Yes.

7            **MS. AULT:**  553 is in?

8            **THE COURT:**  It's in evidence.

9            **MS. AULT:**  All right.

10           If we could put up the first page of 553?

11   **BY MS. AULT:**

12   **Q.**  I believe by stipulation this is Internet history from

13   N39, which is Hassan Gafaar's computer?

14   **A.**  Yes, ma'am, that's correct.

15   **Q.**  All right.

16           And what do these entries show?

17   **A.**  These entries show the Internet history for

18   Dr. Gafaar's computer.

19   **Q.**  All right.

20           And what in particular does the Internet history

21    of Dr. Gafaar's computer show?  What's he doing?

22   **A.**  It shows log-ins to websites associated with Pitcairn

23   Group.

24   **Q.**  And which websites are those?

25   **A.**  Pitcairngroup.com, Echo Backend.  And it appears those

**Bridgers – Direct / Ault**

 1    are the only two.

 2    *Q.*  Looking at those records, what is the first day that

 3    Dr. Gafaar, at least according to these records, logged

 4    into one of these?

 5    *A.*  January 1st, 2006.

 6    *Q.*  And what is the last day that he logged in?

 7    *A.*  That would be appear to be February 1st, 2006.

 8    *Q.*  Where are you seeing February 2nd?

 9    *A.*  I'm sorry, I was reading the reverse.

10         January 30th, 2006.

11    *Q.*  Okay.

12         So you were reading something that said 02/01/06

13     as February 1st when, in fact, that's January 2nd?

14    *A.*  Yes, ma'am, that is correct.

15    *Q.*  All right.

16         And if you could look at Exhibit 66, which I do

17     not believe is in evidence, but I believe there is a

18     stipulation that states that Mr. O'Neill would testify it

19     was taken from Sal Lamorte's computer.

20         *MS. AULT:*  So we would like to move that into

21    evidence at this time.

22         *THE CLERK:*  It's in.

23         *MS. AULT:*  Oh, it is?  Okay.

24         Actually, can we do this part down here?

25    ///

**Bridgers – Direct / Ault**

1    *BY MS. AULT:*

2    *Q.*  So, Special Agent Bridgers, what does Exhibit 66 show?

3    *A.*  This is the Internet history associated with

4    Mr. Lamorte's laptop.

5    *Q.*  Okay.

6         And what does it reflect he was doing?

7    *A.*  It reflects that he was logging into a Hushmail

8    server.

9    *Q.*  Okay.

10   *A.*  As well as logging into beta.ecomsmile.com and

11   alpha.ecomsmile.com.

12       *MS. AULT:*  If we could go to page 4, please.  And

13   probably somewhere in the middle of the page.  I know this

14   is hard to read.

15       So can we blow up those?  All right.

16   *BY MS. AULT:*

17   *Q.*  So that beta and alpha.ecomesmile.com, what is that?

18   *A.*  Those are two Backend websites used or associated with

19   Pitcairn Group.

20   *Q.*  Okay.

21       *MS. AULT:*  Barbara, can I get 569, 570, all the

22   way I think to 572?

23       We need 573 and 574, too.

24   *BY MS. AULT:*

25   *Q.*  So you've testified about some summaries that you

**Bridgers – Direct / Ault**

1    created from UPS records and from the records of the

2    computers found at Kwic Fill Pharmacy?

3    **A.**  Yes, ma'am, that is correct.

4    **Q.**  Okay.

5           If you could look at Exhibit 569A, what is that?

6    **A.**  This is an order for Lawrence A. Bowman.

7    **Q.**  Is that a summary that you created from the

8    information found on the computers found at Kwic Fill?

9    **A.**  Yes, ma'am, that is correct.

10          **THE COURT:**  Admitted.

11                  **(Plaintiff's Exhibit 569A was received**

12                  **in evidence.)**

13          **MS. AULT:**  Can we display that?

14          Well, let's move on to -- will 569B come up?

15          Okay.  Let's move on to 569B really quickly and

16   then we'll go back.

17   **BY MS. AULT:**

18   **Q.**  What is 569B?

19   **A.**  This is a chart of Lawrence A. Bowman's credit card

20   transactions that was processed through Optimal Payments.

21   **Q.**  Okay.

22          And when you say they were "processed through

23    Optimal Payments," what do you mean?

24   **A.**  Optimal Payments charged the credit card of Lawrence

25   Bowman and the credit card or the merchant account for

**Bridgers – Direct / Ault**

1    Optimal Payments was Echo International or Pitcairn.

2    *Q.*  Okay.

3            And then 569C, what is that?

4    *A.*  569C represents the shipments associated with Lawrence

5    A. Bowman.

6    *Q.*  Okay.

7            And when you say "the shipments," what do you

8     mean by that?

9    *A.*  The shipments related to the Pitcairn Group UPS

10   account.

11   *Q.*  Okay.

12           Now, why are there more shipments than credit

13    card charges?

14   *A.*  There were more shipments because the way UPS tracks

15   this, each attempt for a delivery would be an entry into

16   their system, and so you would have to look to the

17   signature field to see if that package was actually signed

18   for to determine the date of the delivery.

19   *Q.*  Okay.

20           Now, when you created your summary of UPS

21    records, did you account for that?

22   *A.*  Yes, ma'am, I did.

23   *Q.*  Okay.

24           Now, if you could look at 570A.

25           Do you have that up there?  570?

**Bridgers – Direct / Ault**

1              All right, so what is 570A?

2    *A.*  This is the Echo International transaction log

3    obtained from Optimal Payments for Michael Struble's

4    order.

5    *Q.*  Okay.

6              Okay.  So, again, this is Optimal Payments

7     charging credit card processors Michael Struble's credit

8     card and the money is going to Echo International or

9     Pitcairn?

10   *A.*  Yes, this is Optimal charging Michael Struble's credit

11   card.

12   *Q.*  Okay.

13             If we could go to 572A, if you could take a look

14    at that.

15             What is 572A?

16   *A.*  This is Rita Sandell's order that was obtained from

17   the computer at Kwic Fill.

18   *Q.*  Okay.

19        *MS. AULT:*  Your Honor, we'd like to move 572A

20   into evidence.

21        *THE COURT:*  Admitted.

22                  **(Plaintiff's Exhibit 572A was received**

23                  **in evidence.)**

24   *BY MS. AULT:*

25    *Q.*  So, again, this is -- was obtained from the computers

**Bridgers – Direct / Ault**

1   found at Kwic Fill?

2   **A.** Yes, ma'am, that is correct.

3   **Q.** All right.  And 572B, what is that?

4        Is that not up there?  It's on the screen.

5   **A.** These are credit card charges for Rita Sandell through

6   Optimal Payments and associated with Pitcairn Group's

7   Merchant account.

8   **Q.** So, again, payments from Ms. Sandell through

9   Optimal Payments to Pitcairn?

10  **A.** Yes, ma'am, that is correct.

11  **Q.** Okay.  And 572C?

12        And what are these?

13  **A.** These are the UPS records associated with

14  Ms. Sandell's order, and I was able to verify that by

15  cross-referencing with the data from Kwic Fill.  If you

16  would look at this one here (Pointing), 552834, the order

17  ID is identical to the order ID that was located at Kwic

18  Fill.

19  **Q.** So the one we saw in 572A?

20  **A.** Yes, ma'am, that is correct.

21  **Q.** Okay.

22        And there is a number of pharmacies listed here,

23   why is that?

24  **A.** It appears that she ordered through Pitcairn Group and

25  one of the partner pharmacies filled that order.

**Bridgers – Direct / Ault**

1    *Q.*  So she got orders shipped from Sane Solutions,

2    Woodbury, Kwic Fill and something called CRJ Inc.?

3    *A.*  Yes, ma'am, that is correct.

4    *Q.*  But these were all made through Pitcairn?

5    *A.*  Yes, ma'am, it was Pitcairn Group's shipping account.

6    *Q.*  Okay.

7          And if we could look at -- if you could look at

8     573A.  And tell me what that is.

9    *A.*  These are orders that were located on Kwic Fill's

10   computer for Jon DeBorde that was processed through

11   Pitcairn Group.

12          *MS. AULT:*  We would like to move 573A into

13   evidence.

14          *THE COURT:*  Admitted.

15                **(Plaintiff's Exhibit 573A was received**

16                **in evidence.)**

17   *BY MS. AULT:*

18   *Q.*  So, again, this is data that was found on Kwic Fill's

19   computer?

20   *A.*  Yes, ma'am, that is correct, with the exception of the

21   items that I did, the last six columns.

22   *Q.*  But the first, the order name, order date and quantity

23   item?

24   *A.*  Yes, ma'am, that was located at Kwic Fill's computers.

25   *Q.*  All right.

**Bridgers – Direct / Ault**

1           And then 573B, what is that?

2    *A.*   These are the Optimal Payments credit card

3    transactions associated with Jon DeBorde for the Pitcairn

4    Group on the Optimal account.

5    *Q.*   So, again, money that goes from Mr. DeBorde through

6    Optimal Payments to Pitcairn?

7    *A.*   Yes, ma'am, that is correct.

8    *Q.*   Okay.

9           And 573C.

10   *A.*   These are the UPS shipping records for Pitcairn Group

11   for the shipments to Jon DeBorde.

12   *Q.*   And, again, he appears to get shipments from multiple

13   pharmacies; is that right?

14   *A.*   Yes, ma'am, that is correct.

15   *Q.*   Finally, if we could look at 574A.

16           If you could tell me what 574A is.

17   *A.*   These are credit card transactions from Joy Williams

18   through Optimal to Pitcairn Group.

19   *Q.*   Okay.  And 574B?

20   *A.*   This is a shipping record that is associated with an

21   order placed by Joy Williams associated with Pitcairn

22   Group's UPS shipping account.

23   *Q.*   Okay.

24           So, again, those were people that you just

25    randomly selected who lived in the Bay Area; is that

```
 1    right?

 2    A.  Yes, ma'am, that is correct.

 3    Q.  And you were able to find their records in three

 4    different places; for the most part, the Kwic Fill

 5    computers, the Echo International records and the UPS

 6    shipping records?

 7    A.  Yes, ma'am, that is correct.

 8         THE COURT:  Okay.  Ladies and gentlemen, we'll

 9    take our recess.  As you know, we don't have court Friday

10    and we don't have court Monday since it's a holiday, which

11    means that we will resume Tuesday at 9:30.

12         Now, I did tell you that I would have a better

13    idea where we are.  My sense is that the Government will

14    conclude its case next week.

15         MS. AULT:  We believe so, Your Honor.

16         THE COURT:  And so where do we go from there and

17    so forth is something that I don't know yet.  I'll

18    certainly tell you the moment I know, but we -- I know it

19    doesn't seem like we're moving all that quickly perhaps,

20    but we actually are.  We are getting through a lot of

21    information and witnesses.  And at any rate, I think next

22    week, I will be able to give you I know a much better idea

23    of where we are.

24         So, again, remember the admonition given to you:

25    Don't discuss the case; allow anyone to discuss it with
```

**Proceedings**

```
 1    you; form or express any opinion.
 2              Have a very nice weekend, and I will see you on
 3    Tuesday morning at 9:30.  Thank you so much.
 4                    (Jury out at 4:00 p.m.)
 5              THE COURT:  Okay, let the record reflect the
 6    jurors have left.
 7              So where are we on Dr. V?
 8              MR. STEVENS:  Your Honor, I –– as Your Honor may
 9    or may not have noticed, I've been absent from the
10    courtroom, and that's because ––
11              THE COURT:  I did notice.  I noticed.
12              MR. STEVENS:  Okay.  And so I've been working on
13    that, and as I also informed the Court earlier, the
14    defense has followed up on the preliminary information
15    that I gave them with a series of questions.
16              I'm now –– my next project, first thing, is to
17    respond to those questions, but based on consultation with
18    other folks in my office, I have determined that a
19    response should be in writing, and so we make it formal
20    and precise.  And I intend to submit that to them tomorrow
21    along with any other additional information that I have
22    obtained, and I believe –– I hope that based on that
23    submission, they can be in a position to determine what ––
24    or we all can be in a position to determine what to do
25    next.
```

**Proceedings**

```
 1              THE COURT:  Well, okay.

 2              When do you expect to have that submission?  I am

 3     just wondering whether we ought to get together tomorrow.

 4     That's the only question in my mind.

 5              MR. SWANSON:  I understand from Mr. Chazin, who

 6     lives in the East Bay with the bridge closure, that he

 7     would like anything --

 8              THE COURT:  Wait a minute, the bridge closes

 9     tomorrow at 5:00, doesn't it?

10              MR. CHAZIN:  No.

11              THE COURT:  Yes.

12              MR. CHAZIN:  First thing in the morning as far as

13     I know.

14              THE COURT:  No.  Wait a minute.  Time out.  We

15     get all these tsunami warnings -- she does, she warns us

16     about tsunamis.  I've gotten about 12 on the bridge.  Does

17     anybody actually know when the bridge closes?  I thought

18     it closes Friday -- okay, we are on the Internet.  We are

19     looking up in Wikipedia.

20              MS. AULT:  Your Honor, according to the Internet,

21     it's 8:00 p.m. on Friday.

22              THE COURT:  Yeah.  There you go.

23              MR. CHAZIN:  I thought it was 5:00 a.m.

24              THE COURT:  They wouldn't cut off a big commute

25     day, so -- I mean they would, but they're not.  Okay.  So
```

**Proceedings**

```
 1      that's not an issue.

 2              Here is -- here is -- let me just tell you -- I

 3      mean it's not like I haven't been up here researching the

 4      issue.

 5              There are a number of issues, and I -- of course,

 6      there is the issue as to what did the U.S. Attorney's

 7      Office for the Northern District know and not know, and I

 8      just think that that's an issue that won't be ultimately

 9      -- it may be easy to resolve it and it may be difficult to

10      resolve, and it may require hearings or not, I don't know.

11              But I know one thing is we are not stopping

12      everything dead in the tracks to have a trial within a

13      trial as to what did you know and when did you know it

14      based upon what I've seen.  Maybe something else will come

15      up that will be educative on that issue.

16              So the second question, let's assume that I can,

17      either by way of agreement or otherwise, appropriately

18      postpone that issue, which means, okay, what happens to

19      Dr. V's testimony?  What do we do about Dr. V?  And I

20      guess there are a couple of alternatives.  One is continue

21      with the direct and proceed with the cross.  One is strike

22      the direct.  Depending on what arguments are made.

23              Because if I'm going to strike the direct, I

24      should do so before he's expected to resume.

25              I mean -- complete the direct and then strike it,
```

**Proceedings**

1    and I don't think I'm going to know anything based upon

2    his further direct testimony that would -- that would

3    illuminate the issue any further on that.

4         But that's one set of remedies if they're

5    appropriate.  And I'm not advising anybody that I think

6    it's appropriate or inappropriate, okay?

7         A second -- and then another related issue is,

8    all right, absent striking the testimony, that would mean

9    the direct is complete, and -- completed and the cross --

10   the cross begins.

11        So the question is, under the cross, to what

12   extent, if any, can both the documents that have been

13   produced to date and/or questions addressed to those

14   documents or the subject matter of those documents, be --

15   be asked during the course of the cross-examination?

16        Now, Mr. Swanson is taking the position that they

17   are admissions under 801(D)(2) -- 1(a)(D)(2) --

18   801(a)(D)(2) -- (a)(D)(2) or (2)(d)(A) -- what is it?

19        *MS. AULT:*  801(d)(2)(A), Your Honor.

20        *THE COURT:*  (d)(2)(A).  Okay.

21        And while, of course, I'll listen to argument on

22   all of these things, I would start with the proposition

23   that it does strike me as being unusual for the statements

24   of a United States Attorney in one district, as a result

25   of an interview that attorney conducts, to in some manner

**Proceedings**

```
1    bind an Assistant U.S. Attorney in a different district.

2    And, therefore, come in as a party -- as a declaration or

3    admission of a party opponent.

4            It seems to me that that would be -- I don't -- I

5    don't see any cases on that.  Of course, I did read the

6    Dean Pregerson's case in San Diego -- maybe he's in LA --

7    in which the Government -- in which he indicated that it

8    is an admission of a party opponent in a different

9    context, and we can talk all about that.

10           I don't know whether there are other cases in the

11   circuit, I've looked, and I guess Mr. Swanson will give

12   you all the cases soon enough as he believes he has.  But

13   that's one of them.

14           Okay.  However, the fact that it may not go in as

15   an admission of a party opponent doesn't mean it's not

16   appropriate for cross-examination.  Of course, the

17   question is, how do you do it?  And it does strike me that

18   if the witness is seated there, and defense counsel comes

19   up and he says, Dr. V, you have had -- you were

20   interviewed by the Assistant United States Attorney for

21   the Eastern District in New York or the District of Puerto

22   Rico or the District of Maryland.  Yes.  And there you

23   recall that you were having a conversation with an

24   Assistant U.S. Attorney.  Yes.  And the subject matter

25   that you discussed with that attorney was your activities
```

**Proceedings**

1    in Puerto Rico in connection with issuing prescriptions.

2    Yes.

3           I assume the answers are "yes," but I have no

4    idea because I don't know that much about it.  I have some

5    idea, but I don't have a complete idea.

6           Isn't it a fact that you lied?  And he can say,

7    yes, no, or I don't know, whatever he is going to say.

8    But if in fact he denies it, he denies having lied, then

9    it appears to me that it might be appropriate to have the

10   Assistant U.S. Attorney from Maryland come out here and be

11   questioned.

12          In other words, I'm not so sure -- putting it

13   another way, taking the Government mantel off of it, which

14   I know Mr. Swanson doesn't want me to do, but I have a

15   real problem with that aspect of it, and I thought I would

16   alert everybody to it so they can see, because, by the

17   way, we are not just engaged in an academic exercise of

18   what does -- what are the Rules of Evidence; we are

19   actually engaged in a trial in which there are a number of

20   calculations that parties on both sides have to make in

21   connection with the presentation of their case.

22          And that's why I'm exploring this.

23          So it seems to me that one way of allowing this

24   evidence in would be the way that I am suggesting,

25   provided, provided that when a United States Attorney

**Proceedings**

1    comes out, and I think it's done outside the presence of

2    the jury initially, he or she says that it was the same

3    investigation or whatever it was.

4         You know, I mean they have to lay a foundation

5    for it, but once the foundation is laid, I would have a

6    hard time excluding that evidence.  I don't want to make

7    it sound like I'm fighting the exclusion of the evidence,

8    but it seems to me it's perfectly proper if you took all

9    of the -- you took it out of the context of this is the

10   Government, this is the defense and so forth, and said,

11   Look, in any case if a witness gives a prior inconsistent

12   statement on the same subject matter that he's now

13   testifying about, isn't it Hornbook law that comes in?

14        I mean how else do you impeach people?  I mean,

15   there are ways you could impeach people, but by the way,

16   it's one of the most powerful ways to impeach a person,

17   because it's -- because of a number of things, including

18   that it's an Assistant U.S. Attorney testifying about what

19   it is, who brings to the witness stand a certain amount of

20   credibility.  Which, of course, the jury can consider.

21        Now, it may be that the defense doesn't want to

22   do that.  I don't know.  But I wanted to lay out and I

23   wanted to say this today, because I think that you all are

24   trial lawyers, and it's a case involving serious matters,

25   an enormous amount of funds were expended on all sides, a

**Proceedings**

```
 1    great effort was gone to on all sides so far, and it is
 2    being treated, as this case has been treated by counsel,
 3    as a very serious matter.  And liberty is at stake, a lot
 4    of things are at stake.
 5           So I want you to -- I want you to think about how
 6    you move through these steps carefully.  At the same time
 7    I don't want to surprise anybody.  I think the terrible
 8    thing would be for either side to say, You know, I had no
 9    idea the judge was going to do this.
10           And by the way, by my saying what I am thinking
11    about doesn't mean that I would do any of those things.
12    You know, you could convince me as to the law says X or
13    the law says Y.  I mean, I have done a little bit of
14    research, but I haven't done anything compared to what I
15    would expect the parties to do.
16           Now, if it would be helpful to have -- it
17    probably wouldn't be helpful to have a meeting tomorrow,
18    because you are going to exchange documents and so forth
19    and so on, but I think that sometime next week, like
20    Tuesday, I think we have to make some choices.
21           And I also think the United States Attorney's
22    Office should notify the Assistant U.S. Attorneys in these
23    various districts that they may be called to testify.
24    They would be part of the defense case, but they would be
25    called to testify.
```

**Proceedings**

1          So, you know, and when that happens, I think you

2     have to let the Justice Department know and Eric Holder

3     know and the President or whoever -- and he's here now, by

4     the way.

5                    **(Laughter.)**

6          **THE COURT:**  You know, I mean, you have to go

7     through a lot of procedure, and that is why I'm having a

8     conversation today, because time moves on, the jury has

9     been here for three weeks.  I have a real responsibility

10    to the jury.  And I have a responsibility to the parties.

11    To have a rapid adjudication of the case.

12         So I just lay all that out.  I don't know --

13    maybe there are things that I haven't even thought about,

14    and I'm sure there are, I'm sure there are.  But I thought

15    it might be helpful at least if I just sort of put all

16    that out.

17         **MR. SWANSON:**  Well, we find it very helpful, and

18    I think we need to give it some thought, and we need to

19    complete our conversation with the U.S. Attorney's Office,

20    and then I think rather than meeting tomorrow, we'll put

21    our thoughts and research in writing and submit it to the

22    Court.

23         **THE COURT:**  That would be extremely useful.  I

24    appreciate that.  Thank you.  We are in recess.

25         **MS. AULT:**  Thank you, Your Honor.

Proceedings

1           **MR. SWANSON:**  Thank you, Your Honor.

2                   **(Proceedings adjourned at 4:14 p.m.)**

3

4

5                               ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **CERTIFICATE OF REPORTER**

3

4            I, Sahar Bartlett, Official Court Reporter for

5      the United States Court, Northern District of California,

6      hereby certify that the foregoing proceedings were

7      reported by me, a certified shorthand reporter, and were

8      thereafter transcribed under my direction into

9      typewriting; that the foregoing is a full, complete and

10     true record of said proceedings as bound by me at the time

11     of filing.  The validity of the reporter's certification

12     of said transcript may be void upon disassembly and/or

13     removal from the court file.

14

15

16                          **/s/ Sahar Bartlett**

17                **Sahar Bartlett, RPR, CSR No. 12963**

18                **Thursday, February 16, 2012**

19

20

21

22

23

24

25